**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | **Case No: 18-CV-7335** |
| | ) | |
| v. | ) | |
| | ) | |
| LOYOLA UNIVERSITY CHICAGO, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendant. | ) | |

<u>**AMENDED COMPLAINT**</u>

Plaintiff John Doe[1] ("John" or "Plaintiff"), by and through his undersigned attorneys, for

his Amended Complaint against Loyola University Chicago ("Loyola" or the "University")

alleges as follows:

**SUMMARY OF THE COMPLAINT**

1.      In response to the United States Department of Education's "Dear Colleague"

letter and 2014 Questions and Answers, Loyola adopted a gender-biased system for investigating

and adjudicating accusations of sexual misconduct made by female complainants against males.

Under Loyola's revamped policy, individuals accused of sexual misconduct who are

overwhelmingly male, and facing severe penalties such as expulsion from the University –

received less due process than if they had been accused of stealing a pack of gum from the

campus bookstore. As set forth herein, Loyola applied its biased policies to railroad John – who

---

[1]      Contemporaneously with the filing of this Complaint, Plaintiff has filed a Motion for Permission to Proceed Under Pseudonym.  As set forth in the Motion, Plaintiff is entitled to proceed anonymously because of the highly sensitive nature of the disciplinary proceedings against him that form the basis for his Complaint, and the fact that Loyola is fully aware of his identity and will not be prejudiced in any way.  Plaintiff also seeks to maintain the privacy rights of his accuser and other student-witnesses by requesting permission to identify them anonymously.

was an exemplary student with an unblemished record – out of the University. Loyola provided false information to John regarding how its investigation and hearing would be conducted, failed to provide adequate safeguards to protect John's rights, viewed all facts in the light least favorable to John, refused to consider exculpatory evidence, and applied two sets of rules for evaluating facts presented by his female accuser versus those presented by John.

2.      On November 4, 2016, a female student at Loyola (referred to herein pseudonymously as "Jane Roe" or "Jane") with whom John had a consensual relationship accused John of non-consensual sexual penetration in three separate encounters almost ten months after the last encounter occurred. On the first and third encounters, Jane performed oral sex on John. On the second encounter, Jane alleged that John forced Jane to touch his genital area with her hand.

3.      Also on November 4, 2016, another female student (referred to herein pseudonymously as "Elizabeth") filed a nearly identical complaint against John. John and Elizabeth had a consensual dating relationship that ended nearly two years before Elizabeth and Jane lodged their complaints. Loyola promised John that it would keep the two complaints separate to preserve his "rights as a student not to be subject to any inappropriate bias."

4.      A mere six weeks after Jane made her complaint, Loyola expelled John from the University after finding him responsible for non-consensual sexual penetration and sexual contact in the first and second encounters. The rush to reach a resolution was mandated by Loyola's gender biased policies for dealing with accusations of sexual misconduct set forth in its code of student conduct, titled *Community Standards 2016-2017* ("Community Standards"). In that rushed six-week period – conducted over Thanksgiving, Loyola's final exam period and concluding just before Christmas – Loyola employed the Community Standards in a

2

discriminatory manner toward John and in favor of his female accuser. For example, and as detailed herein:

- Both John and Jane suggested witnesses for the investigators to interview, but the investigators violated University policy by failing to interview the witnesses John suggested would have exculpatory information, but did interview witnesses suggested by Jane.

- The Deputy Title IX coordinator told John that he could not have an advisor at his interview with investigators, even though the Community Standards allowed him to have an advisor present.

- Loyola allowed investigators (and the Hearing Board) to learn that John had been accused of sexual misconduct by Elizabeth, but did nothing to investigate whether Jane and Elizabeth collaborated to make false accusations against John. Indeed, Jane and Elizabeth filed their complaints just moments apart from one another on the same date.

- Loyola prohibited John from taking the notes that he had made about the investigative report. Loyola required him to turn over his notes to a University official until the day of the hearing. Without his notes, Loyola deprived John of the opportunity to prepare adequately for his hearing.

5. The "hearing" regarding Jane's complaint and the Hearing Board's basis for finding John responsible similarly were injected with bias and demonstrated that Loyola applied one set of rules to females and another set of rules to the males accused of sexual misconduct. Loyola did not allow John to question Jane directly. While the Community Standards allowed John to suggest questions for the Hearing Board to ask, the Hearing Board refused to ask Jane a question suggested by John and, in fact, chastised John during the hearing for even suggesting that Jane be questioned at all. One Hearing Board member even signaled to the other members during the hearing that he found credible Jane's statement that she could not picture the alleged sexual assault, but knew it occurred. The Hearing Board also allowed Jane to speak to her advisor during the hearing, but threatened to remove John's advisor from the hearing when he communicated with John.

3

6.     The Hearing Board also went out of its way to read facts in favor of Jane and against John. For example, when Jane corrected statements contained in the investigation report attributable to one of the witnesses that she suggested be interviewed and which statements actually were favorable to her claim, the Hearing Board asserted that Jane's correction was evidence of her credibility. The Hearing Board, however, applied a different rule to John's apparent correction of the record. When John stated he and Jane did not discuss the topic of coercion, the Hearing Board noted that, in the written summary of the John's recorded investigation interview, the investigators quoted John as saying that he and Jane agreed that no one was coerced. John disputed that he told the investigators that he and Jane discussed coercion. Nevertheless, unlike with Jane, the Hearing Board used John's attempt to correct an apparent mistake in the record as its *sole* basis of finding the entirety of John's testimony not credible. As a result, Loyola's *sole* basis for finding him responsible and expelling him from the University was the asserted discrepancy between John's hearing testimony and his witness interview.

7.     There is much more. Despite the significance of the purported discrepancy between what John said during his interview and what John said at the hearing, the Hearing Board refused to review the audio recording (or transcript) of John's interview to determine whether, in fact, John stated that he and Jane discussed coercion and agreed that nobody was coerced during his interview. The Hearing Board's arbitrary and capricious decision to ignore the best evidence of what John actually said during his interview was the result of Loyola's gender biased Title IX system.

8.     In addition, the Hearing Board failed to call two additional witnesses – Witnesses A and B (defined below) – that John identified as individuals who would have provided exculpatory information. The Hearing Board also failed to address exculpatory information that

4

John presented (and Jane confirmed). Namely, that Jane came over to John's apartment a third time even though Jane alleged that John had coerced her into sexual contact the first two times that she visited John at his apartment. John argued that Jane would not have come back the third time if either of their first two interactions were coerced. Keeping with its pattern of ignoring exculpatory facts, the Hearing Board failed to address this critical argument in its decision.

9. Finally, Loyola breached its promise not to subject John to "inappropriate bias" and allowed Jane's Hearing Board to learn that John had been the subject of a second complaint of sexual misconduct (i.e., Elizabeth's). Nor did Loyola conduct any investigation into how it came to be that Jane and Elizabeth filed nearly identical complaints only moments apart. While John was found not responsible in connection with Elizabeth's complaint, he was not able to explain to Jane's Hearing Board that Elizabeth's claims were baseless. Furthermore, Loyola conducted no investigation to determine whether Elizabeth and Jane had coordinated their efforts to falsely accuse John. In sum, John had the worst of all worlds – Jane's Hearing Board learned that John was subject to another complaint, but John was powerless to defend himself against the inference that he was a repeat offender.

10. Loyola's bias against John continued in its handling of John's internal appeal from Loyola's subsequent responsibility finding. Incredibly, the Appellate Officer (defined below) stated that Loyola's rules did not allow him to review the best evidence of what John said at the interview (i.e., the audio recording of the interview) despite John's request that he do so. The Appellate Officer stated he had to rely on the investigators' written summary. As a result, Loyola never verified its Hearing Board's sole basis for determining that John's testimony was not credible (which had led to the Hearing Board's decision to expel John from Loyola), by reviewing the best evidence available.

11.     The Appellate Officer likewise ignored the exculpatory evidence in favor of John by refusing to consider the affidavits of Witnesses A and B that would have cast doubt on Jane's testimony. He also incorrectly faulted John for failing to call Witnesses A and B at the hearing. The Community Standards did not permit John to call any witnesses. To the contrary, whether to allow witness testimony was at the sole discretion of the Hearing Board.

12.     The Appellate Officer also refused to address the Hearing Board's failure to consider that Jane returned a third time to John's apartment and performed oral sex on him even though she asserted that she had been coerced into sexual contact with John on two previous occasions.

13.     Loyola violated Title IX, breached its contract with John, and wrongfully expelled him. John now has a permanent record that will follow him around for decades as he seeks employment. John has suffered emotional damage because of Loyola's conduct. Through this complaint, John seeks declaratory, injunctive and compensatory damages from Loyola.

## THE PARTIES

14.     Plaintiff John Doe is a citizen of the State of Illinois. During the events described herein, John was enrolled as a full time, tuition-paying, undergraduate student at Loyola.

15.     Defendant Loyola University Chicago is a Jesuit university with a principal address of 1032 W. Sheridan Road, Chicago, IL 60660.

16.     At all times material hereto, Loyola acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of Loyola's business, mission and/or affairs.

## JURISDICTION AND VENUE

17.     This Court has original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, *et seq.* and 28 U.S.C. § 1331, and jurisdiction over

related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. § 1367.

18.    Venue is proper in the Northern District of Illinois pursuant to 12 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to John's claim occurred in the Northern District of Illinois and because Loyola resides in Cook County.

## FACTUAL ALLEGATIONS

### I.    The Standards under Title IX for Investigating and Adjudicating Claim for Sexual Misconduct

19.    Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.  Loyola is a recipient of federal funds and, therefore, is bound by Title IX and its regulations.

### A.    Title IX's Prohibition against Gender Discrimination

20.    Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." The meaning of "discrimination" under Title IX is "differential treatment" or "less favorable treatment," and "covers a wide range of intentional unequal treatment."

### B.    Title IX Regulations Require a Prompt, Equitable, Fair and Impartial Process for Resolving Sexual Misconduct Complaints

21.    The Department of Education issued regulations under Title IX that require colleges and universities receiving Federal funds to establish policies and procedures to address sexual assault, including student-on-student complaints.  *See* 62 Fed. Reg. 12034. The guiding principle established by federal regulations is that grievance procedures to resolve such student complaints must be "prompt and equitable."  34 C.F.R. § 106.8(b) (emphasis added).

22. A proceeding that arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nclude a prompt, fair and impartial process from the initial investigation to the final result." 34 C.F.R. § 668.46(k)(2)(i) (emphasis added).

**C. OCR's 2001 Guidance Instructs Schools That Compliance with Title IX Requires an "Adequate, Reliable, and Impartial Investigation" of Sexual Misconduct Complaints and "Due Process to Both Parties"**

23. In 2001, the Education Department's Office for Civil Rights ("OCR") issued guidance in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" (66 Fed. Reg. 5512, Jan. 19, 2001, http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. The 2001 Guidance identified "a number of elements in evaluating whether a school's grievance procedures are prompt and equitable," including whether the procedures provide for:

- "Notice to students . . . of the [school's] procedure;"

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;" and

- "Designated and reasonably prompt timeframes for the major stages of the complaint process."

*(Id.* at 20) (emphasis added).

24. OCR's 2001 Guidance further provides that "[a]ccording due process to both parties involved, will lead to sound and supportable decisions." (*Id.* at 22) (emphasis added).

