**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No: 18-CV-7335** |
| v. | ) | |
| | ) | **Hon. Gary Feinerman** |
| LOYOLA UNIVERSITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF JOHN DOE'S RESPONSE TO DEFENDANT'S**
**MOTION TO DISMISS COUNTS III AND IV OF AMENDED COMPLAINT**

Plaintiff John Doe ("John"), by his attorneys, respectfully submits the following response to the motion to dismiss Counts III and IV of Defendant Loyola University of Chicago ("Loyola").

After a rushed, one-sided investigation and slanted hearing, Loyola found John liable for sexual misconduct and expelled him from Loyola. As set forth in detail in his Amended Complaint ("AC"), John alleges claims for violations of Title IX (Count I), breach of contract (Count II), promissory estoppel (Count III), and negligent infliction of emotional distress ("NIED") (Count IV). Loyola answered Counts I and II, but has moved to dismiss Counts III and IV. In its memorandum in support [Dkt. 28], Loyola challenges the sufficiency of these claims by focusing exclusively on John's allegations in Counts III and IV that summarize the legal bases for these claims, but ignores the factual allegations underpinning those claims. Based on these facts, which the Court must accept as true for purposes of this motion, John has stated claims for relief, and the Court must deny Loyola's motion.

## FACTS RELEVANT TO COUNTS III AND IV

On November 4, 2016, a female Loyola student with whom John had a consensual relationship (referred to in the AC as "Jane Roe" or "Jane") accused John of non-consensual sexual penetration on three separate occasions almost 10 months after the last encounter occurred.  On that same date, another female student (referred to in the AC as "Elizabeth") filed a nearly identical complaint against John.  John and Elizabeth had a consensual dating relationship that ended nearly two years before Elizabeth and Jane lodged their complaints.  (AC ¶¶ 2-3).  Loyola promised John that each complaint would be heard "by separate and distinct Hearing Boards" as "the best way that we can preserve your rights as a student not to be subject to any inappropriate bias as a result of having two complaints under investigation at the same time." (*Id*. ¶ 96).  Six weeks later, on December 20, 2016, the Hearing Boards for the two complaints rendered their decisions.  The Hearing Board for Elizabeth's complaint found John "not responsible" for any alleged misconduct.  The Hearing Board for Jane's complaint found John "responsible" for the alleged misconduct and concluded that he should be expelled immediately from Loyola.  (*Id*. ¶¶ 144-156, 152).

The conflicting outcomes occurred because of bias Loyola injected in the investigation and hearing of Jane's complaint. Loyola violated specific promises to "preserve the impartiality and fairness" of the process and avoid "inappropriate bias." (*Id*. ¶ 96).  Loyola breached its promise to keep the two complaints "separate and distinct" by advising the Chairperson of Jane's Hearing Board of the existence of Elizabeth's complaint and allowing other members of Jane's Hearing Board to learn that John was the subject of another complaint (without informing them that John had been exonerated of those allegations).  (*Id*. ¶¶ 95-97, 101, 141-142, 203).

Loyola also violated other promises it made to John, including breaching its promise to interview all relevant witnesses. The investigators in Jane's case interviewed the witnesses Jane identified, but failed to interview two witnesses John identified who had personally observed Jane and John on the night of their first sexual encounter and had firsthand, exculpatory information contradicting Jane's account that she was visibly distraught and "frozen in fear." (*Id*. ¶¶ 9, 107-108, 114, 181-183). The Hearing Board in Jane's case did not allow these witnesses to testify, and demonstrated additional bias against John by, among other things, (i) refusing to ask Jane a question suggested by John (inquiring as to why she came to John's apartment a third time if, as she claimed, she had been sexually coerced in their two previous encounters), and (ii) refusing to review the audio recording of the investigators' interview of John to determine whether (or not) he told the investigators Jane and he discussed "coercion" during their second sexual encounter, even though the Hearing Board used John's purported "coercion" interview statement as the principal basis to find his hearing testimony not credible. (*Id*. ¶¶ 5-8, 47, 78, 109, 125-126, 146, 193-196, 220(e)).

While Loyola answered Counts I and II of the AC, it moved to dismiss Counts III (promissory estoppel) and IV (NIED) pursuant to Fed. R.C.P. 12(b)(6).

## ARGUMENT

### I.     MOTION TO DISMISS STANDARDS

In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). A complaint properly states a claim if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009),

quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plaintiff's "factual

allegations … must be sufficient to raise the possibility of relief above the 'speculative level.'"

