IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff,<br><br>vs.<br><br>LOYOLA UNIVERSITY CHICAGO,<br><br>    Defendant. | No. 1:18-cv-7335<br><br>Hon. Steven Seeger<br><br>Magistrate Judge Jeffrey T. Gilbert<br>Courtroom 1386 |

**PLAINTIFF JOHN DOE'S MOTION
TO COMPEL PRODUCTION OF DOCUMENTS[1]**

Plaintiff, John Doe ("John"), by his attorneys and pursuant to Fed. R. Civ. P. 37, respectfully requests the Court to order Defendant Loyola University of Chicago ("Loyola" or the "University") to produce documents and information in response to Plaintiff's Document Request Nos. 17 and 18. In support of this motion, Plaintiff respectfully states as follows:

**INTRODUCTION**

1.  This action arises out of, among other things, Loyola's gender-biased policies for investigating and adjudicating allegations of sexual misconduct made by females against males. In 2011, the United States Department of Education issued the "2011 Dear Colleague Letter," a document the Seventh Circuit confirmed is relevant in evaluating whether a school discriminated against a student in violation of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. §§ 1681-88. *See Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019). In *Purdue*, the Seventh Circuit held that the 2011 Dear Colleague Letter and the actions the university took in response to the letter are "relevant in evaluating the plausibility of a Title IX claim[,]" citing other federal appellate courts that have reached the same result. *Id.* To gauge the effect the 2011

---

[1] In accordance with the Court's order dated September 23, 2019, Plaintiff waited to file this motion until the Court set its first status hearing after reassignment.

Dear Colleague Letter had on Loyola's disciplinary process, Plaintiff requested, in part, specific information regarding disciplinary proceedings at Loyola related to its Sexual Misconduct Policy from 2009-10 to 2018-19.  *See* **Exhibit A** at Request 17.  John also requested all Hearing Board opinions and decisions of Appellate Officers from 2009-10 to 2018-19 that related to the Sexual Misconduct Policy.  *Id*. at Request 18.

2.      To date, Loyola has not produced: (1) the information John requested in Request 17 for academic years 2009-10 to 2014-15; and (2) the opinions of the Hearing Boards and decisions of Appellate Officers for academic years 2009-10 to 2014-15.[2]  As outlined below, well-established case law provides that the information John seeks is relevant to his claims and his requests are narrowly tailored.

## BACKGROUND

3.      As set forth in his Amended Complaint (Dkt. 19), John alleges that Loyola railroaded him out of the University by, among other things, application of Loyola's gender-based policies and system for investigating and adjudicating accusations of sexual misconduct made by female complainants against male students.  (Am. Compl. ¶ 1.)  On November 4, 2016, a female complainant, Jane Roe ("Jane"), accused John of non-consensual sexual penetration during three separate encounters nearly ten months after the last encounter occurred.  (*Id.* ¶ 2.)  Six weeks later, Loyola expelled John.  (*Id.* ¶ 4.)

4.      The University's rush to resolve Jane's accusation was mandated by Loyola's gender-based policies for dealing with allegations of sexual misconduct set forth in its code of

---

[2]     On September 18, 2019, Loyola indicated a willingness to provide additional documents for the years 2013-14 and 2014-15, but not any earlier years.  *See* **Exhibit E** at 1.  Loyola has not yet produced those documents and it is not entirely clear whether Loyola's offer was conditioned on Plaintiff's abandoning his request for documents relating to earlier school years. Given the amount of time and correspondence that has taken place related to this discovery dispute, John seeks the documents related to the years 2013-14 and 2014-15 into his prayer for relief in the event Loyola abandons its willingness to produce documents relating to those years.

