**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE, | |
| Plaintiff, | No. 1:18-cv-7335 |
| vs. | Hon. Steven Seeger |
| LOYOLA UNIVERSITY CHICAGO, | Magistrate Judge Jeffrey T. Gilbert |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR PARTIAL**
**SUMMARY JUDGMENT AS TO LIABILITY FOR BREACH OF CONTRACT**

Jonathan M. Cyrluk
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
Email: cyrluk@carpenterlipps.com

Patricia M. Hamill
  *Admitted Pro Hac Vice*
Lorie K. Dakessian
  *Admitted Pro Hac Vice*
CONRAD O'BRIEN PC
1500 Market Street, Suite 3900
Centre Square, West Tower
Philadelphia, Pennsylvania 19102-2100
Email:  phamill@conradobrien.com
        ldakessian@conradobrien.com


*Attorneys for Plaintiff John Doe*

**I.    INTRODUCTION**

In late October 2016, nine months after her sexual encounters with Plaintiff John Doe, Jane Roe filed a formal complaint with Defendant Loyola University Chicago's Deputy Title IX Coordinator, Tim Love, accusing John of sexual misconduct. On November 8, 2016, Love met with John to discuss the charges and told John the case "hinged" on whether John "coerced" Jane into sexual activity.  A few weeks later, John met with Loyola's investigators for a recorded interview. During the interview, John refuted the charges, saying "no one was forced. No one was coerced." In their written summary, the investigators also wrote that: "In person, when Respondent next saw Complainant, they shared that they had both rushed into things. They mutually agreed that they had moved fast physically and 'that no one was coerced.'"

At the hearing to determine whether John was responsible for sexual misconduct, the chair of the hearing board misquoted the interview summary and asked John: "The second part of that statement, it says they *mutually agreed* that no one was coerced. How did coercion come up in that conversation?" (Misquoted and added words in italics.) In response, John said, "It didn't" and explained that he and Jane did not discuss coercion, but he simply said "no one was coerced" because he had been told the case was about coercion. Without consulting the audio recording of John's interview, the Board concluded that John's "account during the hearing [concerning whether he discussed coercion with Jane] was contradictory" to "the Investigators' account of the interview." Finding him not credible based on this singular and supposedly "contradictory" statement, the Board rejected John's account. It then adopted Jane's account wholesale, found John responsible for sexual misconduct and expelled him.

John sued Loyola, asserting claims for violation of Title IX of the Education Amendments of 1972 (Count I), breach of contract (Count II), and promissory estoppel (Count III). During discovery, Loyola disclosed that nine months before she filed her formal complaint,

1

Jane had told a Loyola official that: "*While she doesn't believe she was forced or coerced,* she performed oral sex on [John.]" Even though Tim Love, Loyola's Title IX official at the time of the investigation of Jane's allegations, was aware of this statement and had told John the case "hinged" on "coercion," he violated the Community Standards and arbitrarily chose not to provide this highly relevant and possibly exculpatory information to John, the investigators and the hearing board. Discovery in this case also revealed that Loyola failed to preserve John's audio recorded interview despite Loyola's policies mandating that it be preserved and a document preservation request issued to Loyola while John's appeal was pending.

While there is substantial evidence supporting John's other claims, as well as other contractual breaches, he recognizes that multiple fact issues would preclude summary judgment. But for purposes of this motion, John sets forth only undisputed facts that prove that Loyola breached §§ 401, 409 and 411 of its published Community Standards by failing to: (a) provide John evidence he needed to defend himself; and (b) allow him to review evidence and refute testimony.