**D.** **OCR's 2011 Dear Colleague Letter and May 2014 Investigation List Pressure Colleges and Universities to Protect and Favor *Female* Complainants Alleging Sexual Misconduct**

25.     In April 2011, without public notice and comment, OCR issued a "significant guidance document" commonly referred to as the Dear Colleague Letter. (See *Dear Colleague Letter*, Apr. 4, 2011, http://www.2ed.gov/about/offices/list/ocr/letters/colleagues-201104.pdf)).

26.     The Dear Colleague Letter reaffirmed OCR's 2001 Guidance and identified certain procedures "that are critical to achieve compliance with Title IX," including that schools must ensure "[a]dequate, reliable, and impartial investigation of complaints," and that both parties "must have an equal opportunity to present relevant witnesses and other evidence." (*Id*. at 9, 11).

27.     The Dear Colleague Letter, however, also instructed that schools "must use a preponderance of the evidence standard (*i.e*., it is more likely than not that sexual harassment or violence occurred)," and not use the "clear and convincing standard (*i.e*., it is highly probable or reasonably certain that the sexual harassment or violence occurred.)" (*Id*. at 11).

28.     Even though the Dear Colleague Letter offered guidance, OCR framed the use of the preponderance of the evidence standard as a mandatory requirement. The Dear Colleague Letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation." (*Id*. at 16).

29.     This portion of the Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual assault proceedings as OCR wanted. (*See* NPR, "How Sexual Assaults Came to Command New Attention," Aug. 13, 2014, http://www.npr.org.2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention).

30.     In January 2014, the White House put further pressure on colleges and universities to prevent and police sexual violence on their campuses by creating a task force of senior administration officials to coordinate Federal enforcement efforts. The task force made clear that the priority was to protect women's rights over those of men because women were by far the majority of victims of sexual assault and men were the perpetrators of those assaults.

31.     The task force's first report, dated April 2014, explicitly focused on protection of women and girls, starting with the claim that "*[o]ne in five women is sexually assaulted in college.*" It pressed colleges and universities to provide "[t]rauma-informed training" for their officials, stating that, "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." Not Alone: The First Report of the White House Task Force to Protect Students From Sexual Assault, https://www.justice.gov/ovw/page/file/905942/download (emphasis added).

32.     In April 2014, OCR issued further guidance in the form of *Questions and Answers on Title IX and Sexual Violence* (the "2014 Questions and Answers").  (*See* https://www2.ed.gov/about/offices/list/ocr/.../qa-201404-title-ix.pdf). The 2014 Questions and Answers strongly implied that allowing an accused student to cross-examine his accuser could create a "hostile environment" and put a college or university in violation of Title IX.  (*Id.* at 31).

33.     Since cases involving alleged sexual misconduct on college campuses overwhelmingly arise from a woman accusing a man, measures that are put in place to protect alleged victims and punish alleged perpetrators necessarily intend a harsher treatment of men.

34.     Numerous rights organizations have spoken out against the legal and financial pressure exerted by OCR to force colleges and universities to adopt inequitable procedures that favored the female complainants and that made it much more likely that male accused students

would be found responsible. (*See*, *e.g.*, prominent Harvard and University of Pennsylvania Law School faculty members asserting that OCR's new rules violate the due process rights of the accused; Foundation for Individual Freedom in Higher Education (FIRE); and Families Advocating for Campus Equality (FACE)).

**E.** **In September 2017, OCR Reaffirmed Title IX's Regulations and 2001 Guidance, and in November 2018, the Department of Education issued its proposed regulations for Title IX proceedings**

35.     On September 7, 2017, the Secretary of the Department of Education observed that "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington," that "no student should be forced to sue their way to due process," and that "[o]ne person denied due process is one too many." (https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement).

36.     On September 22, 2017, OCR stated that "many schools have established procedures for resolving allegations that 'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.'" (*See September 22, 2017 Dear Colleague Letter*, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf, at 1).

37.     In September 2017, OCR reiterated that colleges and universities must adopt grievance procedures that provide for "a prompt and equitable resolution of complaints of sexual discrimination, including sexual misconduct[,]" which referred to and mirrored earlier guidance issued in 2001 and 2006. (*See September 2017 Q&A on Campus Sexual Misconduct*, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf, at 3).

38.     OCR confirmed that "[i]n every investigation conducted under the school's grievance procedures, the burden is on the school – not on the parties – to gather sufficient

evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred .…" (*Id*. at 4).

39.     OCR stated that schools must avoid discriminatory practices against accused students (who are overwhelmingly male) that had become commonplace at colleges and universities nationwide after the issuance of the 2011 Dear Colleague Letter – *i.e*., schools (i) must not "restrict[] the ability of either party to discuss the investigation (e.g., through 'gag orders')," (ii) must not use "training materials or investigative techniques and approaches" or "[d]ecision-making techniques or approaches" that "apply sex stereotypes or generalizations," (iii) must "avoid conflicts of interest and biases for or against any party" by investigators or adjudicators, and (iv) must "prevent institutional interests from interfering with the impartiality of the adjudication."  (*Id*. at 4-5).

40.     "An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence – including both inculpatory and exculpatory evidence – and take into account the unique and complex circumstances of each case."  (*Id*. at 4).

41.     The Department of Education's proposed new regulations for Title IX sexual misconduct proceedings by the nation's colleges and universities were issued on November 15, 2018. (*See* https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term). Comments will be due 60 days after the regulations are published in the Federal Register, and there will be an opportunity for reply comments as well.

42.     Key provisions of these proposed regulations require colleges and universities to adhere to the following procedures:

- Conduct live hearings in all Title IX cases, with cross-examination by advisors.
- Ensure that accuser and accused have access to all evidence gathered in the investigation.
- Disclose training materials to either party on request.
- Provide accommodations for complainants.
- Allow continued use of the preponderance of evidence standard only in certain situations.
- Permit either party to appeal.

**F.      Loyola Adopted a Gender Biased Policy for Investigating and Determining Title IX Claims**

43.     The University's policies and procedures for alleged Gender-Based Discrimination and Misconduct (which guided the University's disciplinary action against John) were based on the University's incorrect interpretation of the 2011 Dear Colleague Letter and 2014 Questions and Answers, and on its reaction to OCR's legal and financial pressures on colleges and universities to protect and favor female complainants.

44.     Loyola was among the first universities after the Dear Colleague Letter to adopt a "survivor-centered approach" to university disciplinary proceedings for sexual misconduct allegations. Loyola's "survivor-centered approach" defines "complainants" as "survivors" or "victims" of sexual assault based on having made an accusation, which presumes a sexual assault has occurred before any investigation of the facts.  It created irreconcilable conflicts of interest with its investigators and Hearing Boards by training them to be protective of the female "survivors" above all else, and places the burden on the accused male to prove his innocence.

45.     As early as the 2012-13 version of the *Loyola University Community Standards* ("Community Standards"), Loyola defined "complainant" as "the party who makes the

complaint," and as "the *alleged survivor.*" (*See* 2012-13 Community Standards, attached hereto as **Ex. 1**, §§ 201.1.c at 10, 518.1.b. at 41) (emphasis added).

46. Loyola defined "victim" and "survivor" as "*a person who has allegedly been subject to dating violence*, sexual misconduct, or stalking," and promised to follow a process that would adhere to "*the wishes of the alleged victim or survivor.*" (*Id.* §§ 518.1.h. at 42, 518.5.e at 44) (emphasis added). But, although the 2012-13 Community Standards used the terms "survivor" and "victim" to define "complainant," Loyola counterbalanced the use of those terms by defining "survivor" and "victim" as a person "allegedly" subject to dating violence, and by modifying "survivor" with the term "alleged" survivor.

47. Loyola also made clear in the 2012-13 Community Standards that it "*will never presume a student is in violation of University policy. A conduct hearing will be conducted to take into account the totality of all information available from all relevant sources.*" (*Id.* § 518.6 at 46) (emphasis added).

48. In addition, as of 2012-2013, Loyola applied the same set of rules to the investigation and hearing of sexual assault claims as it would to students accused of other offenses. Under the 2012-2013 Community Standards, any student accused of any violation of the Community Standards would be entitled to:

- Notice of the allegations against him or her that, among things, identified the alleged misconduct. (*Id.* § 604.1 at 50);

- A hearing before an administrator or a panel of three to five "representatives from Loyola's faculty, staff, and student body[.]" (*Id.*at § 605.2.a and b at 51). For hearings regarding sexual misconduct "the student's preferences for hearing type will be taken into consideration." (*Id.* § 605.1 at 51);

- Question the complainant, call witnesses on his or her behalf, and inspect the evidence against him or her. (*Id.* § 605.3 at 51-52); and

14

- Respondents "are provided the final opportunity to make any closing arguments." (*Id.* § 605.3.i at 52).

49.     As alleged above, in early 2014, the government task force made clear that the issue of sexual assault on college campuses colleges and universities should focus on the protection of women and girls, starting that "[o]ne in five women is sexually assaulted in college." https://www.justice.gov/ovw/page/file/905942/download.

50.     After the government task force issued its 2014 statements concerning the victimization of women via sexual assault and the 2014 Questions and Answers, Loyola changed its Community Standards to establish a separate process for investigating and hearing claims of sexual misconduct from those of other violations of the Community Standards.

51.     For example, the 2016-17 Community Standards dropped Loyola's promise to those (males) accused of sexual misconduct to "*never presume a student is in violation of University policy*" that previously was contained in the 2012-13 Community Standards.  That promise simply does not appear in the 2016-17 Community Standards. (The 2016-2017 Community Standards are attached hereto as **Ex. 2**).

52.     In the 2016-17 Community Standards used in John's proceedings, Loyola adopted procedures that discriminated against males in favor of the female accusers. The Community Standards defined a "complainant" as "the person who has reported experiencing misconduct to the University [who] … may be a "Survivor" or "Reporter."  But, unlike the 2012-2013 Community Standards that used qualifying words like "alleged," the 2016-2017 Community Standards categorically defined a "survivor" or "victim" as a "person who has experienced sexual or gender-based discrimination or misconduct," without the qualifying term "alleged." (Ex. 2 §§ 201.1.g at 9, 201.1.af. at 11).

15

53.     Loyola's presumption was demonstrated and perpetuated by the preferential treatment accorded to "survivors." Loyola promised special "rights" and "services" to "students who experience gender-based misconduct … regardless of whether they pursue resolution through the University's formal conduct process." (*Id.* § 409.1.a-f at 49). These rights and services include the "right to be informed in writing of available counseling services," as well as legal services including "*evidence collection options"* and "*legal assistance*." (*Id*.) (emphasis added).

54.     In a section titled "Outreach to Reporter and/or Survivor," Loyola promised that, within three days of receiving a report of alleged gender-based misconduct, "the Deputy Coordinator will request to meet in-person with the survivor(s)," at which time the Deputy Coordinator will review the University's services provided to survivors, including "advocacy services" and "legal assistance." (*Id.* § 409.5 at 51-52).

55.     In its *Gender-Based Misconduct/Title IX Services* website, Loyola advised "survivors" of sexual misconduct that they can receive confidential services from the University-sponsored Wellness Center, Loyola's Sexual Assault Advocacy Line, and Pastoral Counselor, and tells "survivors" that the Dean of Students Office can assist them in "navigating the student conduct process or accessing other resources." (Attached hereto as **Ex. 3**).