*Britton v. ITT Technical Institute*, 2014 WL 1568684, at *2 (N.D. Ill. Apr. 17, 2017); *Twombly*,

550 U.S. at 555. However, "[s]pecific facts are not necessary; the statement need only give the

defendant fair notice of what the … claim is and the grounds upon which it rests." *Erickson v.*

*Pardus*, 551 U.S. 89, 93 (2007), citing *Twombly*, 550 U.S. at 555.

## II.    THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES A CLAIM FOR PROMISSORY ESTOPPEL

To state a claim for promissory estoppel, John must allege facts showing that "(1)

defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3)

plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the

promise to its detriment." *Hart v. Amazon.com, Inc*., 191 F. Supp. 3d 809, 824 (N.D. Ill. 2016).

John has alleged facts supporting each of these elements.

Loyola argues that "Plaintiff alleges only conclusions" with respect to each of the four

elements of promissory estoppel. (Dkt. 28 at 6-7). As the basis for this argument, Loyola

singles out *one* paragraph in the AC – ¶ 225  in Count III – which states, "Loyola unambiguously

promised John that it would accord him a fair and just process to resolve any allegations of a

violation of the Community Standards"; "John relied on such promise"; "John's reliance was

expected and foreseeable by Loyola"; and "John reasonably and justifiably relied to his

detriment on the promise when he was subjected to a process that violated that promise."

John does not dispute that ¶ 225 simply sets forth the legal elements of a promissory

estoppel claim under Illinois law (as it was intended to do), and therefore, these allegations are

conclusions of law. Loyola, however, ignores the scores of *factual allegations* in the AC, which

precede, and are "incorporated by reference" in, Count III that contain "sufficient factual matter" regarding each element of Johns' claim for promissory estoppel.

> **A.** **John Alleges Specific Promises and John's Detrimental Reliance on those Breached Promises Satisfying the First and Fourth Elements of His Promissory Estoppel Claim.**

Loyola argues that the AC "provides no citation for this alleged promise" to provide John with a fair hearing and fails to clearly reference "in what policy or procedure" the promise allegedly was made. (Dkt. 28. at 7). Loyola sets up a straw man and surmises that John is relying on a statement in the 2012-2013 Community Standards, in which Loyola promised that its student conduct proceedings "shall be informal, fair, and expeditious." (*Id.*) Loyola then knocks down the straw man and argues that this general promise is not definite enough to constitute an unambiguous promise under cases decided in this judicial district. (*Id.*) These cases have found that "general claims" and "broad principles of fairness" in a university's policy manual must also be accompanied by "specifics about how those goals will be achieved" to constitute "an unambiguous promise" for a promissory estoppel claim. *Doe v. Columbia Coll. Chicago,* 299 F. Supp. 3d 939, 960-61 (N.D. Ill. 2017); *Doe v. Univ. of Chicago*, 2017 WL 4163960, at *10-11 (N.D. Ill. Sept. 20, 2017).[1]

John does not dispute that courts have held that promises made by a university about its sexual misconduct policies and procedures must be specific or definite enough to "constitute the type of *unambiguous* promise required to support a promissory estoppel claim." *Columbia Coll.*,

---

[1]     *Columbia Coll.*, 229 F. Supp. 3d at 960-61 ("while a plaintiff may derive a promissory estoppel claim from a policy manual, those claims typically arise with specific promises … not general claims"); *Univ. of Chicago, supra,* at *10-11 ("Promises sufficient to support a claim of promissory estoppel may come from a defendant's policies and procedures manual," but promises to provide "a prompt, fair, impartial and thorough investigation and resolution" are "not definite enough to constitute an *unambiguous* promise" in the absence of "specifics about how those goals will be achieved.").

299 F. Supp. 3d at 960 (emphasis in original).  Contrary to Loyola's argument, the AC alleges multiple specific promises regarding *how these goals were to be achieved in John's case*.  These *specific promises* concerning procedures and rights Loyola would follow to ensure a fair process – completely ignored by Loyola – satisfy the Illinois standard for an *unambiguous* promise.

Similarly, Loyola myopically focuses on ¶ 225, and incorrectly argues that the AC alleges only that John "relied to his detriment on general policy language about fairness."  (Dkt. 28 at 8).  To the contrary, the AC sets forth detailed factual allegations showing how Loyola breached each of the specific promises it made to John upon which he relied, and how Loyola's breaches were detrimental to him.