student conduct, titled Community Standards 2016-2017 ("Community Standards"). (*Id.*) John alleged that the Community Standards were enacted in response to the Dear Colleague Letter and the United States Department of Education's 2014 Questions and Answers on Title IX and Sexual Violence ("2014 Questions and Answers"). The Dear Colleague Letter essentially required schools to apply a preponderance of the evidence standard rather than the clear and convincing standard to complaints of sexual misconduct. (*See id.* ¶¶ 27-28.) The Dear Colleague Letter put significant pressure on colleges and universities, explicitly threatening that "[w]hen a recipient does not come into compliance voluntarily, [the Office for Civil Rights] may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation." (*See id.* ¶ 28.) Further, in 2014, the White House created a task force of senior administrative officials to further pressure colleges and universities to change the way allegations of sexual misconduct were handled. (*See id.* ¶ 30.) The task force's very first report, which came out in April 2014, focused on the protection of females, stating that "[o]ne in five women is sexually assaulted in college." (*See id.* ¶ 31) (emphasis omitted). That same month, the Education Department's Office for Civil Rights ("OCR") issued further guidance in its 2014 Questions and Answers, which strongly implied that allowing an accused student to cross-examine his accuser could create a "hostile environment" and lead to a college or university's possible violation of Title IX. (*See id.* ¶ 32.) Because cases involving alleged sexual misconduct on school campuses overwhelmingly arise from a woman accusing a man, the measures put in place to protect alleged victims and punish alleged perpetrators necessarily intended harsher treatment of men. (*See id.* ¶ 33.)

5. John alleges that Loyola's Community Standards, adopted in response to the Dear Colleague Letter and the Questions and Answers, are part of Loyola's gender-biased system for

3

investigating and adjudicating accusations of sexual misconduct made by female complainants against males. (*See id.* ¶ 1.) John further alleges that Loyola employed the Community Standards in a discriminatory manner against John and in favor of Jane in its investigation, hearing, and internal appeal of the accusation and finding. John sued Loyola based on claims for violations of Title IX (Count I), breach of contract (Count II), and promissory estoppel (Count III).[3]

6. On March 13, 2019, John served his First Set of Document Requests Directed to Loyola (the "Document Requests"). John's Document Requests sought, *inter alia*:

- Request 17: All documents, for each academic year from 2009-10 through the present, that refer or relate to reports, audits, compilations, graphs, and statistics prepared by or for the University regarding disciplinary proceedings related to violations of the Sexual Misconduct Policy, including but not limited to such data as (a) the number of sexual harassment, sexual misconduct (including sexual assault), dating violence, domestic violence, and stalking incidents reported each year, (b) the type of alleged misconduct or violation, (c) the charge(s) brought against the accused, if any, (d) the date of the Hearing, if a Hearing was held, (e) the names of the Hearing Board members, (f) the findings of the Hearing Boards, (g) the sanction(s) imposed, (h) the appeal, if any, (i) the name of the Appellate Officer, and (j) the outcome of the appeal – with the names of all involved students redacted, but the gender of the students indicated.

- Request 18: All hearing board opinions and decisions of appellate officers relating to proceedings held pursuant to the Sexual Misconduct Policy, from academic year 2009-10 to the present, with the names of all involved students redacted, but the gender of the students indicated.

**Exhibit A**.

7. On April 26, 2019, Loyola responded to John's Document Requests. **Exhibit B**. Regarding Request 17, Loyola failed to produce any documents and objected to the request

---

[3] The Court dismissed John's negligent infliction of emotional distress claim. (Count IV (Dkt. 47.))

4

> as overly broad, unduly burdensome, seeking information protected by the attorney-client privilege or work product privileges and/or the Family Educational Rights and Privacy Act of 1974 ("FERPA"), and seeking information bearing no relevance on the issues in this litigation. The specific details requested concerning other sexual misconduct complaints made to the University and the University's investigation and resolution of those complaints for a nearly 10-year period beginning approximately seven years before the University's investigation and resolution of Jane's complaint against [John] that is at issue in this litigation are not relevant to the University's investigation and resolution of Jane's complaint. Notwithstanding these objections, [Loyola] refers [John] to its Annual Security Report and Fire Safety Report ("ASR"), which is published annually and includes crime statistics from the previous year, including statistics regarding incidents of rape, fondling, incest, statutory rape, domestic violence, dating violence, and stalking for Loyola's campuses. The ASR for years 2016 and 2017 are available at the following links. . . . [Loyola] further refers [John] to the following information regarding the Gender-Based Violence Climate Survey on which Loyola embarked in 2017.