## II.     SUMMARY OF UNDISPUTED MATERIAL FACTS

### A.     John and Jane's their sexual encounters

In 2016, John was a full-time, tuition paying, undergraduate student, on track to graduate in spring 2017. SMF 1.[1] On January 13, 2016, John and Jane went on a first date, and had a sexual encounter in John's apartment. John and Jane agreed that on this date they had kissed, touched each other sexually, and performed oral sex on each other. SMF 4. A few days later, Jane went to John's apartment to talk. They agreed they had rushed into things and were interested in pursuing a relationship that wasn't built solely on sexual interaction. SMF 5. On

---

[1] Citations to Plaintiff's Local Rule 56.1(a)(3) Statement of Undisputed Material Facts are cited as "SMF __."

January 17, 2016, Jane went to John's apartment a third time and performed oral sex on John. SMF 6.

### B. Jane's initial discussions with Loyola employees

A few days later, Jane talked to her Loyola ▇▇▇▇▇▇ about her encounters with John. The ▇▇▇, in turn, submitted a report to Loyola's Title IX office on January 21, 2016 (the "January 21 Report"). SMF 8. Rabia Khan Harvey, who was then Loyola's Deputy Title IX Coordinator, met with Jane on January 26th. Khan Harvey's report (the "January 26 Report") of the meeting states that Jane told Khan Harvey "*she doesn't believe she was forced or coerced*," and Jane did not file a formal complaint against John at that time. SMF 9-11 (emphasis added.).

### C. The formal complaint, the investigation, and the hearing

Nine months later, after several communications with Tim Love (who had replaced Khan Harvey and had become Loyola's Interim Deputy Title IX Coordinator), Jane decided to file a formal complaint against John. SMF 13. Jane's complaint triggered a process governed by the "Community Standards" Loyola published for that academic year, 2016-2017. SMF 16. Among other things, the Community Standards (SMF 65) provided accused students the rights:

- To receive notice and "have the relevant policies explained clearly and fully at every level of the conduct process" (§ 401.1).
- To "review all documentation concerning the potential policy violations during the hearing," and to "refute information provided by witnesses" (§ 401.4, .5).
- "[T]o review in person the Final Investigation Report and *any other relevant information that will be considered by the board*" (§ 409.6.c; emphasis added).
- To a process conducted in compliance with applicable laws, which require a prompt, fair, and thorough investigation and resolution (§ 409; *see* SMF 65 n. 7.)[2]

---

[2] In addition, § 411 of the Community Standards, covering the appeal process, mandates reversal of a hearing board's decision if "[a] substantive procedural error or error in the interpretation of University policy occurred that denied the respondent the right to a fair hearing and decision." *See also* Loyola's Annual Security Report and Fire Safety Report for the Year 2016, § 409.6(5): "The investigation and resolution process of reports or notifications of gender-based misconduct will always be prompt, impartial, and thorough." SMF 65 fn. 7.

On November 4, 2016, Love assigned two inexperienced investigators — employees Ray Tennison and Leslie Watland — to investigate Jane's allegations. SMF 17-18. Also on that date, Love sent a letter to John, notifying him that "it is alleged that you sexually assaulted fellow student [Jane Roe]." Although the November 4th letter did not set forth the policy provisions triggered by Jane's complaint (an omission Love described as a "typographical error"), and also did not set forth the factual basis of any allegations, Love told John at a meeting on November 8, 2016, that the case "hinged" on whether there was "coercion." SMF 19-20.

On December 1 and 2, respectively, Watland and Tennison interviewed Jane and John, and audiotaped both interviews. SMF 21.[3] Watland then drafted an approximately three-page, single-spaced, 140-line summary of John's interview for inclusion in a Final Investigation Report ("FIR"). SMF 23. John told the investigators about his and Jane's encounters, explaining that Jane had initiated their sexual activity. He stated that he had done nothing wrong, and that "[n]o one was coerced, no one was forced." SMF 24. John also described a conversation John and Jane had a few days after their first date, which Watland summarized as follows: "In person, when Respondent next saw Complainant, they shared that they had both rushed into things. They mutually agreed that they had moved fast physically and 'that no one was coerced.'" SMF 25.