56.     "Survivors" were specifically referred to Jessica Landis, the University's Assistant Dean of Students for Safety and Equity and Title IX Deputy Coordinator. Loyola told the "survivors" that they may also speak to Associate Dean Timothy Love, who "is also equipped and prepared to provide services as needed." (*Id.*)

57.     Loyola offered none of these resources to students accused of sexual misconduct, and (as alleged below) Loyola offered none of the aforementioned services to John.

58.     The 2016-2017 Community Standards also abandoned Loyola's previous promise "*to take into account the totality of all information available from all relevant sources,*" but instead injected the investigation and hearing process with conflicts of interest by having an overriding mandate that they protect and favor the female complainant.

59.     In short, by the time of John's proceedings in 2016-17, Loyola had adopted a "survivor-centered approach" to sexual misconduct allegations that overtly protected and favored female complainants, presumed a violation of University policy had occurred, placed upon accused male students the burden of proving their innocence, and accorded special treatment, including legal assistance, to one party, the female "complainant"/"survivor," but not to the other party, the accused male student.

### G.     Loyola's Procedures for Investigating and Adjudicating Claims of Sexual Misconduct Reflected Loyola's Bias against Males

60.     Loyola's bias against males also manifested itself in the procedures it provided for adjudicating claims of sexual misconduct set forth in the 2016-2017 Community Standards. In addition to containing overt direction to provide rights to accusers without corresponding rights to the accused, Loyola established procedures that prevented those accused from having a fair adjudication of claims of sexual misconduct. The procedures for investigating and adjudicating claims for sexual misconduct provide less protection to the accused than the procedures for adjudicating claims of other violations of the Community Standards. Loyola even expressly acknowledged that the student conduct process for investigating and adjudicating alleged sexual misconduct cases is different from the standard University process for other alleged violations. (Ex. 2 § 409.6 at 52; Ex. 2 at 13).

61.     For example, students accused of non-sexual misconduct are entitled to a hearing, including a hearing in which their fellow students are part of the Hearing Board. (Ex. 2 § 405.2 at

17

41-42). In contrast, hearings for students accused of sexual misconduct are heard only by members of the faculty or staff of the University. (*Id.*, § 409.6.c at 53).

62.     Students accused of non-sexual misconduct offenses have the right to "provide a personal account of the alleged incident," "refute all suggested violations," and are expressly "invited to comment on any harm or impact caused by the alleged incident and offer recommendations related to outcomes that will repair the harm." (*Id.* § 405.3 at 42). Students accused of non-sexual misconduct offenses are permitted to invite witnesses to the hearing. (*Id.* § 406.4 at 44).

63.     In contrast, Loyola did not give students like John, who are accused of sexual misconduct, the rights to provide a personal account of the alleged incident, to refute all suggested violations, and to comment on any harm or impact caused by the alleged incident and offer recommendations related to outcomes that will repair the harm at the hearing. (*Id.* § 409.6.a at 52-53). Most significantly, Loyola did not give students accused of sexual misconduct the right to invite witnesses to the hearing. Instead, the accused only could suggest witnesses for the investigators "to be considered for interviewing." Whether a witness would be called at a hearing, however, "is at the discretion of the Hearing Board." (*Id.* § 409.6.a.vii and § 409.c at 52-53).

64.     The parties in a sexual misconduct case "are not permitted to interrupt, directly question, or 'cross examine' one another. At a designated time, the complainant(s) and respondent(s) may suggest questions to be posed to the other party by the Hearing Board. Whether or not to pose such suggested questions is at the sole discretion of the board." (*Id.* § 409.c at 53).

II. **Loyola Violated Title IX and Breached its Contractual Obligations to John by Expelling Him from the University After Applying a Gender Biased Investigative and Hearing Process to Jane's Complaint**

65.    Prior to registering at Loyola in August 2013, John had an outstanding high school academic record and college admission test scores.  John was accepted by other top undergraduate universities and colleges. After weighing various factors and considerations of each university, John made a conscious and informed decision to commit to Loyola, and he entered the freshman class for the 2013-2014 academic year.

A. **John's Relationship with Elizabeth**

66.    In January 2015, John was a sophomore at Loyola when he met Elizabeth in one of his classes. Approximately one week later, John and Elizabeth gathered with a group of friends to watch a movie. At the end of the night, John walked with Elizabeth to her dorm and the two kissed.

67.    The next day, John and Elizabeth went grocery shopping together.  They talked and discussed that she was in a relationship with another man and that John was in the process of ending his relationship with his high school girlfriend.

68.    The next night, Elizabeth came over to John's dorm room and watched a movie with John and one of his roommates. John's roommate left, and Elizabeth and John began kissing. They then went to John's room and ultimately had sexual intercourse.

69.    John and Elizabeth continued a boyfriend/girlfriend type relationship for several weeks. In February 2015, John introduced Elizabeth to his family.

70.    At the end of February 2015, John was about to leave for spring break and went to Elizabeth's dorm room to say goodbye. Elizabeth's roommate was not in the dorm, and Elizabeth and John had sexual intercourse.

71.     During Spring break of 2015, John Doe's family cautioned him about getting into a serious relationship after having just ended a long-term relationship with his high school girlfriend. In addition, Elizabeth told John that she had been speaking to her ex-boyfriend.

72.     After spring break, John and Elizabeth discussed their respective situations when they returned to campus and decided that they would just be friends.

73.     From April 2015 through October 16, 2016, John and Elizabeth exchanged text messages and continued to have a friendly relationship.

74.     From the time of their first sexual encounter in January 2015 through the date of her last communication with John, Elizabeth never stated or insinuated that her sexual encounters with John were not consensual.

**B.      John's Relationship with Jane Roe**

75.     In October or November 2015, John met Jane Roe on a shuttle ride from Loyola's downtown campus to Loyola's main campus. Later that day, Jane obtained John's phone number from a mutual friend ("Witness A") who lived in her dormitory.

### 1.      The January 13, 2016 Sexual Contact

76.     Over the next several weeks, Jane and John communicated and decided to go on a date. On January 13, 2016, Jane and John went on a date to a local pizzeria. After eating dinner, Jane and John returned to John's apartment. Jane and John visited with John's roommate ("Witness B") in the common area of the apartment for a few minutes and then went to John's bedroom to watch a movie. After about 30 minutes, John and Jane began to kiss. Jane initiated the kissing and then climbed on top of John. Jane undid John's pants and assisted John in removing Jane's pants.

77.     John asked Jane to perform oral sex on him. Jane responded that she would, but "only if [John would] return the favor." John proceeded to perform oral sex on Jane. Jane, in

turn, performed oral sex on John. Vaginal intercourse did not occur during this encounter. After their sexual interaction, John and Jane cuddled and continued to watch the movie. When the movie ended, John and Jane left John's room, said goodbye to Witness B and then John walked with Jane to her dorm room. While at Jane's dorm, John and Jane stopped to say hello to Witness A, and spoke with Witness A for approximately 30 minutes. Jane never stated or otherwise indicated that John and Jane's sexual interaction was coerced or not consensual.

### 2. The January 15 or 16 Meeting

78.     On or about January 15 or 16, 2016, John and Jane exchanged text messages and later Jane hung out at John's apartment.  During the text exchange and the in-person meeting, John and Jane discussed that they had moved too quickly in their relationship and that they should slow down while they saw where their relationship was going. They also discussed whether a relationship was possible given their involvement with certain University activities. At the end of their in-person meeting, John and Jane kissed and hugged and she left his apartment.

### 3. The January 17, 2016 Sexual Contact

79.     On January 17, 2016, Jane came over to John's apartment to hang out. Jane and John ordered food and watched the Chicago Blackhawks' game on television. Jane commented that she was bored watching hockey. John, however, continued to watch the game.

80.     Jane told John that she wanted to distract John and began to kiss John. John and Jane began to make out and John asked if they were still taking things slow. Jane responded by grabbing John's penis through his pants. John asked Jane if she wanted to move forward physically and Jane said "yeah" and proceeded to assist John in removing his pants. Jane performed oral sex on John. John asked if he could perform oral sex on Jane, but Jane declined, stating that she had her period.

21

81.     John and Jane went to John's bedroom and continued to hang out. They watched a
TED talk on YouTube concerning solving Einstein's Riddle. John attempted to solve the riddle.
Jane complained that she was bored and that John was not giving her attention. She asked John
to "give me attention" and "touch my butt." Jane became annoyed with John when he told her
that he would after he finished the riddle.

82.     John finished the riddle and Jane stated that she wanted to go home. John gave her
a kiss goodnight and offered to walk with Jane to her dorm. Jane declined and decided to walk
home by herself. Jane later texted John that a campus safety officer drove her home because of
the cold weather. She also texted John words to the effect:  "screw you. I'm tired of your shit. I
hope the next girl won't fall for your crap."

83.     On January 29, 2016, John and Jane saw each other at a party. Jane was
intoxicated, approached John, and accused him of using her. Jane told John that she wanted to
date him and that she was heartbroken. One of Jane's friends pulled her away from talking with
John. After the party had ended, Jane confronted John on the street and said that she would "get
you back for not wanting to date me" and yelled: "I hope there is a guy that screws your sister
over like you screwed me over."

84.     On January 30, 2016, John texted Jane and told her never to speak of his sister
again and that he did not use Jane. Jane responded that she understood, but wanted John to know
how she felt. John texted Jane that they needed to go their separate ways.

85.     Jane never stated or intimated that she did not consent to their sexual activities in
any of her oral or written communications with John.

22

**C.     Elizabeth and Jane Roe Collaborated to Make False Accusations of Sexual Assault against John Doe**

86.     On November 4, 2016 – twenty-one months after John last had sexual intercourse with Elizabeth and ten months after John had sexual contact with Jane Roe, Loyola notified John that Elizabeth and Jane Roe had lodged separate formal complaints (the "Complaints") against him on the same date, only moments apart. Elizabeth's and Jane's Complaints were assigned consecutive case numbers and both alleged that John had "sexually assaulted" Elizabeth and Jane, respectively.

**D.     Loyola Was Contractually Obligated to Provide a Fair Process to John**

87.     Loyola was contractually required to investigate and conduct hearings relating to the Complaints pursuant to the 2016-2017 Community Standards. The Community Standards sets forth the policies and procedures for the disciplinary proceedings in John's case, including the Student Code of Conduct (Article II), Student Conduct Procedures, and the student conduct process for alleged Gender-Based Discrimination and Misconduct. (Article IV).

88.     Loyola's *Annual Security Report and Fire Safety Report for the Year 2016* ("Security Report") also sets forth the University's Sexual Assault, Sexual Misconduct, and Title IX policies and procedures for the relevant time period. (**Ex. 4**, attached hereto).

89.     In a provision titled "Rights of All Parties" (Ex. 2 § 409.6.a at 52-53; Ex. 4 at 13), Loyola promised its students, including John, that "[a]ll complainants and respondents involved in the University's formal conduct process can expect the following:

> i.     All complaints and reports of gender-based misconduct and the potential impact on both complainants and respondents will be treated seriously, and the University will respond promptly and proceed in a timely manner.
>
> ii.    Both parties will be treated with dignity and respect, and the privacy of each party will be respected.

iii.    Both parties will receive timely notice of any required meetings, and will have the opportunity to review any investigative report after the investigation has concluded but before a formal hearing.

….

vii.    Both parties may present evidence throughout the investigation, including proposing witnesses to be considered for interviewing.

viii.    As with all University conduct processes, each party may choose to be accompanied by one advisor of their choice. The advisor may accompany either party at any point in time throughout the conduct process."