For example, the AC includes the following five specific promises and breaches of those promises to John's detriment.

*__First__*, the AC alleges that on November 4, 2016 Timothy Love, then the Associate Dean of Students and Interim Title IX Coordinator, advised John in writing that, while the same investigators would investigate both complaints:

> *to preserve the impartiality and fairness of the hearing process*, each complaint … will result in separate and distinct investigative reports, which will then each by heard by separate and distinct Hearing Boards (with different personnel serving on each board). *This is the best way that we can preserve your rights as a student not to be subject to any inappropriate bias as a result of having two complaints under investigation at the same time*."

(AC ¶¶ 95-96) (emphasis in AC).

On its face, this is a specific promise made by the University to John that Loyola will use a special, individualized procedure given the circumstances of John's case to ensure that the University adheres to its broad promise of impartiality and fairness.  Put another way, with this promise, Loyola "commit[ted] itself to taking a specific action for the benefit of Plaintiff."  *Hart v. Amazon.Com, Inc.*, 191 F. Supp. 3d 809, 824 (N.D. Ill. 2016).

6

John alleges that Loyola breached this promise by advising the Chairperson of Jane's Hearing Board about Elizabeth's complaint and allowing other members of Jane's Hearing Board to learn that John was the subject of another complaint during the Board's deliberations of Jane's complaint. (AC ¶¶ 96-97, 101, 141, 142, 203). By allowing Jane's decision-makers to learn about another complaint, Loyola violated its promise to John that each Hearing Board would decide only one complaint, and neither Hearing Board would know that John was the subject of another complaint. (*Id*. ¶ 96). The Hearing Board that was free from taint (i.e., Elizabeth's Hearing Board) found John *not* responsible, while Jane's Hearing Board found John responsible after a hearing tainted by "inappropriate bias" and beset by procedural errors. (*Id*. ¶¶ 145-146, 204). This broken promise resulted in John's expulsion and permanent notation of sexual assault on his academic record to his severe detriment. (*Id*. ¶¶ 151, 166).

**_Second_**, Loyola promised John that he "will have the opportunity to review any investigative report after the investigation has concluded but before a formal hearing," and will "have at least two (2) days" before the hearing to do so. (AC ¶¶ 89 iii.; 92). This promise goes beyond the broad promise of an impartial and thorough resolution process. Like the promise to hold separate and distinct hearings, this promise involves a specific procedure, with a definite timeline, that the University will follow for John's benefit.

John alleges that Loyola breached this promise by providing John with an *incorrect* version of the Final Investigation Report, and failing to rectify that error before the hearing. (*Id*. ¶¶ 112-116). Loyola notified John that Jane's hearing would take place on December 14, 2016, and he could review the Final Investigation Report beginning December 12, 2016 – two days before the hearing. Unbeknownst to John, however, Loyola provided him with an incorrect version of the Report. John did not learn about the error until 7 p.m. the evening before the 9

a.m. hearing – too late for him to review the correct Report. (*Id.*) Thus, Loyola did not give John the opportunity to review the actual Final Investigation Report *at all* – let alone two days before the hearing. (*Id.*) The detriment to John is obvious. He did not know what the Final Investigation Report said, and thus, was not able to adequately prepare for the hearing. (*Id.*) That flawed and deeply unfair hearing resulted in a finding of responsibility, a sanction of expulsion, and a wrongful, lifelong stigma branding John as a sexual offender. (*Id.* ¶¶ 146, 166).

***Third***, Loyola promised that its investigators will "separately interview relevant witnesses that can provide a firsthand account of something seen, heard, or experienced relating to the alleged incident." (AC ¶¶ 91, 181). Like the two promises cited above, this promise goes beyond the general commitment to impartiality and fairness. It sets forth a specific procedure Loyola agreed to follow – interviewing relevant witnesses during the investigation – and specific criteria the investigators will use to define and identify "relevant" witnesses – *i.e.*, they are persons who can provide "a firsthand account" of something they have "seen, heard, or experienced" with respect to the "alleged incident."