*Id.* Regarding Request 18, Loyola also failed to produce any documents and objected to the request

> as overly broad, unduly burdensome, and seeking information bearing no relevance on the University's investigation and resolution of Jane's complaint against [John] that is at issue in this litigation. The University's decisions relating to other student complaints involving alleged sexual misconduct complaints over a nearly 10-year period, beginning approximately seven years before the University's investigation and resolution of Jane's complaint against [John], are not relevant to the University's investigation and resolution of Jane's complaint, in that they were not considered and did not factor into the University's investigation and resolution of Jane's complaint, and involve different students, different factual allegations, different Student Code provisions, and/or different versions of the Student Code than were at issue in Jane's complaint against [John] and the University's investigation and resolution of that complaint.

*Id.*

8. On July 12, 2019, John's counsel wrote to Loyola's counsel about various deficiencies with Loyola's discovery responses. *See* **Exhibit C**. As to Request 17, John's counsel responded to Loyola's objections and explained that Loyola must produce the requested information because it related to the time-period before the 2011 Dear Colleague Letter was issued. An analysis of sexual misconduct disciplinary proceedings from 2009-10 to 2018-19 will allow John to evaluate the impact the 2011 Dear Colleague Letter had on Loyola's disciplinary process. Moreover, John's counsel noted that Request 17 specifically addressed Loyola's FERPA concerns by allowing Loyola to redact the names of the students, but still indicate their genders. *See id.* at 2-3. Finally, John noted that the links Loyola provided to its 2016 and 2017 Annual Security Report and Fire Safety Reports and to information regarding its Gender-Based Violence Climate Survey did not contain the requested information. *See id.* at 3. In particular, the links did not contain, as requested in Request 17, the type of the alleged sexual misconduct; the charges the University brought against the accused, if any; the date of the hearing, if a hearing was held; the names of the Hearing Board members; the findings of the Hearing Boards; the sanction(s) imposed; the appeal, if any; the names of the Appellate Officers; and the outcome of the appeal. *See id.*

9. Regarding Request 18, which sought Hearing Board opinions and decisions of Appellate Officers pertaining to sexual misconduct proceedings for academic years 2009-10 to 2018-19, John similarly noted that Request 18 was narrowly tailored to opinions and decisions starting from 2009-10 so John could evaluate the effect the 2011 Dear Colleague Letter had on Loyola's disciplinary process. *See id.* Moreover, Request 18 specifically advised that Loyola could redact the names of the students to address any FERPA concerns. *See id.*

6

10. On August 6, 2019, counsel for Loyola responded and provided additional documents. *See* **Exhibit D**. In response to Requests 17 and 18, Loyola produced a chart that indicated the genders of the complainants and respondents in 36 sexual misconduct matters for only the years 2015-16 to 2018-19. *Id.* at 2. Loyola, however, failed to produce any documents from 2009-10 through 2014-15 related to its sexual misconduct investigations/adjudications and Hearing Board opinions and decisions of Appellate Officers from 2009-10 to 2014-15. Nor did Loyola provide the names of all of the Hearing Board members and Appellate Officers on the various cases from 2009-10 through 2018-19.[4]

11. The parties discussed Loyola's discovery deficiencies in a call between counsel on August 19, 2019, which was followed by email correspondence on August 20 and 29 and September 12, 15, 16, and 18, 2019. *See* **Exhibit E**. On September 18, 2019, Loyola indicated a willingness to produce additional data related to sexual misconduct proceedings for the years 2013-14 and 2014-15. *See id.* at 1. Loyola, however, has not yet produced the additional information and continues to refuse to provide any documents from 2009-10 to 2012-13. On September 26, 2019, Plaintiff advised that Loyola should produce the requested documents for all requested years. *See* **Exhibit F**. Loyola continues to refuse to do so.