The investigators and Love prepared the FIR, which was supposed to include relevant materials for the Board. Love prepared the section entitled "History of the Case," in which he noted that Jane had met with Khan Harvey on January 26, 2017, but Love omitted Jane's statement to Khan Harvey that "she doesn't believe she was forced or coerced" contained in the January 26 Report, and did not attach the January 26 report to the FIR. In contrast, Loyola attached the January 21 Report of Jane's ▓▓▓ to the FIR. SMF 27-29. The FIR was submitted

---

[3]    John was given his own summary to review, but not the audiotape, and Watland testified at her deposition that the summaries are "not a direct transcription of everything said in the interview." SMF 23, 26.

to a hearing board, consisting of Loyola employees Jessica Landis (Chair), Brian Houze, and Angela King Taylor.

On December 14, 2016, the Board conducted a hearing and posed questions to the parties based on the FIR. John told the Board that some of the acts that Jane alleged had not happened at all and that Jane had initiated or requested the other acts. SMF 34-35. At one point, Landis asked John about the conversation Watland had summarized, though Landis misquoted the summary in her question: "The second part of that statement, it says they *mutually agreed* that no one was coerced. How did coercion come up in that conversation?"[4] John responded: "It didn't." John explained he had been told in documents or by Love that the case was about coercion: "And so, that's why I brought that up during the interview is I said no one was coerced. It has nothing to do with that exact conversation [with Jane]." John advised that any suggestion that he and Jane specifically discussed the topic of coercion "was a misinterpretation" of his statements. SMF 36.

Landis then asked the investigators "to speak to that line." Watland repeated what she wrote, explaining she put the phrase "no one was coerced" in quotations because "the phrasing – it seems more formal than I think I anticipate people usually talking to each other." Watland did not recall asking follow-up questions or "asking, hey, did you say those exact words to her or did she say those exact words to you." SMF 37.[5]

John and Jane then both confirmed that they had agreed they rushed into a physical relationship. John stated that "*we* felt like *we* rushed into things. . . . And *we* wanted to pump the brakes and try to develop a …a relationship [not] cemented in physical contact." SMF 38 (emphasis added). Jane concurred, stating her memory of the conversation was "[e]xactly the

---

[4]     (Misquoted and added words in italics.) The actual language in the FIR was: "[t]hey mutually agreed that they had moved fast physically and 'that no one was coerced.'" SMF 25.
[5]     Tennison also does not recall following up with John, and remembers only "John invoking that word, 'coerced.'" SMF 41.

same as his." SMF 39. The Board did not ask any more questions on this issue, and gave no hint of the weight it was going to give to any inconsistency between John's recollection and Watland's. SMF 40.

### D. The Board's decision

While the Board was drafting its decision, Love learned the Board was prepared to rule against John based on its conclusion that John's statement concerning whether he and Jane discussed "coercion" was not credible. Because coercion was a "unique factor" of the case, Love "wanted to be sure that her [Landis] addressing that as part of their credibility decision just took into account that I did affirm that we [he and John] had talked about that [coercion]." Love stated: "I had talked to him about that [coercion], so it was not surprising to me that he had used that -- may have used that word in the investigation process." SMF 48.

The Board issued a decision on December 20, 2016. The Board acknowledged first that "[a]ccording to the Respondent, all sexual contact and penetration was clearly consensual" and that "Complainant's account of events was significantly different." "The board then considered the credibility" of the parties. The Board found Jane credible, primarily because:

> Complainant has consistently shared her account of the alleged events over the course of the last 11 months: she reported a consistent account to Witness 1 the night of the incident, to her ████ [sic] a few days after the incident, to the Investigators months later, and to the Board during the hearing.

SMF 44. Unaware of Jane's prior statement that "she doesn't believe she was forced or coerced," the Board stated that it "*did not have* any other information to consider to evaluate the Complainant's credibility." *Id.* (emphasis added.) The Board found John not credible, citing one single reason: John's effort to clarify that "neither the word 'coercion' nor the topic of coercion was discussed with the Complainant as ***implied*** in the FIR[.]" *Id.* (emphasis added).