90.    According to the Security Report, "[t]he investigation and resolution process of reports or notifications of gender-based misconduct will always be prompt, *impartial and thorough.*" (Ex. 4 at 13) (emphasis added).

91.    Loyola promised its students, including John, that the Investigators would "separately interview relevant witnesses that can provide a firsthand account of something seen, heard, or experienced relating to the alleged incident." (*Id.* § 409.6.b at 53).

92.    Loyola promised John that he would "have at least two (2) days to review the Final Investigation Report," but did not allow students, like John, to make a copy of it. (*Id.* § 409.6.c at 53).

93.    Student disciplinary files for students who are found responsible for misconduct are maintained by the University at the University's Office for Student Conduct and Conflict Resolution ("OSCCR") for seven years from the date of the incident, with the exception of cases resulting in University dismissal. Loyola indefinitely retains such files. (Ex. 1 §§ 412 at 59, 201.1.l at 9).

### E.      The University's Investigation and Hearing Regarding the Complaints

94.      As a result of the Complaints, before any investigation, the University removed John from his position with a University sponsored group.

95.      On November 4, 2016, Timothy Love, who was then the Associate Dean of Students and the Interim Title IX Coordinator, emailed John two Temporary No Contact Directives, which ordered John to have no direct or indirect communications with Jane or Elizabeth and warned John that the University would not tolerate any type of retaliation against Jane Roe or Elizabeth. Upon information and belief, neither Jane nor Elizabeth were provided with similar mutual Temporary No Contact Directives.

96.      Mr. Love further informed John that each Complaint asserted that John "engaged in non-consensual sexual activity" with Jane and Elizabeth, respectively. Mr. Love advised that while the same investigators would investigate both Complaints:

> *to preserve the impartiality and fairness of the hearing process*, each complaint . . . will result in separate and distinct investigative reports, which will then each be heard by separate and distinct Hearing Boards (with different personnel serving on each board). *This is the best way that we can preserve your rights as a student not to be subject to any inappropriate bias as a result of having two complaints under investigation at the same time*.

Thus, to avoid "inappropriate bias" and preserve "impartiality and fairness," the Hearing Boards were not supposed to learn that John was the subject of two different Complaints.

97.      Mr. Love, however, admitted to John that he had advised the chairperson of Jane's Hearing Board, Jessica Landis, who was also Loyola's Title IX Coordinator, regarding the existence of Elizabeth's complaint. Moreover, as set forth in detail below, Loyola failed to shield John from "inappropriate bias" because other members of the Hearing Board assigned to Jane's Complaint learned that John was the subject of another Complaint during its deliberations of Jane's Complaint.

98.     As alleged above, Ms. Landis was the Deputy Title IX coordinator that Loyola told "survivors" of sexual misconduct that they should contact for help in "navigating the student conduct process or accessing other resources." It was an inherent conflict of interest for a person who Loyola represented was a resource for "survivors" to sit on a Hearing Board in a case involving an alleged "survivor" against an accused like John.

99.     Loyola placed Timothy Love, like Landis, in an inherent conflict of interest, by having him serve both as a "resource" for "survivors" and "victims" of sexual assault "in navigating the student conduct process," while at the same time heading up the Title IX investigative and adjudication process in Jane Roe's and Elizabeth's sexual assault complaints against John.

100.    It is not possible for Love to have assisted Jane Roe and Elizabeth in obtaining university-sponsored services as "survivors" and "victims" of sexual assault while at the same time overseeing an "impartial" Title IX investigation and adjudication of their complaints.

101.     On November 8, 2016, John met with Mr. Love in person. Mr. Love explained that both Jane Roe and Elizabeth claimed that they did not consent to sexual contact with John and that he had coerced them into having sexual relations. Mr. Love also advised that both Jane's complaint and Elizabeth's complaint were nearly identical and that they admitted to Mr. Love that they had been in communication with each other and filed their complaints within minutes of each other. This critical fact regarding Jane's credibility was redacted from the Final Investigation Report provided to the Hearing Board that heard Jane's Complaint even though the chairperson of the Hearing Board and, upon information and belief, other members of that Hearing Board learned that another student had accused John of sexual misconduct. In other words, Loyola allowed Jane's Hearing Board to learn that John was the subject of another

26

complaint of sexual misconduct, but intentionally withheld information from the Hearing Board that Jane and Elizabeth collaborated to accuse John of sexual misconduct and filed their Complaints moments apart. Nor did Loyola investigate the circumstances of Jane and Elizabeth's collaboration.

102.    Mr. Love also incorrectly advised that John would *not* be entitled to have an advisor at his interview with the investigators.

103.    Between November 18, 2016 and November 22, 2016, John communicated with the investigators to set up an interview to discuss Jane Roe's Complaint. On November 22, 2016, the investigators confirmed that they would interview John on December 2, 2016 at 3:00 p.m. The investigators advised, "[t]his meeting will be about [Jane's Complaint]. We will have a separate meeting with you about any other ongoing investigation."

104.    On December 2, 2016 at 9:23 a.m. – the day of John's interview for Jane Roe's Complaint – one of the investigators emailed John and, contrary to the investigators' earlier representations that the interview only would concern Jane's Complaint, stated that "we will talk about both cases today. We will start with [Jane's case] and then [Elizabeth's case]."

105.    Later on December 2, 2016, the two investigators interviewed John in connection with both Complaints. Both interviews were audio recorded. Contrary to Mr. Love's previous statements that John would not be allowed to have an advisor with him during the interview, the investigators told John that he was entitled to have an advisor with him during the interviews and that they would wait until later that day for John to obtain a lawyer. Because there was not enough time to secure an attorney that day, John proceeded with the interview without legal representation.

27

106.     In the interview with respect to Jane's Complaint, John stated the facts set forth in paragraphs 73 to 83, above. John advised that within days after they first performed oral sex on each other, John and Jane agreed that they had moved too fast and wanted to have more than just a physical relationship. John had learned previously from his discussions with Mr. Love, and the interview confirmed, that Jane was accusing John of coercion. Only in this context, did John tell the investigators "no one was coerced." John did not state that he and Jane discussed the subject of coercion.

107.     During the interview, John told the investigators about Witnesses A and B. But the investigators never interviewed Witnesses A and B. Witness A would have testified that (a) he saw John and Jane after John walked with Jane back to her dorm room after their first sexual encounter, (b) John and Jane sat in Witness A's dorm room for approximately 30 minutes talking, and (c) both "John and Jane seemed happy [and] were friendly with each other and talkative." Witness A would have further described that he saw Jane several times over the next several days and that Jane "had only positive and affectionate things to say about" John. It was only after John did not walk Jane home that Jane told Witness A that John was "an asshole" because "he did not walk her home one night." Witness A also would have testified that Jane never indicated in any way that John's sexual contact with Jane was anything other than mutually consented to.

108.     Witness B would have testified that he was in John's apartment during the January 13, 2016 sexual encounter and that he saw Jane before and after she left John's bedroom while he (Witness B) was in the common area outside of John's bedroom. Witness B would have testified that he did not hear anything from John's bedroom that indicated that Jane did not

consent to sexual contact and that her demeanor after leaving John's room did not indicate that she was unhappy or had any discomfort.

109.    On December 8, 2016 at 12:22 p.m., the investigators sent John an email containing the summaries of the interviews and told John that he had until 1:00 p.m. the next day, December 9, to make any comments to the summaries. John, who was in the middle of preparing for final exams, had limited time to review the summaries. As alleged above, the investigators' summary of John's interview contains a subtle error that assumed outsized importance at the hearing on Jane's Complaint. It states that John advised the investigators that he and Jane "mutually agreed that they had moved fast physically and 'that no one was coerced.'" The potential technical implication is that John and Jane agreed to two things – one, that he and Jane proceeded too fast physically; and two, that neither was coerced. The report should have stated only that John and Jane mutually agreed that they had moved fast physically. John separately told the investigators during his interview that no one was coerced.

110.    Loyola initially set the hearings regarding both Complaints for the same day, December 14, 2016, before two separate hearing panels. One hearing was to be in the morning and the other in the afternoon.

111.    On December 8, 2016 at 11:09 a.m., Mr. Love notified John that Elizabeth wanted to have the hearing of her Complaint heard on December 16, and asked John if he would accommodate Elizabeth's request. John agreed to Elizabeth's request, and the hearing for her Complaint was set for December 16, 2016.

112.    On December 9, 2016, Mr. Love notified John that the University would conduct the hearing regarding Jane's Complaint on Wednesday, December 14, 2016. In addition, Mr.

Love notified John could review the Final Investigation Report for Jane's case beginning on Monday, December 12, 2016.

113.    On December 11, 2016, Loyola's Title IX coordinator, Jessica Landis, provided formal notification to John that "on or around January 17, 2016 12:00 AM" it appears that John "may have violated one or more policies" at the University, including:

> 202(21)(a) Sexual Misconduct:Non-consensual sexual penetration (C),
>
> 202(21)(b) Sexual Misconduct: Non-consensual sexual contact (C),
>
> 202(21)(a) Sexual Misconduct: Sexual harassment (C)

In addition, Ms. Landis notified John that the Final Investigation Report for Jane's case would be available for review on December 12, 2016. The University advised that John could review the investigative report and take notes, but he could not copy it. Loyola later advised that he could not take his notes with him to prepare for the hearing. With respect to the hearing, the University advised that each party would have the ability to make a closing statement and have an advisor present. Despite the seriousness of the charges and the potential penalties involved, the University cautioned that the advisor "may not ask questions, interject, coach, advocate for, or otherwise speak on behalf of" John.  In sum, according to the University, "[a]dvisors do not 'represent' students or function as legal counsel for the purposes of the University conduct process." Ms. Landis' statement that John's advisor could not "coach" him is inconsistent with and contrary to the Community Standards, which expressly state that an advisor "may only speak to the advisee[.]" The Community Standards do not contain a prohibition on "coaching" and only state that "Advisors may not ask questions, interject, advocate for, or otherwise speak on behalf of a student[.]"  (Ex. 2 § 406.1 at 43). Upon information and belief, Loyola did not tell Jane that her advisor could not "coach" her.

114.     On December 12, 2016, while preparing for final exams, John reviewed the investigative report at the OSCCR. While Loyola allowed John to take notes during the review, the University did not allow him to take the notes with him, and instead, required John to turn over his notes to a University employee until the day of his hearing. Thus, Loyola deprived John of the opportunity to prepare fully for the hearing. In reviewing the investigative report, John saw that Jane claimed that she was visibly distraught and "frozen in fear" after her sexual encounters with John. Witnesses A and B, however, would have provided testimony to contradict Jane's statements. Per Loyola's Community Standards, John relied on the investigators to interview those witnesses and the Hearing Board to invite them to be witnesses at the hearing.

115.     The investigative report, however, did not contain summaries of interviews of Witnesses A and B. In contrast, the report did include summaries of interviews of witnesses suggested by Jane.

116.     After John reviewed the report, on December 12, 2016 at 3:19 p.m., Timothy Love emailed John to tell him that due to Loyola's error, John reviewed the incorrect version of the report and told John that he could review the correct version. John did not see the email. The next evening (December 13) at approximately 7:00 p.m., Mr. Love called John to tell him about the error in the report, but John was not able to review the corrected version of the report prior to the hearing, which was set for December 14, 2016 at 9:00 a.m. Thus, contrary to the Community Standards, Loyola did not give John 48 hours to review the report.