John alleges that Loyola breached this promise when the investigators failed to interview two witnesses John named as individuals who would have exculpatory information (identified as Witnesses A and B in the AC). (*Id.* ¶ 107). Witness A would have testified that (a) he met with Jane and John in Witness A's dorm room for approximately 30 minutes after Jane and John returned to Jane's dorm following their first sexual encounter, (b) "John and Jane seemed happy [and] were friendly with each other and talkative," (c) when Witness A saw Jane several times over the next several days she "had only positive and affectionate things to say about" John, (d) Jane told Witness A that John was "an asshole" because "he did not walk her home one night," and (e) Jane "never indicated that John's sexual contact with Jane was anything other than

mutually consented to." (*Id*.) Witness B would have testified that he was in John's apartment during the January 13, 2016 sexual encounter, he saw Jane before and after she left John's bedroom while Witness B was in the common area outside of the bedroom, and he did not hear or observe anything that indicated Jane was unhappy or uncomfortable. (*Id*. ¶ 108). Witnesses A and B would have provided "firsthand" testimony to contradict Jane's claim that she was visibly distraught and "frozen in fear" during her sexual encounters with John. (*Id*. ¶¶ 114, 182). As a result of the omission of this material evidence from the Final Investigation Report, John was denied the ability to present this exculpatory testimony to the Hearing Board – to his severe detriment. (*Id*. ¶ 183).

*__Fourth__*, Loyola promised that the hearing "will be conducted to take into account the totality of all information available from all relevant sources." (AC ¶ 47). This promise, too, goes beyond the broad promise that the process will "always be … impartial and thorough." The words "impartial" and "thorough" are general terms; the promise that the Hearing Board will consider "the totality of *all* information" from all *available* and *relevant sources* is specific. With this promise, an accused student like John who identifies "relevant sources" of information can expect the Hearing Board to consider and weigh that information.

John alleges that Loyola breached this promise when the Hearing Board (a) failed to call Witnesses A and B whom John had identified as persons with exculpatory information, (b) failed to address exculpatory evidence John presented (and Jane confirmed) that Jane came over to John's apartment a third time, even though she alleged John had sexually coerced her the first two times she visited him at his apartment, (c) refused to ask Jane a question suggested by John (inquiring as to why she came to his apartment a third time), and, in fact, chastised him during the hearing for suggesting that question, and (d) refused to review the audio recording of John's

interview with the investigators to determine whether John told (or did not tell) the investigators that he and Jane discussed coercion during their second sexual encounter.  This refusal to listen to the audio recording, which was the best evidence to determine John's actual words at his interview, was severely detrimental to John, because the Hearing Board used the "coercion" interview statement as the principal basis to discredit John's hearing testimony in its entirety and expel him from the University.  (*Id*. ¶¶ 5-8, 78, 109, 125-126, 146, 193-196, 220 (e)).

**_Fifth_**, Loyola promised the parties that they "may choose to be accompanied by one advisor of their choice," and "[t]he advisor may accompany either party at any point in time throughout the conduct process."  (AC ¶ 89 viii.).  Like the other promises cited above, this promise goes beyond the general commitment to provide an impartial process.  It guarantees both parties the right to have an advisor accompany them "at any point in time throughout the conduct process."  This is an unequivocal promise about a specific procedural right.

John alleges that Loyola breached this promise when Timothy Love incorrectly told John that he would not be entitled to have an advisor at his interview with the investigators.  (*Id*. ¶¶ 4, 102, 187, 189).  When John arrived for his interview, the investigators told him he was permitted to have an advisor present, and they would postpone the interview for later that day.  By that time, however, it was too late to secure his advisor's presence, and John proceeded with the interview without his advisor, to John's detriment.  (*Id*. ¶¶ 105, 188).  Had Loyola not violated its promise about John's right to an advisor, John would have been accompanied by his lawyer-advisor.  There is a strong likelihood that the investigators' mistaken claim in their Report that John told them he and Jane had discussed coercion would have been corrected by John's lawyer-advisor, and the Hearing Board would have reached a different result.

In sum, consistent with the case law in this district, John alleges *specific promises* regarding how the "broad principles of fairness" in Loyola's policies would be accomplished, and how Loyola violated those specific promises to John's detriment.