---

[4] Loyola recently has agreed to produce a list of the decision-makers for the 36 students who were subject to sexual misconduct disciplinary proceedings between 2015-2016 and 2018-2019. Loyola has not yet produced this list. John reserves the right to seek an order compelling this information if Loyola does not produce it within one week.

**ARGUMENT**

12. Loyola should be required to produce the information requested in Requests 17 and 18 because the evidence is unquestionably relevant to assess the effect the 2011 Dear Colleague Letter had on Loyola's disciplinary process.

13. Federal Rule of Civil Procedure 26(b)(1) defines the scope of discovery, stating that

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). "It is axiomatic that the concept of relevancy is to be broadly construed at the discovery stage of an action." *Credit Gen. Ins. Co. v. Midwest Indem. Corp.*, No. 90-7151, 1992 WL 199227, at *1 (N.D. Ill. Aug. 7, 1992) (citation omitted). "The scope of discovery in civil cases is extremely broad and relevant objections, while permissible, will not be sustained where discovery sought is relevant to the subject matter." *Id.*

14. "The burden 'rests upon the objecting party to show why a particular discovery request is improper.'" *Cunningham v. Smithkline Beecham*, 255 F.R.D. 474, 478 (N.D. Ind. 2009) (quoting *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 449-50 (N.D. Ill. 2006)). "The objecting party must show with specificity that the request is improper," and its "burden cannot be met by 'a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is

8

neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.'" *Id.* (citations omitted).

15. The information regarding other investigations and hearings is relevant. Three federal appeals courts, including the Seventh Circuit, have held that a university's response to pressure relating to the Dear Colleague Letter is relevant to a plaintiff's claim under Title IX. In *Purdue*, the Seventh Circuit specifically stated that the 2011 Dear Colleague Letter and the actions a university took in response to the letter are "relevant in evaluating the plausibility of a Title IX claim." *See Purdue*, 928 F.3d at 668 (citing *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (pressure from the Department of Education "provides a backdrop, that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim"); *Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018) ("pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment— loss of federal funds—if it failed to comply, led Miami University to discriminate against men in its sexual-assault process," combined with other allegations, "support[ed] a reasonable inference of gender discrimination); *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016) ("There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults."); *see also Menaker v. Hofstra Univ.*, 935 F.3d 20, 34 (2d Cir. 2019) (stating the 2011 Dear Colleague Letter, *inter alia*, was sufficient to show pressure on the university "to react more forcefully to allegations of male sexual misconduct").[5]

---

[5] *See also Doe v. Ohio State Univ.*, No. 16-171, 2018 WL 4958958, at *3 (S.D. Ohio Oct. 15, 2018) (noting the relevance in Title IX erroneous outcome cases of pressure from the Department of Education and Office for Civil Rights on schools to more effectively respond to complaints of sexual misconduct).

16.     In holding that the district court erred in dismissing a Title IX claim, the *Purdue* court pointed to allegations that set the backdrop for the plausibility of the claim, including those that "Purdue had a financial motive for discriminating against males in sexual assault investigations," that it therefore "tilted the process against men accused of sexual assault so that it could elevate the number of punishments imposed," and that "[t]he resulting track record of enforcement would permit Purdue to signal its commitment to cracking down on campus sexual assault[.]" *Id.* at 668. John's requested discovery goes to each of these points. Loyola has produced its Community Standards from 2009-10 to 2016-17, but has refused to produce information that would show how it actually applied those policies from 2009-10 to 2014-15, thereby depriving John of the information to thoroughly assess how Loyola "tilted the process against men" and its "resulting track record of enforcement." *See id.*

17.     Therefore, Loyola should be required to produce the information requested in Requests 17 and 18 because the evidence is relevant to assess the effect the 2011 Dear Colleague Letter had on Loyola's disciplinary process.[6]