The Board continued:

> All things considered, Respondent's inconsistency regarding the discussion of coercion, ***while a singular instance***, is noteworthy to the Board. The presence or lack of coercion is a foundational component to determining whether consent was present for a sexual interaction. As such, the Respondent's inconsistency around this topic in particular holds significant weight.
>
> After evaluation, the Board had no reason to question the credibility of the Complainant's account. ***As discussed, the Board did find reason to question the credibility of the Respondent's account. Based on a preponderance of the evidence standard, the Board did find the Complainant's account to be – more likely than not – credible and therefore based analysis of the potential policy violations on the information provided in her account***.

*Id*. (emphasis added). The Board reached this conclusion even though it found no inconsistencies in John's statements regarding the sexual acts and without (a) listening to, or asking the investigators to listen to, the audio recording of John's interview, or (b) addressing Love's acknowledgment that he discussed "coercion" with John. SMF 44; *see also* SMF Ex. 28, *passim*.

Based entirely on its finding that John was not credible, the Board found John responsible for "non-consensual" sexual contact and penetration and expelled him from Loyola. SMF 45-47; *see also* SMF Ex. 28.

### E. John's appeal

John appealed the Board's decision under § 411 of the Community Standards, arguing, among other things, that the Board committed substantive procedural error by basing its decision on an unjustifiable credibility decision and failing to review a transcript of John's interview to confirm the words he used, and made findings manifestly contrary to the evidence. SMF53. Jack McLean, who was Loyola's Appeals Officer at least from 2015 to 2017, rejected John's arguments and denied his appeal. SMF 57.

McLean stated in an early draft of his decision that "Loyola's administrative process does not allow the recording or transcribing of interviews." SMF 54. Love told him this was incorrect and drafted a different rationale (SMF 55-56), which McLean adopted in his final decision:

> Loyola's administrative process does not make investigation interviews available to the hearing officers after the interviewed parties have certified the written summaries prepared by the investigators. Though the interview of the Respondent /Appellant was originally audio recorded, this recording was only to be used by the investigators to draft their interview summary. . . . Thus, neither the hearing board nor the Appeals Officer has access to the 'interview transcript.' Without such access, the only way to verify what was said in the initial interview (beyond relying on the certified statement) is to consult with the investigators and the party who was interviewed. . . . If Hearing Board members found the Investigators' account more credible than that of the Respondent/Appellant, the Appeals Officer must defer to the Hearing Board on that issue of credibility.[6]

Notwithstanding this self-serving rationale, McLean and other Loyola officials conceded in discovery that Loyola's policies and procedures did not preclude the Board or Appeals Officer from reviewing the interview audiotape or asking the investigators to review it. SMF 59. McLean also conceded that denying a respondent access to relevant evidence is "substantive procedural error;" that substantive procedural error is an automatic ground for appeal, whether or not the error impacted the decision; and that he had previously reversed a finding of responsibility on that ground. SMF 60.

Even though Loyola's policies required preservation of the audio recordings, and John's counsel sent Loyola a document preservation letter while the appeal was pending, Loyola failed to preserve the recording of John's interview and did not produce it in discovery. SMF 67-75.

---

[6] SMF 57. McLean confirmed he based his decision on deference to the Board's credibility determination, that he did not consider the evidence further (despite his duty to review whether findings were "manifestly contrary to the evidence"), and that, if the Board had found both parties credible, the ruling would be "no responsibility[.]" SMF 57, 62, and 63.

## III.    ARGUMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law . . . The Court must constru[e] the facts and mak[e] reasonable inferences in favor of the nonmovant." *Ironbeam, Inc. v. Papadopoulos*, 432 F. Supp. 3d 769, 776-77 (N.D. Ill. 2020) (internal quotation marks and citations omitted).