117.     Around the time of the hearing on Jane's Complaint, the University was subject to severe public criticism for the way it had previously handled issues of sexual misconduct on campus. On December 15, 2016, various news outlets reported that for three years Loyola had allowed a male student on the Loyola golf team to remain enrolled at the University even though

31

the student had been indicted in his home state for rape of a minor female. The news outlets reported that Loyola students were highly critical of the University for allowing an alleged rapist to live and go to school at the University. http://loyolaphoenix.com/2016/12/former-loyola-mens-golfer-sentenced-10-years-prison-2013-rape/. Likewise, on December 20, 2016, Time magazine and the Washington Post published articles detailing Loyola's students' "outcry" and "outrage" at Loyola for allowing an accused rapist to enroll at the University. http://time.com/4608052/loyola-university-rapist-ben-holm/; https://www.washingtonpost.com/news/morning-mix/wp/2016/12/20/outcry-at-loyola-after-students-learn-athlete-accused-of-rape-was-enrolled-for-three-years/?utm_term=.72bc7ab75fe6.

118.    The December 15 article in Loyola's student newspaper indicated that 500 students already had signed a petition demanding an apology from the University "for its lack of transparency" and failure to educate "the Loyola community about rape culture and sexual violence."

119.    On December 16, 2016, Loyola's Title IX Coordinator issued a statement acknowledging that they learned about the issue on December 12, 2016 when it received media inquiries.

120.    Against the student body's criticism and increased media attention, Jane's Hearing Board – which consisted of two hearing officers who were members of the University's Title IX office that was at the center of the student body's outrage – conducted the hearing and concerning Jane's Complaint against John and deliberated the matter in the following days.

121.    On December 14, 2016, the University conducted the hearing on Jane's Complaint before the Hearing Board. The hearing lasted approximately two hours. The only live witnesses that were at the hearing were John and Jane. The investigators also were present. The

32

Hearing Board also considered the statements of Jane, John and other witnesses contained in the investigative report.

122.    At the hearing, Jane and John gave their account of the events that occurred in January 2016, and specifically what occurred on the dates of their three interactions – January 13; 15 or 16; and 17, 2016. John testified consistently with the statements that he provided to the investigators that are set forth in paragraphs 73 to 83 above. Jane told a very different story than John with respect to the January 13 interaction. Jane claimed that John: (a) kissed her without permission; (b) performed oral sex on her without permission; (c) forced here to masturbate in front of John; (d) forced her to perform oral sex on him; and (e) touched her vagina with his penis.

123.    With respect to the January 15 or 16 interaction, contrary to John's testimony that that John and Jane decided to slow down their relationship, Jane claimed that John pushed here against the door, began kissing her, and placed her hand on his penis.

124.    During the course of the hearing, Jane admitted that she could not picture actual sexual contact with John occurring, but claimed that she knew it happened. Loyola did not permit John to cross-examine Jane under the University's Community Standards, and allowed him only to suggest questions to the Hearing Board to ask Jane. John then asked the Hearing Board to ask Jane how she could be certain that events occurred as she claimed if she could not picture the events in her mind. The Hearing Board refused to ask this critical cross-examination question of Jane. One of the members of the Hearing Board chastised John for suggesting the question, and presented a hostile attitude toward John. The Hearing Board member stated words to the effect: "There are a lot of things I can't imagine happening but I know they happen. I can't picture the sun rising but I know it happened." By making this assertion, the Hearing Board

member signaled to the other board members that he (the Hearing Board member) was endorsing

Jane's account, and that they too should endorse her account.

125.    The same board member treated Jane's advisor differently than John's advisor.

Throughout the hearing, Jane's advisor frequently talked to Jane. At no time did any members of

the Hearing Board reprimand Jane or her advisor for those communications despite Loyola's

directive that advisors could not "coach" or "advocate for" the parties. In contrast, during the

hearing, John's advisor privately pointed out to John a page in the investigative report, indicating

to John a point he should consider.  Even though John's advisor's manner of communicating

with John was substantively no different than the manner in which Jane's advisor communicated

with Jane, the same Hearing Board member that reprimanded John for suggesting a question to

ask Jane, immediately stopped the proceedings and scolded John's advisor, stating that if he (the

advisor) communicated with John again, then the Hearing Board would remove John's advisor

from the hearing. Thereafter, Jane continued to converse with her advisor, but John, now under

threat of losing his advisor, did not communicate at all with his advisor.

126.    The Hearing Board's refusal to allow John's advisor to communicate with John

during the hearing violated the Community Standards, which expressly provide that "an advisor

may only to speak to the advisee[.]" (Ex. 2, § 406.1 at 43). The Hearing Board also treated John

less favorably than Jane by barring John's advisor from speaking to him but not barring Jane's

from speaking to her.

127.    The Hearing Board did not call any other witnesses, including Witnesses A and B,

who both would have provided testimony supporting John's version of events and shown that

Jane did not indicate any duress immediately after the January 13, 2016 sexual activity and such

testimony would have contradicted Jane's claim that she was distraught and "frozen in fear."

34

128.     On December 15, 2016, John met with Mr. Love to discuss the lack of fairness at the hearing. John advised that the Hearing Board showed disdain for John and refused to ask a significant question that John suggested should be posed to Jane and refused to allow his advisor to communicate with John. Mr. Love told John that the hearing on Elizabeth's complaint hopefully would present a better environment. Mr. Love also admitted to John that the "University receives money every year to assist the victims in these situation but no funding goes towards assisting those accused."

129.     Upon information and belief, Love was referring to the 6-year Campus Grant awarded to Loyola in 2009 by the Office on Violence Against Women, U.S. Department of Justice, to be used by Loyola to support female students who report sexual assault.

130.     Loyola spent the Violence Against Women grant to fund (among other things) its Wellness Center's professional advocates program.  That program provides "support and advocacy" by trained "professional advocates" to female "sexual assault survivors," including referrals to "legal advocacy" and "support and advocacy in navigating Loyola's conduct system."

131.     The "professional advocates" funded by the Violence Against Women grant were Loyola professional staff members and graduate students.

132.     With funds provided by the Violence Against Women grant, Loyola has sponsored the Coordinated Community Response Team ("CCRT") – later renamed the Community Coalition on Gender-Based Violence.  The goal of these Loyola-sponsored organizations was (and is) to "connect survivors with services both on and off campus," and to "review and improve gender-based misconduct policies."

133.    Loyola's Wellness Center chairs the Community Coalition on Gender-Based Violence, which "consists of faculty and staff from key Loyola departments," including Loyola's Title IX Office, the Office of Student Conduct and Conflict Resolution, and the Office of the Dean of Students.

134.    In 2016, among other projects, the CCRT sponsored a newsletter that called attention to "a great deal of media attention related to issues of gender-based violence nationwide, as well as on our campus."

135.    The CCRT newsletter described a 2016 incident, in which student activists staged "counter protests" and chalked "messages of support for survivors" on campus over a planned off-campus meeting of a Men's Right's Activists group ("MRA group").  The MRA event was canceled, and the CCRT newsletter reported that MRA groups and groups like them "perpetuate rape culture and contribute to a culture that normalizes violence."

136.    Loyola's "Surviving Sexual Assault" website project, initially funded by the Violence Against Women grant, instructed (and continues to instruct) students, staff, and faculty to "believe the survivor" and to "provide the survivor with resources," including "referrals to legal advocacy."

137.    The Wellness Center also sponsors a student organization called CHANGE. The students in this organization describe themselves as "activists" and "leaders" whose role is "to create programming around prevention, awareness, and response to gender-based violence," and to "empower survivors of gender-based violence."

138.    The Wellness Center's Assistant Director of Health Promotion has stated that "the national discussion about campus sexual violence" has made "[p]eople feel more empowered to

come forward and recognize that we do believe people and we are not going to victim-blame and that we want to provide support."

139.     Jessica Landis (then Loyola's Deputy Title IX Coordinator) also credited the 2011 Dear Colleague Letter for raising awareness and activism regarding campus sexual assaults both nationally and at Loyola's campus. Landis also acknowledged the September 2017 Department of Education rollback of the Dear Colleague Letter, and that "some cases have gone wrong on a national scale" under that now-rescinded OCR guidance.

140.     Loyola's Office of the President has issued "Gender-Based Violence" climate surveys that, among other things, state that Loyola is "effectively and respectfully supporting survivors."

141.     Notwithstanding Loyola's pledge to prevent "inappropriate bias" against John that would occur if either Hearing Board learned that John was subject to a second claim of sexual misconduct, Loyola failed to shield John from such bias. First, Mr. Love advised Jessica Landis, the Chairperson of Jane's Hearing Board, that John was the subject of another claim for sexual misconduct. Second, on December 15, 2016, John went to the OSCCR office to review the investigative report for Elizabeth's Complaint in advance of the hearing. While at the office, the entire Hearing Board from Jane's case saw John at the OSCCR office. The OSCCR office should not have scheduled John's visit to the OSCCR office to review an investigative report related to one case to occur at the same time that the members of the Hearing Board had convened in that office to deliberate on John's responsibility in another case.

142.     Third, on December 16, 2016, John appeared for his hearing on Elizabeth's Complaint. While waiting with his attorney, the same member of the Hearing Board for Jane's Complaint who had chastised John for suggesting a question to ask Jane and reprimanded John's

37

advisor for speaking to John at the hearing saw John and his advisor (the same one who was with John at Jane's hearing) waiting in the OSCCR office for the hearing of Elizabeth's Complaint. John's hearing on Elizabeth's Complaint took place in a conference room at the OSCCR. Simultaneously, the Hearing Board for Jane's Complaint was deliberating on that Complaint in the conference room adjacent to the conference room in which John's hearing on Elizabeth's Complaint was taking place. During the hearing on Elizabeth's Complaint, John heard the Hearing Board deliberating on Jane's Complaint through the adjoining wall. Upon information and belief, the Hearing Board for Jane's Complaint could hear the hearing on Elizabeth's Complaint. The OSCCR should not have allowed John's hearing on Elizabeth's Complaint to take place at the same time and location as the Hearing Board on Jane's Complaint deliberated.

143.    At the hearing on Elizabeth's Complaint, John testified regarding his relationship with Elizabeth as set forth in paragraphs 64 to 72 above. Like Jane Roe, Elizabeth told an entirely different story. She testified that she indicated to John that sex "was not on the table" and that John forced her to have sex with him.

144.    On December 20, 2016, Loyola notified John that the Hearing Boards for both Complaints had rendered their decisions.

145.    With respect to Elizabeth's Complaint, the board found John "**NOT RESPONSIBLE**" for any alleged misconduct. The board found that John's testimony was no more or less credible than Elizabeth's testimony.