**B.      John Alleges Facts Sufficient to Satisfy the Second and Third Elements of His Promissory Estoppel Claim.**

With respect to the second and third elements – *John's reliance* and the *foreseeability of his reliance by Loyola* – John alleges that, as a Loyola student accused of sexual misconduct, he was subjected to Loyola's internal student conduct process, and that Loyola presented him with specific promises about procedures Loyola would follow and rights John would have to "preserve the impartiality and fairness" of the process.  (AC ¶¶ 2-12, 47, 89 viii., 91-92, 95-96, 181).  Under these circumstances – where Loyola told John *what he can expect from Loyola* and *what rights he is being given by Loyola* – common sense dictates that John would rely on these promises and representations, and that Loyola expected his reliance.  Further, Loyola expressly advised all students involved in the conduct process that they "*can expect*" to be given the opportunity to review the Final Investigation Report "before a formal hearing," and to have an advisor present "at any point in time throughout the conduct process."  (*Id*. ¶¶ 89 iii., viii.).  Loyola expressly told John that appointing "separate and distinct Hearing Boards … is the best way that *we can preserve your rights* as a student."  (*Id*. ¶ 91) (emphasis added).  In short, Loyola told John that he could expect Loyola to honor the protections it was promising him.[2]

_____

[2]      Loyola argues that "disclaimers" in the 2012-2013 Community Standards, stating that the University "reserves the right to change the policies and procedures outlined in the Community Standards," belie Plaintiff's "conclusory assertion that his alleged reliance was expected by or foreseeable to Loyola."  (Dkt. 28 at 8).  But, as John explained above, he does not rely solely on general promises for his promissory estoppel claim, and thus, Loyola's disclaimers as to these general promises are inapplicable to the specific promises Loyola made to John, and John's expected and foreseeable reliance by Loyola.

### III. THE AMENDED COMPLAINT SUFFICIENTLY ALLEGES NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

To allege a claim for NIED, John must allege facts showing: "(1) that defendant owed plaintiff a duty; (2) that defendant breached that duty; and (3) that plaintiff's injury was proximately caused by that breach." *Johnson v. Wal-Mart Stores, Inc.*, 587 F. Supp. 2d 1027, 1033 (C.D. Ill. 2008). In addition, a direct victim of emotional distress must allege the emotional distress "was accompanied by a contemporaneous physical injury to or impact on the plaintiff." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009). Loyola incorrectly argues that John has not alleged two elements of negligent infliction of emotional distress, *i.e.*, physical injury and duty.

#### A. John Sufficiently Alleges Physical Injury.

"Illinois law recognizes claims for negligent infliction of emotional distress," and that "[d]irect victims of negligent infliction of emotional distress are 'the persons that the negligent conduct has directly affected.'" *Myers v. Condominiums of Edelweiss, Inc.*, 2013 WL 4597973, *8 (N.D. Ill. Aug. 29, 2013), quoting *Barnes v. Anyanwu*, 391 Fed. Appx. 549, 552 (7th Cir. 2010). Under Illinois's impact rule, "a direct victim may not recover for emotional distress suffered as a result of the defendant's alleged negligence unless the emotional distress was accompanied by a contemporaneous physical injury to or impact on the plaintiff." *Id.*, quoting *Lewis*, 561 F.3d at 703. The court in *Lewis* noted that certain types of alleged injuries – *e.g.*, "immense emotional pressure, the loss of business [or] reputation, etc. – do not constitute 'contemporaneous physical contact' or 'physical injury or illness' sufficient to state a claim for negligent infliction of emotional distress." *Id.*, quoting *Wallis v. Card Servs. Int'l, Inc.*, 2012

12

WL 1866374, at *5 (N.D. Ill. May 22, 2012).[3]  The AC alleges that John suffered "physical

harm" as a "direct, proximate, and foreseeable consequence" of Loyola's negligence.  (AC ¶

232).  At this stage of the case, the allegation of "physical harm" is sufficient; John is not

required to plead *evidence* of physical illness to withstand a motion to dismiss.  Such evidence

will be developed in discovery.[4]

### B.  John Sufficiently Alleges Duty.

Loyola also argues that, as a matter of law, it owed no duty to provide John with a fair

and impartial process and to protect him from foreseeable harm that would result from Loyola's

breach of that duty.  (Dkt. 28 at 10).  In support of this contention, Loyola cites a series of

inapposite cases for the proposition that, "[o]rdinarily, a party owes no duty of care to protect

another from the harmful or criminal acts of third persons."  (*Id.*, citing, *e.g.*, *MacDonald v.*

*Hinton*, 836 N.E.2d 893, 898 (Ill. App. 2005)).  The cases cited by Loyola, however, involve

claims brought by plaintiffs seeking recompense from defendants for the negligent acts of *third*

*parties*.  For example, in *Hinton*, the personal representative of the estate of an employee who