18.     Lower courts confronted with similar requests have overruled universities' efforts to shield the information from production. For example, the plaintiff in *Ohio State*, like John, alleged the university engaged in gender-based discrimination during his disciplinary proceeding. 2018 WL 4958958, at *1. Also like John, the plaintiff requested "all documents concerning any investigation, evaluation, prosecution, adjudication, or appeal of a charge of

---

[6]     In its September 12 email, Loyola cited *Doe v. University of Chicago*, No. 16-8298, 2017 WL 4163960, at *5 (N.D. Ill. Sept. 20, 2017), and *Doe v. Colgate University*, No. 15-1069, 2017 WL 4990629, at *8 (N.D.N.Y. Oct. 31, 2017), for the proposition that the 2011 Dear Colleague Letter has no relevance to a plaintiff's Title IX claim. *See* **Exhibit E** at 4. On the contrary, the *University of Chicago* and *Colgate University* cases were decided before the *Purdue*, *Baum*, *Miami Univ.*, and *Menaker* cases (addressed above), all of which held that pressure from the federal government to vigorously respond to allegations of sexual misconduct is relevant to a Title IX erroneous outcome claim. Moreover, neither of the cases Loyola cited related to a discovery dispute.

sexual assault, sexual misconduct, sexual harassment or similar offense made to [the university]." *Id.* at *4. The court ordered the university to produce data between 2010 and the present (2018) that "reflect[ed] the gender of the accused, the gender of the accuser, the charges, the relevant dates, the outcome of each case, and the identity of the investigators." *Id.* The university then produced a spreadsheet that contained a list of 1,200 sexual misconduct cases. *Id.* Of those 1,200 cases, the plaintiff requested the full case files of thirty-five of them. *Id.* The university objected to producing the full case files based on the burden associated with complying with FERPA. *Id.* The court overruled the objection because the university failed to demonstrate that the burden was disproportionate to the needs of the case. *Id.* The court further held that data pertaining to other disciplinary proceedings and appeals was relevant to the plaintiff's claim of gender bias.[7] *Id.* at *5.

19.     In another case against Ohio State, the plaintiff sought redacted documents concerning any sexual misconduct investigations at the university from 2010 to the present (2015). *See Doe v. Ohio State Univ.*, No. 15-2830, 2015 WL 6082606, at *1 (S.D. Ohio Oct. 16, 2015). The court rejected the university's overbreadth argument and ordered the production of documents. *Id.* at *2. The court concluded that, "if The Ohio State University has a pattern and practice that treats males unfairly in sexual misconduct investigations, then the school has a

---

[7]     The court in *Ohio State* specifically concluded that "appeal information [was] relevant to Plaintiff's claims[]" because "[t]he existence of gender bias in the appellate process would be just as relevant to Plaintiff's claims as the existence of gender bias in the initial disciplinary proceeding." *Id.* at *5. Based on email correspondence between counsel in this matter, it is expected Loyola may argue that the court did not address relevancy issues. As noted, however, the court did address the relevancy of the information in *Ohio State*. Loyola may further argue that Ohio State was subject to an OCR investigation into its Title IX compliance. This is a distinction without a difference. Numerous appellate courts have concluded that pressure from the federal government for schools to vigorously address allegations of sexual misconduct is relevant to a plaintiff's Title IX claim, regardless of whether there was an ongoing investigation of the school. *See, e.g., Purdue*, 928 F.3d at 668-69 (citing the Sixth Circuit's decision in *Miami Univ.*, 882 F.3d at 594, the Sixth Circuit's decision in *Baum*, 903 F.3d at 586, and the Second Circuit's decision in *Columbia*, 831 F.3d at 58).

significant problem in this litigation. Determining whether such a problem exists necessitates looking at the data and the context surrounding that data." *Id.*