### A.    Loyola must honor implied and express contractual obligations to John

It is well settled that a university's handbook and other published materials create express contractual obligations. *See, e.g., Steinberg v. Chicago Med. Sch.*, 371 N.E.2d 634, 640 (Ill. 1977); *Bosch v. NorthShore Univ. Health Sys*, 155 N.E.3d 486, 499 (Ill. App. Ct. 2019). In addition, even absent express written terms, a university has implied contractual duties, the breach of which "might consist of nothing more than a claim that the student paid her tuition, satisfactorily performed her coursework, and was wrongly denied her degree (or advancement toward that degree). The wrongful dismissal or denial of degree is the breach." *Bosch*, 155 N.E.3d at 496 (student allowed to assert both express and implied contract claims based on breach of a specific handbook provision university's substantial deviation from its procedures).

### B.    Loyola breached express contractual provisions

Loyola, through its Community Standards, expressly promised John that:

- He would be able to "review all documentation concerning the potential policy violations during the hearing," and to "refute information provided by witnesses" (§ 401.4, .5).

- The investigators would "collect[] all relevant information." (§ 409.6.b).

- He would be able "to review in person the Final Investigation Report and any other relevant information that will be considered by the board" (§ 409.6.c).

- Loyola would reverse any hearing board decision where "[a] substantive procedural error or error in the interpretation of University policy occurred that denied the respondent the right to a fair hearing and decision. (§ 411; *see* SMF 65 and fn. 2, *supra*).

The undisputed facts establish that Loyola's Community Standards are part of its contract with John, and that Loyola breached specific provisions. *First*, Loyola breached §§ 409.6.c and 401.4-.5 of the Community Standards by (a) failing give John access to the audio recording of his interview, and (b) relying on the written summary of John's interview without reviewing the best evidence (*i.e.*, the audio recording) of what John actually said during the interview before concluding that John's statement at the hearing contradicted an "implied" statement in the FIR (whether John and Jane discussed "coercion").

As a result of the purported "inconsistency," Loyola determined that the entirety of John's version of events was not credible and used that as the *sole* basis to expel him. Yet the Board easily could have accessed the audio recording of the interview to determine precisely what John said in the interview just as it did with the audio recording of the hearing to determine precisely what John said at the hearing. SMF 50. By using John's purported words against him, but not letting him listen to those exact words (or listening to them itself), the Board denied John his right to review relevant information and refute witnesses. SMF 65.

Loyola compounded its breach of those same provisions and irreversibly prejudiced John by failing to preserve the interview recording in violation of its own practices and a document preservation request from John's counsel. SMF 67-75. *See, e.g., Schmalz v. Vill. of N. Riverside*, No. 13 C 8012, 2018 WL 1704109, at \*3-4 (N.D. Ill. Mar. 23, 2018) (finding prejudice from failure to preserve), *objections to report and recommendation overruled*, No. 13 C 8012, Doc. No. 290 (N.D. Ill. July 6, 2018) (failure to preserve evidence after preservation notice "is sufficient to show bad faith"). (Judge Bucklo's order attached hereto as **Ex. A**.) Because Loyola has deprived John of the evidence he needed to support his account, the Court should accept as an undisputed fact that the audio recording would have corroborated John's explanation of what

10

he told the investigators. *See, e.g., Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 627-28 (7th Cir. 2018) (lower court appropriately accepted as true plaintiff's proposed stipulations of fact concerning emails' content when defendant failed to preserve evidence); *Freidig v. Target Corp.*, 329 F.R.D. 199, 209 (W.D. Wis. 2018) (court accepted witness statement as undisputed when defendant failed to preserve relevant videotape).