146.    With respect to Jane Roe's Complaint, however, the Hearing Board for her case found John "**RESPONSIBLE** for engaging in non-consensual sexual contact and non-consensual sexual penetration." Even though the Hearing Board heard directly from only two witnesses – John and Jane – they stated that Jane was more credible than John. To support their

38

conclusion, the Hearing Board pointed to the summary of John's interview with the investigators wherein the investigators wrote that, a few days after their first sexual contact with Jane, John stated that "[t]hey [i.e., John and Jane] mutually agreed that they had moved fast physically and 'that no one was coerced.'" The Hearing Board compared that statement to John's testimony at the hearing, wherein John testified that he and Jane did not discuss coercion. At the hearing, John advised that he only told the investigators that "no one was coerced," but did not indicate that he told the investigators that John and Jane agreed that no one was coerced or even discussed coercion at all. The Hearing Board concluded that "John's account during the hearing was contradictory to the investigation report and the Investigators' account of the interview." The Hearing Board reached this conclusion without ever reviewing the best evidence of what John said during the interview – the audio recording (or transcript) of John's interview with the investigators. The Hearing Board's determination not to review the audio recording (or even a transcript) of the interview was arbitrary, capricious and not made in good faith. The Hearing Board gave no explanation why it would ignore John's own words, but instead rely on a hearsay account of what he said at the interview.

147.    The Hearing Board used its conclusion that John provided inconsistent statements to the Hearing Board and the investigators to conclude that all aspects of Jane's testimony were more credible than all aspects of John's testimony. The Hearing Board stated:

> All things considered, Respondent's inconsistency regarding the discussion of coercion, while a singular instance, is noteworthy to the Board. The presence or lack of coercion is a foundational component to determining whether consent was present for a sexual interaction. As such, Respondent's inconsistency around this topic in particular holds significant weight.
>
> After evaluation, the Board had no reason to question the credibility of Complainant's account. As discussed, the Board did find reason to question the credibility of Respondent's account. Based on a preponderance of the evidence standard, the Board did find the Complainant's account to be – more likely than

not – credible and therefore based analysis of the potential violations on the information provided in her account.

148.    While the Hearing Board used John's efforts to correct the record against him, it construed Jane's efforts to clarify the record as proof of her honesty. Although the only witnesses at the hearing were John and Jane, the Hearing Board referred to witness interviews of Jane's witnesses contained in the investigative report. The Hearing Board noted that Jane "corrected a detail from Witness 1's interview that would have 'helped her case,' but Complainant clarified that it was inaccurate." The Hearing Board did not provide specific information regarding the "detail" that would have helped her case. Upon information and belief, the "detail" was an alleged statement made by Jane to Witness 1 that Jane corrected to say that either (a) she did not make the statement to Witness 1, or (b) that she was not sure if she made the statement to Witness 1. According to the Hearing Board, Jane's correcting a witness and saying that she was not "sure about something" showed that was trying "to convey a fair and accurate account at all times, rather than an intent to say whatever was necessary (regardless of truth) to sway the decision of the board in her favor."

149.    The Hearing Board applied a different logic to John, when faced with an analogous set of facts. It would have helped John's case if he stated that he and Jane agreed that no one was coerced. Yet, when John clarified that he and Jane never discussed coercion, the Hearing Board used this fact against him. John's testimony at the hearing showed that John did not "say whatever was necessary," but instead gave truthful testimony. The Hearing Board found no other inconsistencies between John's testimony and his interview.

150.    Based solely on its determination concerning John's credibility, the Hearing Board adopted 100% of Jane's version of the events that occurred on January 13, 2016. Specifically, the Hearing Board concluded that: (a) John kissed Jane without permission; (b)

40

performed oral sex on Jane without permissions; (c); John forced Jane to touch her vagina; (d) John forced Jane to perform oral sex on John; and (e) John rubbed his penis against Jane's vagina without permission. With respect to the meeting between John and Jane that occurred on or about January 15 or 16, 2016, the Hearing Board found that John forced Jane's hand to touch his genitals.

151. The Hearing Board concluded that it "had no reason to question the credibility of [Jane's] account." Yet the Hearing Board did not hear (either live or by summary of witness interviews) the testimony of Witnesses A and B, which testimony would have cast significant doubts on Jane's credibility. Likewise, the Hearing Board failed to address the fact that Jane came over to John's apartment alone on January 17, 2016 – only a day or two after she alleges a second nonconsensual sexual encounter with John. The fact that Jane came over to John's apartment and performed oral sex on him after she claimed that she was assaulted is at least one "reason to question" her credibility. Nevertheless, the Hearing Board failed to discuss this fact in its ruling even though, in the formal notification of the charges against him, it advised John that he was accused of sexual misconduct that allegedly occurred "on or about January 17, 2016 12:00 AM." Also, the Hearing Board failed entirely to address the parties' interaction on January 17, and did not base its finding of responsibility on John's alleged conduct on January 17.

152. The Hearing Board concluded that John should be expelled immediately from Loyola.

**F. Loyola Rejected John's Appeal**

153. Pursuant to the Community Standards, either party was permitted to appeal all or part of the outcome of a hearing within 120 hours of when the Notice of Outcome is sent. (Ex. 2 § 409.6.f. at 54; Ex. 2 at 15). An appeal must be based on one or more of three grounds: (1) "new

41

substantive information is available that could not have been discovered by a diligent respondent at the time of the hearing and that would have likely changed the outcome of the case;" (2) "a substantive procedural error or error in the interpretation of University policy occurred that denied the respondent the right to a fair hearing and decision;" or (3) "the finding (as to responsibility or sanctions or both) was manifestly contrary to the information presented at the hearing or to the established Community Standards (i.e., the decision was clearly unreasonable and unsupported by the great weight of information)." (Ex. 2 § 411.1 at 58).

154.    The Dean of Students or his or her designee (the "Appellate Officer") in cases of gender-based misconduct had the option of requesting to speak with either party during the appeal process. The Appellate Officer makes the final decision based on submitted materials and interviews and notifies both parties simultaneously and in writing of the outcome of the appeal. (Ex. 1 §§ 409.6.f at 54, 411 at 58).

155.    The Appellate Officer could choose one of four outcomes:  (a) affirm the original decision and sanction(s); (b) affirm the original decision but modify the sanction(s); (c) overturn all or part of the original decision and uphold, modify, or remove the sanction(s); or (d) remand the case for a rehearing before different Hearing Board members. (Ex. 1 § 411.4 at 59).

156.    On December 24, 2017, John timely submitted his appeal. John's bases for appeal were that: (a) new substantive information should change the outcome: (b) the University committed Substantive Procedural Errors; and (c) the Hearing Board's findings were manifestly erroneous.

157.    With respect to the new information, John submitted sworn declarations of Witnesses A and B, who both testified that they interacted with Jane immediately after her sexual encounters with John on January 13, 2016 and that nothing appeared out of the ordinary.

158.     As for Loyola's procedural errors, John pointed to Loyola's: (a) failing to interview key witnesses, including Witnesses A and B; (b) allowing Jane's Hearing Board to learn that John was the subject of a contemporaneous investigation; and (c) failing to review the audio recording or transcript from his interview with investigators before concluding that his hearing testimony was inconsistent with his interview statements.

159.     Finally, John argued that the Hearing Board ignored exculpatory evidence in John's favor. John argued that Jane's conduct of voluntarily returning to John's apartment two times after he allegedly forced her into sexual contact with him undermined her credibility. John argued that the Hearing Board's failure to discuss John and Jane's third meeting on January 17, 2016 wherein Jane performed oral sex on John showed that the Hearing Board could not reconcile Jane's actions of having further contact with John to her claims that she did not consent to sexual contact on two prior occasions. Instead, the Hearing Board ignored this argument.

160.     John also argued that "coercion" under the Community Standards requires "the use of force, threats, or intimidation," but Witness B, who was in the apartment next to the bedroom door where the alleged coercion took place, and who observed Jane Roe's demeanor immediately before and after the alleged assault, heard and saw nothing to suggest Jane was in any distress.

161.     On January 20, 2017, the Appellate Officer rejected John's appeal. With respect to the new substantive information, the Appellate Officer erroneously asserted that John had sufficient time before the hearing to obtain Witnesses A and B's statements such that he could have presented them at the hearing. The Appellate Officer blamed John for failing to "ask to have [Witnesses A and B] testify at the hearing." The Appellate Officer's statement is contrary to the Community Standards, which did not allow John call witnesses to testify, but states that

"witness participation in a hearing is at the discretion of the Hearing Board." (Ex. 1 §409.6)
Likewise, the Appellate Officer's statement is contrary to the mandate of Title IX that the burden
was not on John to call witness, but was on Loyola "to gather sufficient evidence to reach a fair,
impartial determination as to whether sexual misconduct has occurred .…" (*See September 2017
Q&A on Campus Sexual Misconduct,* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-
201709.pdf at 4 (referring to the 2001 Guidance).

162.     The Appellate Officer ignored the inherent unfairness of allowing the Hearing
Board to learn that there was another accusation against John and ruled that John had not shown
that members of the Hearing Board were not capable of compartmentalizing the information. The
Appellate Officer's conclusion, however, disregards Loyola's promise to John that Jane's
Hearing Board would not learn that John was the subject of another complaint, which Loyola
acknowledged was necessary "to preserve the impartiality and fairness of the hearing process"
and "the best way that [Loyola] c[ould] preserve [John's] rights as a student not to be subject to
inappropriate bias[.]"

163.     The Appellate Officer reached the conclusion that the Hearing Board was not
biased against John based on his own belief as to the training of the Hearing Board members.
The Appellate Officer did not interview the members of the Hearing Board or otherwise conduct
any investigation as to whether they were unfairly tainted by their knowledge that John had been
the subject of another complaint. At a minimum, the Appellate Officer should have remanded
John's case for a hearing before a different Hearing Board.

164.     The Appellate Officer also held that the Hearing Board had no obligation to
review the best evidence of what John said at his interview concerning coercion, but instead
stated that "Loyola's administrative process does not make investigation interviews available to

44

the hearing officers" and the audio recording of John's interview "was only to be used by the investigators to draft their interview summary." The Appellate Officer did not state a basis why the audio recording of John's interview could not be used after the investigators prepared the interview summary.

165.    Finally, the Appellate Officer rejected John's arguments regarding the Hearing Board's manifestly erroneous decision. Like the Hearing Board, the Appellate Officer did not even address John's argument that Jane's conduct in returning to his apartment on January 17 was inconsistent with her claim that she did not consent to sexual activities on two prior occasions.

166.    Loyola expelled John from the University and placed a permanent mark on his academic record stating that he was expelled for sexual misconduct. That record will follow John for the rest of his life. John will have to provide this information to any graduate school to which he applies and likely to prospective employers.

167.    As a result, John has suffered from depression and anxiety.

## COUNT I
### (Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.)

168.    The foregoing allegations are incorporated by reference as if fully set forth herein.

169.    Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, *et seq*., provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

170.    At all relevant times, Loyola received federal financial assistance.

171.    Title IX prohibits the imposition of university discipline where (as here) gender bias was a motivating factor behind the university's misconduct.

45

172.     Under pressure from OCR, and in response to widespread media attention on a purported nationwide campus rape culture, Loyola deliberately set out to adopt sexual misconduct policies that would focus on the needs of complainants (who are overwhelmingly female), presumptively identifying and treating them as "survivors" and "victims," providing them with special services, resources, and support not offered to accused male students (including legal assistance and the opportunity to meet with Loyola's Deputy Title IX Coordinator for help in "navigating the student conduct process"), and depriving accused male students of a fair and impartial process.

173.     Loyola violated Title IX by reaching an erroneous outcome in connection with Jane's Complaint. Loyola's decision that John was responsible was the result of Loyola's application of an investigative and adjudicative process that intentionally was biased in favor females over males, generally, and that favored his female accuser over him. Loyola's gender bias also was reflected in the way Jane's Hearing Board conducted the hearing.