---

[3]      It appears the Seventh Circuit has not directly addressed the issue of what *types* of physical injuries, impact, or illnesses satisfy the impact rule in the context of this case, where a student alleges a university's negligent conduct in a disciplinary proceeding resulted in negligent infliction of emotional distress.  John has found one Illinois district court case that does address the issue.  *Yates v. John Marshall Law School*, 2009 WL 1309516 (N.D. Ill. May 11, 2009).  In *Yates*, the district court reasoned a student/plaintiff "*must allege that a physical act by JMLS caused her injury*," as opposed to alleging that the school's "*non-physical conduct affect[ed] her physically and mentally.*" *Id.* at *3 (emphasis added).  That analysis is flawed.  A school is never going to *physically act* upon a student in these types of cases, and such a standard would insulate schools from liability for NIED claims.  Instead, the impact rule requires that the defendant's negligent conduct caused the plaintiff to suffer physical injury or illness (*not* that the defendant must have physically touched or assaulted the plaintiff).  *See Johnson v. Wal-Mart Stores, Inc.*, 587 F. Supp. 2d 1027, 1033 (C.D. Ill. 2008) (impact rule requires that the victim "*sustain[ed] contemporaneous physical impact or injury because of the negligence of a defendant*") (emphasis added); *Barnes*, 391 Fed. Appx. at 554 (direct victims "are actually *physically injured by the defendant's negligent conduct*") (emphasis added).

[4]      In discovery, John expects to show he suffered headaches, stomach aches, and other symptoms of physical illness contemporaneously with emotional distress symptoms as a result of Loyola's negligence.

was murdered by a co-worker sued the employer for damages. *Id*. at 896. Likewise, in *Rabel v. Ill. Wesleyan Univ*., 514 N.E.2d 552, 554, 560-61 (Ill. App. 1987), also cited by Loyola, the student-plaintiff sought to hold the school responsible for the negligent acts of a third party – a fellow student whose fraternity-house prank caused the plaintiff to sustain physical injuries. These cases are inapplicable here. Loyola is not a "third party."

Likewise, Loyola's reliance on *Columbia Coll.* (and a handful of other district court cases cited in *Columbia)* for a blanket rule that universities do not owe students a duty of care to properly apply their policies in sexual misconduct disciplinary proceedings is misplaced. *Columbia Coll*., 299 F. Supp. 3d at 962-63. These cases are distinguishable to the extent they use the standard for duty drawn from third-party negligence claims, and to the extent they hold that university policies do not create a legal duty to "protect the interests of any particular student." *Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214, 1229 (D. Or. 2016) (university's goal "was to reach just code of conduct decisions rather than protect the interests of any particular student"). Here, John alleges that Loyola made specific promises about procedures and rights it was according to John, and thereby, "voluntarily assumed a duty" of care owed to him. *See Doe v. Amherst Coll*., 238 F. Supp. 3d 195, 228 (D. Mass. 2017) (noting under Massachusetts law "a duty finds its source in existing social values or customs or *where a defendant has voluntarily assumed a duty*") (emphasis added). In sum, John has sufficiently alleged negligent infliction of emotional distress.

## <u>CONCLUSION</u>

For the reasons set forth above, John respectfully requests that the Court deny Loyola's

Motion to Dismiss Counts III and IV of the Amended Complaint.

Dated:  February 25, 2019                    Respectfully submitted,

                                             JOHN DOE


                                             /s/ Jonathan M. Cyrluk
                                             Jonathan M. Cyrluk
                                             CARPENTER LIPPS & LELAND LLP
                                             180 North LaSalle Street, Suite 2105
                                             Chicago, IL  60601
                                             Email:  cyrluk@carpenterlipps.com

                                             Patricia M. Hamill
                                             Lorie K. Dakessian
                                             CONRAD O'BRIEN PC
                                             1500 Market Street, Suite 3900
                                             Centre Square, West Tower
                                             Philadelphia, PA  19102-2100
                                             Email:  phamill@conradobrien.com
                                                       ldakessian@conradobrien.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that he caused the foregoing PLAINTIFF

JOHN DOE'S RESPONSE TO DEFENDANT LOYOLA UNIVERSITY OF CHICAGO'S

MOTION TO DISMISS COUNTS III AND IV OF AMENDED COMPLAINT to be filed with

the Clerk of the court using the CM/ECF system, which will send electronic notification to the

following counsel of record this 25th day of February 2019:

Peter G. Land
Gwendolyn Morales
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL  60606
Emails:  Peter.Land@huschblackwell.com
           Gwendolyn.Morales@huschblackwell.com


                                 /s/ Jonathan M. Cyrluk
                                 Jonathan M. Cyrluk