20. Here, like the plaintiffs in the *Ohio State* cases, John alleges that Loyola adopted a gender-biased system for investigating and adjudicating allegations of sexual misconduct in response to the 2011 Dear Colleague Letter. Like those plaintiffs, John also requested data about other disciplinary matters (Request 17) and the opinions of Hearing Boards and Appellate Officers (Request 18) from 2009-10 through 2018-19 to assess the effect the Dear Colleague Letter had on Loyola's disciplinary process.[8] Yet Loyola refuses to produce any information for the years 2009-2010 through 2014-2015.[9]

21. The data sought by John is even more limited than the plaintiffs' document requests in the *Ohio State* cases. On August 6, 2019, Loyola supplemented its document production to provide data about sexual misconduct cases from 2015-16 to 2018-19 and identified 36 sexual misconduct cases during this approximately four-year time period. *See* **Exhibit D** at 2. Loyola estimated that information for the additional years of 2009-10 to 2014-15 would include an expected 50-60 cases and an additional 1,000 pages of documents. *See* **Exhibit E** at 4. Producing two reams of paper in a Title IX lawsuit is hardly burdensome. For example, in *Ohio State*, the court concluded that the university had "not demonstrated that the burden of complying with FERPA [was] disproportionate to the needs of the case" because the "[r]eview of 3,500 pages [did] not strike the Court as unduly burdensome." *Ohio State*, 2018

---

[8] To allay any concern Loyola had with complying with FERPA, which pertains to the release of educational records, *see* 20 U.S.C. § 1232g(b)(2), John specifically requested the information in Requests 17 and 18 with the students' names redacted, but their genders indicated. *See, e.g.*, *Ohio State*, 2018 WL 4958958, at *4 (quoting *Doe v. Ohio*, No. 91-464, 2013 WL 2145594, at *6 (S.D. Ohio May 15, 2013)) (stating university "could redact all personally identifiable information" to avoid FERPA problem).

[9] On September 18, 2019, Loyola indicated a willingness to produce additional data pertaining to other sexual misconduct proceedings for the years 2013-14 and 2014-15. *See* **Exhibit E** at 1. Loyola has not yet produced this information.

WL 4958958, at *4. Loyola's estimated production of 1,000 pages is far less than the additional 3,500 pages produced in *Ohio State*. *See id.*

## COMPLIANCE WITH LOCAL RULE 37.2

22. As detailed herein, John's counsel attempted resolve this dispute with Loyola's counsel through telephone calls and written correspondence between July 12 and September 26, 2019, but Loyola has not produced the requested information.

## CONCLUSION

Based on the foregoing, the Court should: (i) order Loyola to produce (a) data relating to sexual misconduct investigations and adjudications from 2009-10 to 2014-15, and (b) the opinions of the Hearing Boards and Appellate Officers in all adjudications of alleged sexual misconduct from 2009-10 to 2014-15; and (ii) grant such other relief as the Court deems just and proper.

Dated: October 18, 2019            Respectfully submitted,

                                                 JOHN DOE

                                           By:     /s/ Jonathan M. Cyrluk
                                                      *One of John Doe's Attorneys*

Jonathan M. Cyrluk
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
Email: cyrluk@carpenterlipps.com

Patricia M. Hamill
Lorie K. Dakessian
CONRAD O'BRIEN PC
1500 Market Street, Suite 3900
Centre Square, West Tower
Philadelphia, Pennsylvania 19102-2100
Email: phamill@conradobrien.com
         ldakessian@conradobrien.com

**<u>CERTIFICATE OF SERVICE</u>**

      I, Jonathan M. Cyrluk, an attorney, hereby certify that, on October 18, 2019, I caused a copy of the foregoing to be served on all counsel of record via the Court's CM/ECF system.

                                            /s/Jonathan M. Cyrluk
                                    Jonathan M. Cyrluk
                                    CARPENTER LIPPS & LELAND LLP
                                    180 North LaSalle Street, Suite 2105
                                    Chicago, Illinois 60601
                                    312-777-4820 (direct)
                                    312-777-4839 (fax)
                                    cyrluk@carpenterlipps.com