*Second*, Loyola violated §§ 409.6.b and c and §§ 401.4-.5 by failing to (a) collect all relevant evidence, which included Jane's prior statement that she "didn't believe she was forced or coerced," and (b) provide the statement to John or the Board. Love told John the case "hinged" on "coercion," yet Loyola did not provide John a statement from Jane that directly refuted this claim. The Board then relied primarily on the purported consistency of Jane's statements to find her credible. Because the Board relied on the absence of any additional statements by Jane, her prior statement to Khan Harvey about the alleged sexual acts was "relevant information" that should have been provided by Loyola to John pursuant to § 409.6.c and §§ 401.4-.5[7]

An April 2015 internal Loyola appellate decision (the "2015 Loyola Appeal Decision") mandates a finding that Loyola breached not just the contractual promises discussed above, but also its own appeal standards and its overarching contractual duty of fairness. In that decision, Loyola's Appeals Officer (McLean) reversed a Board decision based on defects almost identical to those John raised in his appeal. In that case, as in John's, the Board found an accused student responsible for sexual assault and expelled him from Loyola. The student appealed for reasons including Loyola's loss of a videotape that could have exonerated him and refusal to allow him to review the entire file, including audio recordings of the investigators' interviews of the parties,

---

[7]     Loyola's failure to provide exculpatory evidence to John and the Board also violated its promise to comply with laws that require a "prompt, fair, and impartial investigation and resolution." SMF 65 fn. 7

before the hearing. McLean agreed and reversed the hearing board's finding of responsibility. McLean concluded that Loyola had committed "procedural errors," including violating the sections of the Community Standards that gave respondents the right to "inspect all documentation relevant to the case that will be used by the . . . board to make a decision," "review all documentation" and "refute information provided by witnesses," and had unfairly deprived the respondent of his right to defend himself.[8] SMF 65 (§401.4-5 and § 409.6.c.)

With respect to the missing video tapes, McLean found that it was not "fair and just to hold the respondent responsible . . . when the video tapes that could have exonerated him were lost through no fault of his own[.]" Similarly, with respect to the interview recordings, McLean found that failure to provide the recordings was contrary to the Community Standards provision that allowed respondents to "'have the opportunity to inspect all documentation relevant to the case that will be used by the . . . board to make a decision.'"[9] McLean insisted that it was not "fair or just" to preclude the parties from reviewing the interview recordings when "the Hearing Board, through the Investigators who are present, and consulted, at the hearing, is allowed to use selected parts of those interviews in reaching their decision. . . . *The practice hobbles each party in preparing their case and could cloud the search for the facts*." SMF 61 (quoting 2015 Loyola Appeal Decision) (emphasis added). McLean then concluded, in view of the loss of evidence and other errors, that the evidence in the case was "insufficient and inconclusive to hold the Respondent responsible for the allegations." *Id*. (quoting 2015 Loyola Appeal Decision). On that same basis, Loyola should have given John access to the audio recording of his interview since the Board used a supposed inconsistency between a statement in his interview and his hearing

---

[8]    The provisions McLean cited correspond to §§ 401.4-.5 and 409.c of the 2016-2017 Community Standards.
[9]    This section corresponds to §409.6.c of the 2016-2017 Community Standards.

testimony to find him not credible, and thus, responsible. Like the missing videotape in the 2015 Loyola Appeal Decision, the audio tape could have exonerated John.

Similarly, Jane's statement to Kahn Harvey that she didn't "believe she was forced or coerced" also should have been provided to John as part of his contractual right to "review all documentation concerning the potential policy violations during the hearing." John should have been allowed to use that statement to counter the Board's findings (based on Loyola's failure to collect "all relevant evidence") that Jane "has consistently shared her account of the alleged events" and there was no "other information to consider to evaluate the Complainant's credibility." SMF 44. Under Loyola's appeal standards, as articulated and applied by McLean in the 2015 Appeal Decision, Loyola committed substantive procedural error, and the evidence was "insufficient and inconclusive to hold the Respondent responsible for the allegations." SMF 61 (quoting 2015 Loyola Appeal Decision).