174.     Loyola was on notice of, and was deliberately indifferent to, the serious flaws in the investigation of Jane Roe's complaint and the bias demonstrated by Jane's Hearing Board members in favor of Jane and against John. When John complained to Mr. Love about the lack of fairness and equity by the Hearing Board, Mr. Love did nothing to address or remedy the harm to John.

175.     The University selectively enforced its Title IX policies by treating John as a male student accused of sexual misconduct less favorably than it would treat a similarly situated female student, who would not be subjected to the same disciplinary proceedings, which are premised on the notion that females are survivors and victims of sexual assault by male perpetrators.

176.     Upon information and belief, statistical data within the possession, custody and control of Loyola shows that students accused of sexual misconduct are overwhelmingly male, and that following the 2011 Dear Colleague Letter and the 2014 White House task force report, all or nearly all male students accused of sexual misconduct at Loyola have been found responsible, resulting invariably in suspension or expulsion.

177.     Loyola's conduct was so severe, pervasive, and objectively offensive that it denied John equal access to education that Title IX is designed to protect.

178.     As a result of the foregoing, John is entitled to injunctive relief, compensatory damages, prejudgment interest and attorneys' fees and costs, and punitive damages on the basis that Loyola's conduct demonstrated reckless or callous indifference to the requirements of Title IX and its violations of Title IX were egregious.

A.     **Loyola's Investigative and Procedural Errors Affected the Outcome of the Hearing**

179.     There are at least eight investigative and procedurals errors that Loyola made that caused it to reach an erroneous result in connection with Jane's Complaint.

1.     **The Investigators Failed to Interview Witnesses A and B and the Hearing Board Failed to Call Witnesses A and B at the Hearing**

180.     John identified Witnesses A and B to the investigators in advance of the hearing. The investigators neither interviewed nor requested statements from either witness. The failure of the investigators to interview these first-hand witnesses violated Title IX regulations requiring "equitable" grievance procedures and a "fair and impartial process from the initial investigation to the final result**,**" 34 C.F.R. §§ 106.8(b), 668.46(k)(2)(i) (emphasis added), and disregarded OCR's longstanding guidance that required schools to provide "[a]dequate, reliable, and impartial investigation of complaints," including "the opportunity for both parties to present witnesses and other evidence."  (2001 Guidance at 20 (emphasis added); *see also* 2011 Dear

47

Colleague Letter at 9, 11 (both parties "must have an equal opportunity to present relevant witnesses and other evidence") (emphasis added); 2014 Questions and Answers at 12, 25; 2017 Interim Guidance at 3-4).

181.    Loyola also breached § 409.6.a.vii of the Community Standards, which states that complainants and respondents have the right to "present evidence throughout the investigation, including proposing witnesses to be considered for interviewing." (Ex. 2 at 52). The investigators, in turn, were *required* to "separately interview relevant witnesses that can provide a firsthand account of something seen, heard, or experienced relating to the alleged incident." (*Id.,* § 409.6.b. at 53).

182.    Here, Loyola only interviewed witnesses suggested by the female accuser, Jane, and ignored witnesses suggested by the male accused, John. Loyola's failure to interview these witnesses cannot be excused as an exercise of discretion.  Witnesses A and B were not duplicative witnesses or witnesses lacking in relevant information. They had material, exculpatory firsthand evidence calling into question the credibility of Jane Roe's allegations of coercion. Loyola should have interviewed Witnesses A and B, and the summaries of those interviews should have been documented in the Final Investigation Report and supplied to the Hearing Board for consideration. (*See* 2017 Interim Guidance at 4: "An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence … including both inculpatory and exculpatory evidence ….").

183.    As a result of the omission of this evidence from the Final Investigation Report, John was denied the opportunity to present critical exculpatory evidence to the Hearing Board.

### 2. The Dean of Students Failed to Consider the Declarations of Witnesses A and B on Appeal

184.    Pursuant to § 411.1 of the Community Standards, John provided the Appellate Officer with declarations from the Witnesses A and B as "new substantive information" that would have likely changed the outcome of the case.

185.    The Appellate Officer refused to consider the witnesses' declarations as new substantive information, and incorrectly faulted John for not to have Witnesses A and B testify at the hearing. Indeed, John could not invite witnesses to the hearing because the decision to invite witnesses was at the sole discretion of the Hearing Board. (*Id.*, § 409.6.c at 53).

186.    Under these circumstances, the Appellate Officer should have treated the declarations of Witnesses A and B as "new substantive information" that likely would have changed the outcome. His failure to do so breached § 411.1 of the Community Standards and violated John's Title IX right to have a "fair and impartial process from the initial investigation to the final result." 34 C.F.R. § 668.46(k)(2)(i).

### 3. Loyola's Interim Title IX Coordinator Misinformed John about his Right to an Advisor to John's Detriment

187.    In his first meeting with John on November 8, 2016, Loyola's Associate Dean and Interim Title IX Coordinator, Timothy Love, explained to John how the investigative process would work. Mr. Love told John that two investigators would contact him, and John would meet with them and tell his side of the story. Mr. Love told John that he was *not* allowed to have advisor during the interview.

188.    At his interview, however, the investigators told John that he was allowed to have an advisor of his choice at the interview, contrary to what he had been told previously by Mr. Love. By that time, however, it was too late for John to secure his advisor's presence at the interview.

49

189.    Mr. Love's misinformation breached John's contractual rights under § 409.6.a.viii of the Community Standards, which promised John that he could "be accompanied by one advisor of [his] choice" and that "[t]he advisor may accompany either party at any point in time throughout the conduct process."

190.    Loyola violated John's Title IX rights to equal treatment to the extent that Loyola told Jane Roe (upon information and belief) in advance of her investigation interview that she would be allowed to have an advisor of her choice at her interview.

191.    Loyola's inequitable treatment violated Title IX regulations requiring "equitable" grievance procedures and OCR's guidance under which a school's compliance with Title IX requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." (2017 Interim Guidance at 4).

192.    Had Loyola properly advised John of his right to have an advisor present at his interview, he would have had an advisor present and there is a strong likelihood that the investigators' mistake about whether John stated that he and Jane discussed coercion would never have occurred and the Hearing Board would have reached a different result.

**4.     The Hearing Board and Appellate Officer Deprived John of a Fair and Impartial Hearing by Refusing to Review the Audio Recording or Transcript of John's Interview to Clarify What John Actually Told the Investigators about Coercion**

193.    As alleged above, the sole basis for the Hearing Board's finding that John was responsible for sexual misconduct was its determination that John was not credible as a witness based on an apparent discrepancy between what he said during his interview and what he testified to at the hearing.

50

194.     In John's summary of his recorded interview, the investigators wrote that John told them that he and Jane "mutually agreed that they had moved fast physically and 'that no one was coerced.'" At the hearing, John clarified that he and Jane agreed that they had moved fast physically, but his statement that "no one was coerced" was a separate statement that he made to the investigators. Although it was against his interest because he was potentially giving testimony that was different from what was in the investigative report, and it would have been helpful to him to if he and Jane, in fact, had agreed after the fact that no one was coerced, John stated that he and Jane did not discuss coercion. John requested the Hearing Board and the Appellate Officer to review the audio recording (or transcript) of his interview. The Hearing Board incorrectly stated in its written opinion that it asked the investigators at the hearing if John had stated that he and Jane agreed that no one was coerced and that the investigators unequivocally stated that John stated that he and Jane agreed that no one was coerced. In truth, upon questioning, the investigators only stated that during the interview John stated on multiple occasions that "no one was coerced." Contrary to the Hearing Board's statements, the investigators did not state unequivocally that John had told them that John and Jane agreed that no one was coerced.

195.     The Hearing Board and Appellate Officer refused to review either the audio tape or the transcript of John's recorded interview. Instead, they relied on the inaccurate hearsay statement contained in the written summary of John's interview.

196.     The Hearing Board's decision to ignore the best evidence to determine John's actual words used by John during his interview violated John's rights under Title IX to an impartial and fair adjudication.

51

**5.** **The Hearing Board Abused Its Discretion under the Community Standards and Violated John's Title IX Rights by Refusing to Ask Jane a Legitimate Question Submitted by John**

197.    The Hearing Board failed to conduct the Hearing in conformance with § 409.6.c of the Community Standards and violated John's Title IX rights to a "fair and impartial process" by refusing to ask Jane how she could be certain of many of the sexual acts when she said that she could not picture them in her mind. The question – which John suggested – was directly relevant to Jane's credibility.  The Hearing Board showed its bias against the male accused by refusing to ask the question and by chastising John for even suggesting that it pose such a question to the female accuser.

**6.** **The Hearing Board Accepted Jane's Account of Events without Considering Her Conduct that Suggested John Did Not Coerce Her into Sexual Activity**

198.    For example, the Hearing Board failed to give any weight to the undisputed fact that Jane Roe voluntarily returned to John's apartment on two separate occasions after her first visit to the apartment, during which she claimed John coerced her into sexual contact. John argued that if he really had coerced her to perform oral sex on him on January 13 and then forced her to touch his penis on January 15, then Jane would not have come to his apartment on January 17. This is especially so given Jane's statements that she was distraught and "frozen in fear" after the alleged encounters on January 13 and 15.

199.    The Hearing Board and Appellate Officer failed to address John's argument in either of their opinions. The Hearing Board and Appellate Officer could not offer any explanation regarding why Jane's actual conduct did not match her narrative and the University's preordainment of her as the "victim."

200.    As alleged above, by failing to consider the testimony of Witnesses A and B, the Hearing Board and the Appellate Officer failed to consider additional evidence that cast doubt on Jane's credibility.

201.    In addition, the Hearing Board (and later the Appellate Officer) did not consider that "coercion" under § 201.f of the Community Standards requires "the use of force, threats, or intimidation to elicit action from another person." There is no physical, objective, or corroborating evidence that John used force, threats, or intimidation in his sexual encounters with Jane Roe, and she did not attempt to offer any such evidence. Again, the statements of Witnesses A and B would have further bolstered John's statements that he never coerced Jane to do anything. The Hearing Board and Appellate Officer failed to determine (let alone discuss) whether the conduct being considered had met the definition of coercion, which the Hearing Board identified as a foundational component to its consent analysis.

### 7.    Loyola Improperly Permitted Members of the Hearing Board to be tainted by Knowledge of the Second Complaint

202.    As alleged above, Loyola's Deputy Coordinator assigned the two Complaints to two Hearing Boards for separate, independent adjudications. The Deputy Coordinator specifically stated that he was doing so to "preserve the impartiality and fairness of the hearing process" because it was "the best way that [Loyola] can preserve [John's] rights as a student not to be subject to any inappropriate bias as a result of having two complaints under investigation at the same time."

203.    Despite Loyola's recognition and acknowledgment that John would be impermissibly biased if Jane's Hearing Board knew that John was subject to another complaint, Loyola violated its promise to John and allowed Jane's Hearing Board to learn that John was subject to another complaint. Indeed, the Deputy Coordinator told the chairperson of Jane's

Hearing Board that John was subject to another Complaint. The chairperson, herself, had a conflict of interest in acting as both a member of a Hearing Board in a case of a male accused of sexual misconduct, while at the same time acting as a person to whom Loyola directed alleged victims of sexual misconduct to call for assistance. In addition, the Deputy Coordinator assigned the same investigators to both Complaints, thus increasing the likelihood that the two Hearing Boards would learn of the other claims against John. Finally, as a result of not implementing safeguards to protect John's rights, other members of Jane's Hearing Board learned that John was subject to another complaint.