Courts in Illinois and elsewhere have granted affirmative relief to plaintiffs based on far less egregious facts. *See, e.g., Brody v. Finch Univ. of Health Scis*., 698 N.E.2d 257, 265-67 (Ill. App. Ct. 1998) (university breached representation that students would be admitted to medical school if they achieved a certain grade point average); *DeMarco v. Univ. of Health Scis.*, 352 N.E.2d 356, 361-62 (Ill. App. Ct. 1976) (injunction issued where school refused to award a degree for reasons unrelated to academic qualifications); *see also Doe v. George Washington Univ*., 321 F. Supp. 3d 118, 124–28 (D.D.C. 2018) (granting summary judgment to student where appellate officer went beyond defined role and added requirements not included in university's code); *Doe v. Univ. of Notre Dame*, No. 3:17CV298, 2017 WL 1836939, *9-11 (N.D. Ind. May 8, 2017), *injunction vacated after parties settled*, 2017 WL 7661416 (N.D. Ind.

Dec. 27, 2017) (finding likely success on allegations that university breached promise of

"prompt, fair and impartial investigation and resolution").[10]

### C.    Loyola violated its implied contractual obligations

Loyola also breached its implied contractual obligations. John was a tuition-paying

student, on track to graduate in spring 2017, and Loyola expelled him for reasons it cannot

justify. *See Bosch*, 155 N.E.3d at 495-96, 499. In *Bosch*, the court stated that an *academic*

decision can be reversed under an implied contract theory if it is "arbitrary and capricious or the

product of bad faith or malice." *Id.* at 496. The *Bosch* court held that substantial deviation from

procedures and "invented" justifications for a decision could establish arbitrary and capricious

conduct. *Id.* at 499; *see also Brody*, 698 N.E.2d at 265-67 (university's unilateral attempt to

modify agreement with students was arbitrary, capricious, and in bad faith).[11]

---

[10]    Cases denying defendants' motions to dismiss or for summary judgment, in this and other jurisdictions, further confirm the legal principles on which this motion is based. *See, e.g., Steinberg*, 371 N.E.2d at 640 (allowing medical school applicants to pursue class action for breach of contract - and fraud - based on alleged failure to follow published criteria for evaluating applications); *Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992) (reversing dismissal of contract claim against university for failure to honor obligations to student); *McDaniel v. Loyola Univ. Med. Ctr.*, No. 13-CV-6500, 2019 WL 1281969, at *22 (N.D. Ill. Mar. 20, 2019) (denying defendants' motion for summary judgment on contract claim based on alleged breach of promises to provide "due process" and "consider all information for relevance and reliability"); *Liu v. Northwestern Univ.*, 78 F. Supp. 3d 839, 846-48 (N.D. Ill. 2015) (denying motion to dismiss student's contract claim against private university based on failure to give her "due process procedures" set forth in handbook); *O'Driscoll v. Argosy Univ.*, No. 12 C 10164, 2014 WL 714023, at *3 (N.D. Ill. Feb. 25, 2014)*; see also, e.g., Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 179 (N.D.N.Y. 2020) (denying motion to dismiss contract claim based on university's alleged failure to apply preponderance of the evidence standard in campus disciplinary proceeding; plaintiff "plausibly alleged that the disciplinary decision was a result-driven determination in which Syracuse failed to apply the applicable standard" and made credibility determinations "not rationally based on the evidence"); *Doe v. Quinnipiac University*, 404 F. Supp. 3d 643, 671-72 (D. Conn. 2019) (denying defendant's motion for summary judgment on breach of contract claim on similar grounds); *Doe v. Grinnell College*, 473 F. Supp. 3d 909, 933-35 (S.D. Iowa 2019) (same).
[11]    As the *Bosch* court explained, courts typically defer to a university's academic judgments, but that deference does not apply when "academic judgment had nothing to do with [plaintiff's] dismissal." 155 N.E.2d at 499; *see also, e.g., Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019) ("withholding the evidence on which [the university] relied in adjudicating [plaintiff's] guilt was itself sufficient to render the process fundamentally unfair"). While a different panel, in *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 858 (7th Cir. 2019), used language suggesting it was applying "reluctance to interfere in academic affairs" to a disciplinary proceeding involving alleged sexual misconduct, it issued that decision four months before *Bosch*, cited only cases involving traditional academic judgments, did not acknowledge the implied contractual obligations set forth in *Bosch*, and is distinguishable on its facts.