204. This knowledge tainted the Hearing Board's ability to fairly adjudicate Jane Roe's Complaint. Therefore, the members of the Hearing Board should have recused themselves to avoid the appearance of a lack of impartiality and independence, but did not do so.

205. The Appellate Officer impermissibly concluded that the Hearing Board was not tainted by their knowledge of the other allegations against John without performing any investigation to support his conclusion, but instead attempted to shift the onus on John to prove that the Jane's Hearing Board was influenced by its knowledge of another Complaint against John. John, however, had no way to interview the members of the Hearing Board or otherwise investigate the issue.

206. Finally, to the extent that the Hearing Board learned that John was subject to another Complaint, the investigators should have investigated the full extent of the interaction between Jane Roe and Elizabeth to determine how and why they coordinated their Complaints against John. Loyola should have allowed John to question Jane's credibility by the fact that she and Elizabeth coordinated an attack on John.

**8.    Loyola Gave John Inadequate Notice of the Claims Against Him.**

207.    Loyola failed to give John adequate notice of the accusations against him. While Jane alleged three separate occasions on which she claimed that John committed sexual misconduct, neither of the notices sent to John on November 4 and December 11, 2016 explained to John that Jane was accusing him of sexual misconduct on three separate occasions. Based on these notices, John did not understand that Jane claimed that each time she met with John that he engaged in sexual misconduct.

208.    Under title IX and its related regulations, accused students are entitled to a fair process and certain safeguards, including, among other things, adequate notice. Loyola violated Title IX and did not give John adequate notice of the conduct that was at issue, the date(s) in which the alleged conduct occurred, and other information that would have provided a foundation for the allegations against him.

**B.    The Hearing Board's and Appellate Officer's Erroneous Decisions are a Result of Gender Bias**

209.    As alleged above in paragraphs 41 to 64 and 128-140, Loyola adopted the Community Standards to favor the rights of complaining students, who are overwhelmingly female, against those of accused in cases of sexual misconduct, who are overwhelmingly male. Because of the gender biased process and the errors identified in paragraphs 179 to 208, Loyola denied John equal access to education that Title IX is designed to protect.

210.    In addition, the intentional gender bias against the accused male (i.e., John) is shown in the following ways that Loyola conducted the investigation and hearing:

   a)    Loyola told Jane that she could have an advisor from the inception of the process, whereas Loyola initially told John that he could not have an advisor present during his interview.

55

      b)     The investigators interviewed witnesses suggested by Jane, but refused to interview witnesses suggested by John who had exculpatory evidence.

      c)     The Hearing Board allowed Jane's advisor to speak to her during the hearing, but scolded John's advisor and threatened to remove him from the hearing for communicating with John.

      d)     The Hearing Board credited Jane for correcting an error in the Final Investigation Report that would have been favorable to her case, but used John's clarification of an apparent error in his interview summary as evidence that he gave inaccurate testimony.

      e)     Loyola failed to take procedural safeguards to make sure that Loyola lived up to its promise to John that he would not be subject to "inappropriate bias" that would occur if either Hearing Board learned that John was the subject of two Complaints.

      f)     Loyola allowed Jessica Landis to act as chairperson of Jane's Hearing Board, while at the same time acting as the Title IX officer to whom Loyola directed "survivors" of sexual misconduct to contact for assistance "navigating the student conduct process or accessing other resources."

211.    In sum, Loyola punished John with its most severe sanction – expulsion – with little evidence and because of a gender-biased process that contained virtually no procedural safeguards for accused male students.

212.    As a direct, proximate, and foreseeable consequence of Loyola's Title IX violations, Loyola stripped John of his ability to continue his education at Loyola, and severely harmed his academic and career prospects, earning potential, and reputation. He has sustained

significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

213.    As a result of the foregoing, John is entitled to injunctive relief and damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT II
### (Breach of Contract)

214.    The foregoing allegations are incorporated by reference as if fully set forth herein.

215.    At all times relevant hereto, a contractual relationship existed between Loyola and John through Loyola's policies and procedures governing the student conduct process, including but not limited to the policies and procedures contained in the Community Standards and related terms and provisions in bulletins, circulars, and on-line website information and regulations made available to John as a tuition-paying student.

216.    On his part, John fully performed under his contracts with Loyola.

217.    Loyola, through its agents assigned to John's case, was required to act in accordance with the aforementioned policies and procedures in addressing Jane Roe's allegations against John, and in conducting its investigation, hearing and appellate review.

218.    For all the reasons set forth above, Loyola has materially breached its contracts with John by failing to comply with the aforementioned policies and procedures in the course of its investigation and adjudication of Jane's Complaint, and by disregarding its contractual duties throughout the proceedings.

219.    Apart from breaching its express contractual obligations, Loyola breached and violated the covenant of good faith and fair dealing implied in its contracts with John by acting

arbitrarily, capriciously, and in bad faith throughout John's student conduct process, by acting in a manner inconsistent with John's reasonable expectations of a fair and impartial process, by depriving him of the benefit of his bargained-for education, and by meting out a grossly disproportionate sanction of expulsion from the University.

220.    In particular, the following actions taken by Loyola were arbitrary, capricious and not made in good faith:

a)    Failing to interview Witnesses A and B.

b)    Erroneously stating in the Appellate Officer's opinion that John was responsible for calling witnesses at the hearing.

c)    Failing to advise John that he was entitled to an advisor during his interview.

d)    Refusing to allow John's advisor to communicate with John during the hearing and threatening to remove John's advisor from the hearing for attempting to communicate with John.

e)    Concluding that John gave a statement in his interview that was inconsistent with his testimony at the hearing without reviewing the audio recording or transcript of his interview, but instead relying on the hearsay summary of his interview. And then using that asserted inconsistency as the sole basis to discredit John's testimony in its entirety and expel him from the University.

f)    Advising the chairperson of Jane's Hearing Board that John was subject of another Complaint for sexual misconduct and failing to take safeguards to

ensure that no other members of Jane's Hearing Board learned that John was subject to another Complaint.

g)      Allowing Jessica Landis to act as chairperson of Jane's Hearing Board, while acting as the Title IX person specifically designated as the person at Loyola to help "survivors" to "navigat[e] the student conduct process or access[] other resources;"

h)      Failing to investigate in a material way the relationship between Jane and Elizabeth to seek potential exculpatory evidence and evidence of bias and motive of Jane; and

i)      Failing to recommend that John's case on appeal for a rehearing before a different Hearing Board.

221.    As a direct, proximate, and foreseeable consequence of Loyola's numerous material breaches, Loyola stripped John of his ability to continue his education at Loyola, and severely harmed his academic and career prospects, earning potential, and reputation. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

222.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

## COUNT III
### (Estoppel and Reliance)

223.    The foregoing allegations are incorporated by reference as if fully set forth herein.

224.    In the event the Court finds that the promises and representations Loyola made to John in the aforementioned policies and procedures do not constitute legally valid and enforceable contracts, John pleads in the alternative a claim for equitable estoppel.

225.    Loyola unambiguously promised John that it would accord him a fair and just process to resolve any allegations of a violation of the Community Standards; John relied on such promise when he made the decision to enroll at Loyola; John's reliance was expected and foreseeable by Loyola; and John reasonably and justifiably relied to his detriment on the promise when he was subjected to a process that violated the promise.

226.    As a direct, proximate, and foreseeable consequence of the above-identified conduct, Loyola has stripped John of his ability to continue his education at Loyola, and severely harmed John's academic and career prospects, earning potential, and reputation. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

227.    As a result of the foregoing, John is entitled to specific performance or in the alternative to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

## COUNT IV
### (Negligent Infliction of Emotional Distress)

228.     The foregoing allegations are incorporated by reference as if fully set forth herein.

229.     Loyola owed John a duty of reasonable care in providing a fair and impartial process for investigating and adjudicating the charges against him and from protecting him from foreseeable harm.

230.     By participating in the Community Standard's investigatory process and adjudication, John reasonably relied upon Loyola's duty to protect him from harm.

231.     The University breached its duty of care to John in multiple ways, including but not limited to the following:

(a)     creating an atmosphere where the rights of alleged "survivors" and "victims" were elevated over the accused student, and creating a pervasive campus climate of gender-bias that presumes accused males are "perpetrators" and female accusers are "survivors" and victims," and that bolsters student misconceptions about what constitutes sexual assault and consent (a misconception that motivated Jane Roe's accusations in John's case);

(b)     failing to take reasonable care in selecting, training, and supervising competent and impartial investigators, and hearing and appellate members;

(c)     subjecting John to an incompetent, gender-biased process in the investigation and adjudication of his case, where both the Hearing Board assumed Jane's credibility and disbelieved John in this "he said, she said" case solely on the basis of Jane's word and perceived, but not ever verified, inconsistency between John's testimony and a statement during his investigation interview;

(d)     subjecting John to an incompetent appeals process, where the Appellate Officer affirmed the Hearing Board's decision based on erroneous application of the Community Standards.

232.     As a direct, proximate, and foreseeable consequence of the foregoing, John has suffered physical harm, including severe emotional distress, which includes symptoms of depression, social anxiety, loss of concentration and focus, and feelings of hopelessness.

233.    A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

234.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

## JURY DEMAND

235.    Plaintiff John Doe demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Doe respectfully requests that this Honorable Court:

a.  Declare that Loyola breached its contract with John;

b.  Grant injunctive relief ordering Loyola to reverse and expunge its findings of responsibility and sanction from John's educational record;

c.  Grant injunctive relief ordering Loyola to provide a Dean's Statement that shall be made available to third parties upon John's request (such as educational institutions and prospective employers) certifying that Loyola has reversed and expunged the findings and sanction;

d.  Award John compensatory damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of education and professional opportunities, loss of future career prospects, and other direct and consequential damages;

e.  Award prejudgment interest;

f.  Award attorney fees and costs pursuant to statutory or common law doctrines providing for such award; and

g.  Grant such other and further relief that the Court deems just and proper.

Dated:  November 27, 2018                              Respectfully submitted,

                                                                JOHN DOE


                                                                By:/s/ Jonathan M. Cyrluk
                                                                                        One of his attorneys

Jonathan M. Cyrluk (ARDC No. 6210250)
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street
Suite 2105
Chicago, IL  60601
Phone: (312) 777-4300
Email: cyrluk@carpenterlipps.com

Patricia M. Hamill
(Admitted *Pro Hac Vice*)
Lorie Dakessian
(Admitted *Pro Hac Vice*)
CONRAD O'BRIEN PC
Centre Square, West Tower
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Phone: (215) 864-9600
Email:  phamill@conradobrien.com
              ldakessian@conradobrien.com

<u>**CERTIFICATE OF SERVICE**</u>

       I, Jonathan M. Cyrluk, an attorney, hereby certify that on November 27, 2018, I caused a copy of the foregoing to be served by the Court's CM/ECF system on all counsel of record.


                           <u>   /s/Jonathan M. Cyrluk      </u>
                           Jonathan M. Cyrluk
                           CARPENTER LIPPS & LELAND LLP
                           180 North LaSalle Street, Suite 2105
                           Chicago, IL  60601-3129
                           Phone: (312) 777-4300
                           Email: cyrluk@carpenterlipps.com

                           *Attorney for Plaintiff John Doe*