Assuming for purposes of this motion that the same standard applies to the disciplinary decision at issue in this case, the undisputed facts satisfy that standard. Here, Loyola deviated substantially from its procedures and acted in an arbitrary and capricious manner when the Board and Appeals Officer (McLean) failed to review the audio recording of John's interview before concluding that John's statement in the interview contradicted his statement at the hearing. The arbitrary nature of their conduct is illustrated by the Board's decision to review the audio recording of a portion of the hearing itself to determine what John's words at the hearing.

Likewise, Loyola deviated from its procedures and acted arbitrarily and capriciously by advising John that the case "hinged" on coercion, but at the same time failing to provide John, the investigators and the Board with Jane's prior statement that "she doesn't believe she was forced or coerced."

Finally, McLean's appellate decision in John's case is, in and of itself, arbitrary and capricious. Here, McLean simply deferred to the Board's decision, whereas in the 2015 Loyola Appeal Decision, he reversed a hearing board's decision based on the same defects present in this case, even noting that recordings should be provided to the parties. This is the very definition of arbitrary.

IV.    **CONCLUSION**

Based on the foregoing, the Court should enter partial summary judgment in favor of John establishing Loyola's liability for breach of contract (Count II).

Dated: February 3, 2021

Respectfully submitted,

JOHN DOE

By:      /s/Jonathan M. Cyrluk     
*One of John Doe's Attorneys*

Jonathan M. Cyrluk
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
Email: cyrluk@carpenterlipps.com

Patricia M. Hamill
Lorie K. Dakessian
CONRAD O'BRIEN PC
1500 Market Street, Suite 3900
Centre Square, West Tower
Philadelphia, Pennsylvania 19102-2100
Email: phamill@conradobrien.com
        ldakessian@conradobrien.com

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.2.2
### Eastern Division

Frank Schmalz

                            Plaintiff,

v.                                             Case No.: 1:13–cv–08012
                                            Honorable Elaine E. Bucklo

Village Of North Riverside, et al.

                            Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, July 6, 2018:

        MINUTE entry before the Honorable Elaine E. Bucklo: Defendants' motion to reconsider is granted in part. The order stating that defendants had not timely objected to Magistrate Judge Rowland's report and recommendation awarding specific fees was incorrect. The objection was timely filed. As the motion to reconsider notes, defendants had also timely objected to the underlying report and recommendation in which Judge Rowland recommended certain sanctions in response to defendants' spoliation of text messages. I have carefully reviewed defendants' objections, plaintiff's responses, the reports and recommendations, and the underlying briefs and materials presented to Magistrate Judge Rowland with respect to the missing text messages. Defendants' objections to each of Judge Rowland's recommendations are without merit. The argument that defendants' testimony about what they said in admittedly relevant text messages in 2013 concerning plaintiff can reasonably take the place of the messages, and that therefore plaintiff is not prejudiced by their destruction, is frivolous. In addition, I conclude that given the notices that defendants received to preserve evidence, and their undoubted understanding and knowledge of the importance of the orders to preserve the evidence, their subsequent destruction of the cell phones (in one case years after this case began) is sufficient to show bad faith. At the very least, Judge Rowland's recommendation that the parties be allowed to present evidence on the matter to a jury is appropriate. I will consider further closer to trial whether the jury should be instructed on an adverse inference. As stated in the order dated 6/18/18, fees are awarded in the amount of $14,750.00. The recommendation regarding fees is supported by the facts and is reasonable. Motion for leave to withdraw counsel, Lucy B. Bednarek is granted. No appearance required on 7/11/2018 or 7/12/2018. Mailed notice. (mgh, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please

refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.