UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>               Plaintiff,<br><br>   vs.<br><br>LOYOLA UNIVERSITY CHICAGO,<br><br>             Defendant. | No. 1:18-cv-7335<br><br>Hon. Steven Seeger<br><br>Magistrate Judge Jeffrey T. Gilbert |

PLAINTIFF'S REPLY IN SUPPORT OF HIS
MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT II

Plaintiff, John Doe, for his reply in support of his motion for partial summary judgment on Count II of his amended complaint, respectfully states as follows:

The undisputed facts establish that Loyola breached its Community Standards by, among other things, (1) failing to provide Rabia Khan Harvey's report that Jane "doesn't believe she was forced or coerced" into sexual activity to John, the investigators and Hearing Board; and (2) failing to provide John with, or otherwise consider, the audio recording of John's interview.[1] As a result, Loyola deprived John of the evidence he needed to defend himself and violated his contractual right to review evidence and refute testimony. The proceeding was so tainted by these fundamental breaches, that the decision to find John responsible and expel him constitutes its own breach of contract.

In its Response, Loyola misstates the law and the facts. On the law, Loyola essentially argues that, because it is a university and it made a decision, this Court must defer to it. But Courts recognize a qualitative difference between a university's *academic* decisions and its

---

[1] While John's motion focuses on these two undisputed facts, there is additional evidence of multiple other breaches by Loyola. *See* Dkt. 157-59, *passim*. Loyola intentionally railroaded John out of Loyola, which breached Loyola's agreements with John no matter what legal standard applies. John recognizes that these additional facts, however, are disputed and limited this motion to the undisputed facts discussed herein.

disciplinary decisions. Courts defer to academic decisions, but not to disciplinary decisions, such as in this case. Nor do courts defer to a university's failure to follow procedural rules set forth in written agreements. Regardless, even if an arbitrary and capricious standard applied to Loyola's actions, the undisputed facts show that Loyola's decision not to provide relevant evidence to John was arbitrary and capricious. *See Bosch v. NorthShore Univ. Health Sys*, 155 N.E.3d 486, 499 (Ill. App. Ct. 2019).

 Loyola's attempts to create a fact issue fare no better. For example, Loyola asserts that Khan Harvey's report was not relevant to John's case. Resp. 10-13. But in a case where coercion was a "unique factor," there can be no more relevant document than the notes from the then-Deputy Title IX Coordinator stating that the complainant "doesn't believe she was forced or coerced" into sexual activity with the respondent.

 Similarly, the Court should reject Loyola's tortured interpretation of the Community Standards to justify its failure to use the audio recording of John's interview to conclusively determine whether John actually made contradictory statements at his interview and hearing. Under principles of contract interpretation, Loyola had to review and provide the audio recording as part of its obligations to provide John with all relevant information and allow him to refute witnesses. Finally, Loyola does not dispute that the Board and McLean could have from directed the investigators to review the recording to confirm what John said in his interview. Accordingly, because Loyola failed to show any genuine dispute of fact, the Court should grant summary judgment on Count II of John's amended complaint.

## I. ARGUMENT

### A. Loyola misstates John's burden of proof.

*1.      John does not need to show that Loyola acted arbitrarily and capriciously.*

Loyola asserts that no distinction exists between academic and non-academic decisions, and thus, *every* university decision must be given deference, constituting a breach only if it is arbitrary and capricious, or in bad faith. Resp. 1-3. Loyola further contends that, to prevail on summary judgment, John must show that Loyola's dismissal decision was "'without any discernable rational basis.'" *Id.* at 2 (quoting *DiPerna v. Chi. Sch. of Prof'l. Psychology*, 893 F.3d 1001, 1007 (7th Cir. 2018).[2]

Loyola is mistaken. John does not contend that *Bosch* created a "new distinction" between academic and non-academic decisions. Resp. 1. Courts have historically recognized a fundamental difference between the two. *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 89–90 (1978).[3] Courts give heightened deference to *academic* decisions (*Bosch v. NorthShore Univ. Health Sys.*, 155 N.E.3d 486, 496 (Ill. App. Ct. 2019)).[4] Courts, however, also

---

[2]      *DiPerna* concerned the academic decision regarding whether the plaintiff plagiarized one of her papers. 893 F.3d at 1003-05.

[3]      In *Horowitz*, the dismissal decision "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal." 435 U.S. at 89-90. "Such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* The Court distinguished such academic-judgment decisions from purely disciplinary judgments, such as dismissal for disruptive behavior. *Id.*, at 89. The latter proceedings must "provide a meaningful hedge against erroneous action." *Id.*; *see also Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019) (holding that "a university has much more flexibility in administering academic standards than its code of conduct."); *Doe v. Univ. of Scis.*, 961 F.3d 203, 212–13 (3d Cir. 2020) (noting that "courts are sometimes chary about reviewing too closely the manner in which a private university chooses to investigate and discipline its students. That is especially appropriate for matters uniquely within the institution's province, such as academic integrity or faculty development and discipline. . . . *This is not such a case. The investigation and fair adjudication of alleged criminal activity . . . is not uniquely within the province of colleges and universities.*") (emphasis added).

[4]      Contrary to Loyola's assertion, there is no clear "binding precedent" mandating deference. Resp. 2. None of the holdings in the federal cases Loyola cites mandate that the arbitrary and capricious standard applies to non-academic decisions. *Columbia College*, *DiPerna*, and *Holert* merely held that the plaintiff failed to plead or prove

have ruled in favor of students regarding a university's breach of non-academic promises without ever mentioning the phrases "arbitrary," "capricious," or "bad faith."[5] The reason for the deference to purely academic decisions is that judges are not professors and are not well suited to review whether a particular grade or denial of a degree was appropriate. *See, e.g.*, *Harris*, 723 N.E.2d at 720 ("This court will not review school examinations or courses.").

Judge Dow's opinion in *Cairone* is instructive. There, a student with autism was sanctioned for violating the college's code of conduct (the "Code") for, among other things, "nonconsensual touching [and] unwanted physical closeness." *Cairone*, 2019 WL 3766112, at *1. The student asserted a variety of claims, including breach of the procedural rights afforded to her in the Code. *Id.* at *9. In denying the college's motion to dismiss, Judge Dow afforded no deference to the college. The plaintiff was not required to plead, much less prove, that the breach was arbitrary and capricious because the school's failure to follow its promises in the Code did not involve academic judgment.

Similarly, here, John is not asking the Court to review his exams, grades, or courses. Instead, John seeks redress for Loyola's multiple breaches regarding his disciplinary proceedings. Accordingly, Loyola is not entitled to deference here, and John is not required to meet a higher burden to prevail on his motion.

---

sufficient facts to overcome a motion to dismiss, defeat summary judgment, and win a bench trial, respectively. *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 858 (7th Cir. 2019) (motion to dismiss); *DiPerna v. Chi. Sch. of Prof'l. Psychology*, 893 F.3d 1001, 1007 (7th Cir. 2018) (summary judgment); *Holert v. Univ. of Chicago*, 751 F. Supp. 1294 (N.D. Ill. 1990) (bench trial). The *dicta* in these cases regarding the standard to be applied to non-academic decisions are not binding on this court because the issues are controlled by Illinois law. *Cf. Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

[5]     *See, e.g. Cairone v. McHenry Cty. Coll.*, No. 17-4247, 2019 WL 3766112, at *9-10 (N.D. Ill. Aug. 9, 2019) (Dow, J.) (denying college's motion to dismiss breach of contract claim, where student adequately alleged the university's failure to honor certain procedural rights contained in its code of conduct); *McDaniel v. Loyola Univ. Med. Ctr.*, No. 13-6500, 2019 WL 1281969, at *20-22 (N.D. Ill. Mar. 20, 2019) (Dow, J.) (denying university's motion for summary judgment as to breach of contract in case by medical resident by analyzing standard elements for breach of contract, and without reference to an "arbitrary" or "capricious" or "bad faith" standard); *Doe v. Bradley Univ.*, No. 20-1264, 2020 WL 7634159, at *2-3 (C.D. Ill. Dec. 22, 2020) (denying university's motion to dismiss with no mention of "arbitrary" or "capricious" or "bad faith").

     2.    *Even if Loyola's decision to expel John was entitled to deference, John does not need to show that **each** action by Loyola that breached the Community Standards was arbitrary and capricious.*

Loyola is simply wrong that John must show that *every* action it took under the Community Standards was arbitrary and capricious. Resp. 3. Even if Loyola's ultimate decision to find John responsible and expel him is entitled to some deference, the arbitrary and capricious standard does not apply to John's claims that Loyola breached the Community Standards' requirements that Loyola: (1) collect "all relevant information"; (2) allow John to review "all documentation concerning the potential policy violations"; and (3) allow John to refute information provided by witnesses. Dkt. 127 at 9 (citing 2016-2017 Community Standards, Sections 401.4, 401.5, and 409.6.b). Indeed, Loyola's "substantial departure" from these promises demonstrates the arbitrary and capricious nature of Loyola's decision to expel John. *Bosch*, 155 N.E.3d at 501.

## B.    Loyola breached the Community Standards by withholding Khan Harvey's Report of her meeting with Jane.

Loyola makes several arguments to excuse its failure to include Khan Harvey's report in the FIR. Loyola first attempts to minimize the significance of Khan Harvey's report, asserting that the summary of Jane's "reflected Khan Harvey's impression of the conversation and was not a quote from Jane herself." Resp. 11. Even accepting Loyola's contention that a Deputy Title IX Coordinator got the "impression" from Jane's words that sexual activity was not forced or coerced was fundamental to John's case, not only to test Jane's credibility, but to John's overall innocence. Khan Harvey asked Jane questions to determine whether she felt undue pressure, intimidation, or was otherwise forced or coerced. Dkt, 158, Rsp. to LSMF 6. Loyola does not dispute that, based on Jane's answers, Khan Harvey noted that Jane "doesn't believe she was forced or coerced."

Next, seeking to avoid Sections 409.6.b and 409.6.c's requirements that investigators collect "all relevant information," Loyola claims that Khan Harvey's report is not relevant, asserting that (1) Jane never used the words "'forced' or 'coerced' at any point in the investigation," (2) the Board found that "John engaged in various sexual acts without permission," and (3) Love did not tell John that this case "'hinged' on 'coercion[.]'" Resp. 11. These arguments fail. There is no requirement that Jane use the specific words "forced" or "coerced" for force or coercion to be an issue in John's case. Khan Harvey specifically asked questions designed to determine whether Jane had been forced or coerced.

Loyola's attempt to discount the importance of Khan Harvey's report because the Board accepted Jane's claim that John "engaged in various sexual acts without [Jane's] permission" is double-speak. Resp. 11. If Jane was forced or coerced, then there was no "permission" given. Indeed, the Board expressly stated that "the presence or lack of coercion is a *foundational component* in determining whether consent was present[.]" Dkt. 158, Rsp. to LSMF 57, 71 and 75[B] (emphasis added).

The Court also should ignore Loyola's assertions that (a) "Love did not testify that he told John the case 'hinged on coercion' . . . but, rather testified that he told John that 'these cases to me tended to hinge on a question of whether there was pressure, unreasonable pressure, coercion, et cetera[,]'" and (b) Love only "perceived" that both cases "related to issues like pressure to engage in sexual conduct." Resp. 11-12. Love testified that coercion was a "unique factor" in John's case and that he specifically used the word "coercion" in his meeting with John. Dkt. 158, Rsp. to LSMF 75.

Moreover, Love's inclusion of evidence of "coercion" in the FIR, while excluding the Khan Harvey report proves that Loyola breached the Community Standards, which define

6

"coercion" as "unreasonable pressure for any activity." Dkt. 158, Resp. to LSMF 18. Consistent

with that definition, Love included evidence in the FIR that Jane felt "pressured." Dkt. 128,

PSMF 27, Pl. Ex. 3 at Lines 14-17 (attaching Appendix A, which states Jane felt "pressured").

Yet Love did not include Khan Harvey's report that Jane "doesn't believe she was forced or

coerced" in the FIR. This selective omission of evidence breached the Community Standards by:

(i) failing to give John all relevant information concerning the "*potential* policy violations" that

would be relied on by the Board; and (ii) denying his right to refute witnesses. Dkt. 128-12, Pl.

Ex. 12, §§ 401.4-.5 (emphasis added), 406.a.iii, 409.6.b, and 409.6.c.

Loyola also makes the circular argument that it did not breach Sections 406.a.iii, 409.6.b,

and 409.6.c because the Board "did not receive or rely upon Khan Harvey's EthicsLine

summary[.]" Resp. 12-13. The reason the Board did not have Khan Harvey's report is because

the investigators did not collect it in breach of Section 409.6.b. Loyola cannot decide to withhold

exculpatory evidence from the Board, declare the information "not relevant," and then say that

the Board did not review or rely on the evidence. Principles of contract interpretation bar such an

absurd result. *See Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002)

(holding that "a contract will not be interpreted literally if doing so would produce absurd

results"). Loyola's argument also is wrong because, by pointing to the absence of any

contradictory statements to find Jane credible, the Board necessarily relied on (the absence of)

Khan Harvey's report to find Jane credible and John responsible. Dkt. 127 at 11.

Next, Loyola attempts to re-write Section 409.6.b, which unambiguously required

investigators to "[c]oordinate the collection of all relevant information," claiming it applies only

to information "determined to be relevant by the investigators." Resp. 12. This limitation is not

found in the Community Standards. Moreover, the investigators never determined the relevance of Khan Harvey's memo because Love withheld it from them. Dkt. 128, PSMF 30.

Similarly, Loyola argues that it did not have to provide Khan Harvey's report because the Community Standards do not require it to provide the parties with "every email, note, or other document 'concerning the potential policy violations[.]'" Resp. 12. This is absurd. Khan Harvey's report is not just *any* document that might be relevant; it directly related to the "potential policy violations" and Jane's credibility.

The 2015 Appeal Decision also confirms that Loyola's failure to include Khan Harvey's report in Jane's case was such a fundamental breach of the Community Standards that the decision to expel John cannot stand. There, McLean overturned a board's decision, concluding that the failure to give an accused student access to relevant information to defend himself violated the Community Standards. Dkt. 128, PSMF 61.

Despite the substantial similarities between John's appeal and the 2015 Appeal Decision, Loyola attempts to avoid the latter by claiming that McLean was applying the 2014-2015 Community Standards, which did not contain a provision concerning audio recordings found in Section 409.6.b in the 2016-2017 version. Resp. 13-14. But Loyola fails to acknowledge that the 2015 Appeal Decision cited Sections 401.4 and 401.5 as a "[r]elevant section[] of the Community Standards," both of which are nearly identical to Sections 401.4 and 401.5 in the 2016-2017 Community Standards. Dkt. 128, PSMF 61. In other words, McLean's reasoning in the 2015 Appeal Decision applies equally to the errors John raised in his appeal.[6]

---

[6]     In Section 401 of both versions of the Community Standards, Loyola promised students "the following procedural rights in the conduct process." *Compare* Dkt. 128, PSMF 61 *with* Dkt. 161-2 (McClean Decl.), attached Exhibit A at LOYOLA0005170-71. Section 401.5 is identical in both versions, giving students the right to "refute information provided by witnesses." Section 401.4 in the 2014-2015 version, however, gave students the right to "review all documentation concerning the ***allegations*** during the hearing," whereas the same provision in the 2016-2017 version gave students the right to "review all documentation concerning the ***potential policy violations*** during the hearing." *Id.* (emphasis added). There is no material difference between these two versions. If anything, the

Loyola further attempts to distinguish the 2015 Appeal Decision by arguing that it "involved very different facts and evidentiary concerns." Resp. 14. Loyola is incorrect. The 2015 Appeal Decision stands for the unremarkable proposition that it is procedural error not to provide a respondent with evidence relevant to the underlying policy violations and credibility determinations. Just as the video in the 2015 Appeal Decision could have definitively resolved whether the complainant was intoxicated, Khan Harvey's report and the audio recording of John's interview were not provided to John. Those documents would have: (i) refuted the attack on John's credibility; (ii) been used by John to defend himself on the merits entirely; and (iii) refuted the Board's conclusion that Jane told a consistent story throughout.

Finally, even if an "arbitrary and capricious" standard applied to Love's failure to include Khan Harvey's report in the FIR, the Court still must find a breach. Loyola has not provided any basis for Love's decision to withhold this exculpatory evidence. Indeed, Love could not articulate any basis for excluding the report from the FIR. Loyola Ex. J, Love Dep. (11/20/2019) 254-56. This is the very definition of arbitrary under *Bosch*. 155 N.E.3d at 496-97. As such, Loyola breached Sections 401.4, 401.5, 409.6.b, and 409.6.c of the Community Standards, and John is entitled to summary judgment on Count II as a matter of law.

**C.** **Loyola breached the Community Standards by refusing to use John's interview recording to determine the truth about John's alleged "singular instance" of inconsistency that served as the sole basis for his expulsion.**

*1.* *Loyola's contract interpretation argument is wrong.*

Loyola misinterprets the Community Standards regarding the use and disclosure of recorded interviews. Loyola argues that it did not breach Sections 409.6.c and 401.4 and 401.5

---

2016-2017 Community Standards give broader rights to review documents. In all events, in the 2015 Appeal Decision, McLean found that the derogation of that right was a basis to reverse a Board determination. For this reason alone, McLean's decision not to reverse in John's case had no rational justification.

because Section 409.6.b states that recordings will be used only to prepare interview summaries, and that provision controls because it is more specific than the other provisions. Resp. 4-7. Loyola is wrong. Section 409.6.b is no more specific than Sections 401.4 and 401.5, which specifically gave John the right to "review all documentation" and to "refute information provided by witnesses."[7]

Moreover, to the extent that Section 409.6.b conflicts with Sections 401.4 and 401.5, basic rules of contract interpretation require that the Court construe the contract "as a whole, viewing each part in light of the others … to give effect to "each clause and word used," without rendering any terms meaningless. Resp. 4 (quoting *Aeroground, Inc. v. CenterPoint Properties Tr.*, 738 F.3d 810, 813 (7th Cir. 2013)). Here, Section 409.6.b prohibits Loyola from sharing the recording outside of the case to protect the students' privacy. Indeed, other provisions show that any limitations on the use of recordings are to protect the parties' privacy, and are not exceptions to other provisions guaranteeing access to information needed to refute witnesses. Specifically, Section 406.2 emphasizes the importance of privacy. Dkt. 128-12, Pl. Ex. 12, 2016-2017 Community Standards. Section 406.5 further provides that hearings may be recorded and "retained as *part of the **disciplinary** record*." Dkt. 132, LSMF 14 (emphasis added). Section 409.6.b, in contrast, provides that interview recordings "may be retained as needed at the discretion of the University," but "are not retained *as part of the **educational** record*." Dkt 132, LSMF 12 (emphasis added). In sum, reading all provisions of the Community Standards

---

[7]     Loyola's assertion (at Resp. 5) that Section 401.4 (giving John the right to review all documentation) "is silent about audio interview recordings" ignores that the unambiguous definition of "documentation" includes recordings. *See DOCUMENTATION, Black's Law Dictionary* (11th ed. 2019) ("The act of recording information in a tangible medium <his documentation of the event was mostly on film.>").

harmoniously, as the Court must, Loyola should provide the audio recording to parties to refute a specific contention, but *Loyola* cannot disclose it for other purposes.[8]

Here, the audio recording would have definitively addressed the issue the Board deemed most important – its credibility determination regarding what John said in his interview. Nevertheless, John was denied access to, and the Loyola officials refused to consult, the only piece of evidence that would have conclusively established what John said to the investigators. If the Court were to read Section 409.6.b as a limitation on the type of information that is relevant and can be considered, it would lead to absurd results (such as in this case), and thus violate principles of contract interpretation. *Aeroground*, 738 F.3d at 813; *Beanstalk*, 283 F.3d at 860.

Finally, and most significantly, even if Section 409.6.b is more specific and thus controlling over Section 401.4, Section 409.6.b still did not prohibit Loyola from allowing the recording to be used to determine what John actually said during the interview. As McLean and Love admitted, nothing in the Community Standards, including Section 409.6.b, prohibited the Board or McLean from instructing the investigators to review the audio recording to confirm precisely what John said during his interview. Dkt 161, Loyola Rsp. to PSMF 59.[9] Thus, before finding John responsible, both the Board and McLean could have caused the investigators to review the recording to clear up what John actually said without the recording being "shared beyond the investigators." Resp. 5-6. Loyola's refusal to take this simple step breached Sections 409.6.b and 401.4 and 401.5 (even under an arbitrary and capricious standard) by failing to make this critical information available to John, the Board and McLean.

---

[8]     At best, in light of these competing provisions, Section 409.6.b is ambiguous, and thus, the Court must read any ambiguity against Loyola as the drafter of the *Community Standards. Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998).

[9]     Loyola does not actually dispute the portion of PSMF 59 that nothing precluded the Board or McLean from asking the investigators to listen to the recording to determine precisely what John said. Dkt. 161 at 59.

2. *John was not provided the necessary information to refute Watland's statements at the hearing.*

Loyola asserts that it did not violate Section 401.5's right to refute witnesses — specifically investigator Watland — because he was allowed to review his interview summary twice and did not correct the ambiguous sentence concerning what Jane and John allegedly agreed to. Indeed, McLean admitted that he was "not sure" that the sentence at issue "was clear." Dkt. 158, Rsp. to LSMF 108.

Moreover, Watland made statements at the hearing that were *not* contained in the FIR, including that:

- John "had said that they mutually agreed that no one was coerced and that was intentionally put in quotations just because, to me, the phasing – it seems more formal than I think I anticipate people usually talking to each other."

- "But when asking for what did you two talk about, what did you two agree upon, that was something that he had said multiple times was that language."

Dkt. 162, LSOAF 1. Loyola argues that, because the Board deigned to permit John at the hearing to deny stating that he and Jane discussed "coercion," he was able to "refute" Watland and there was no breach of Section 401.5. Resp. 7-8.

Loyola is wrong. John was not able to "refute" Watland because he was unable to present the one piece of evidence that would have done so conclusively — the recording of his interview. Claiming that John, his hands tied behind his back, was allowed to refute Watland by disagreeing with her representation of the interview when other objective evidence exists renders the Community Standards meaningless and leads to an absurd result. *Aeroground*, 738 F.3d at 813; *Beanstalk*, 283 F.3d at 860.

Like the video recording that would have shown whether the claimant was intoxicated in the 2015 Appeal Decision, John's interview recording would have proved whether he told the

investigators that he and Jane agreed that no one was coerced. Finding John responsible without allowing him to review that information constituted substantive procedural error that breached Loyola's contract with John (even under an arbitrary and capricious standard). *See, e.g.*, *Brody v. Finch Univ. of Health Scis./The Chicago Med. Sch.*, 698 N.E.2d 257, 262 (Ill. App. Ct. 1998) (affirming trial judgment for student due to arbitrary and capricious breaches of promise that enrollees in applied psychology program who maintained a 3.0 GPA would be admitted to medical school); *DeMarco v. Univ. of Health Scis./Chicago Med. Sch.*, 352 N.E.2d 356, 362–63 (Ill. App. Ct. 1976) (affirming injunction in favor of student who completed degree requirements but was dismissed because he did not make donation to school).

In sum, Loyola breached Sections 409.6.b and 401.4 and 401.5 of its Community Standards, and the Court should grant summary judgment on Count II in favor of John.

**D.      Loyola's failure to preserve the audio recording mandates that the Court conclude that the recording would support John's claim.**

Finally, the Court should reject Loyola's arguments concerning whether its failure to preserve the recording of John's interview allows the Court, for purposes of this motion, to conclude that the missing recording  would show that John did not tell the investigators that he and Jane agreed that no one was coerced. *First*, Loyola erroneously asserts that John is not entitled to this presumption because he has not shown prejudice the disappearance of the recording. Resp. 10. "Rule 37(e) does not explicitly place the burden of proving or disproving prejudice on either party, and the court is given great discretion in assessing prejudice. To suffer substantive prejudice due to spoliation of evidence, the lost evidence must prevent the aggrieved party from using evidence essential to its underlying claim." *Schmalz v. Vill. of N. Riverside*, 2018 WL 1704109 at *3 (N.D. Ill. March 23, 2018). Here, Loyola found John responsible based on its credibility determination arising out of the aforementioned "singular instance" of

purported inconsistency. As such, the recording was essential to John's defense, and its disappearance prejudiced him.

*Second*, Loyola contends that John's request only can be granted if John shows that Loyola intentionally deleted the recording to deprive John of the evidence. Resp. 10. Not so. A spoliation sanction can be imposed even absent intentional misconduct. *Barbera v. Pearson Ed., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018) (finding no abuse of discretion to sanction defendant's destruction of emails by accepting as true stipulations of fact on summary judgment, despite there being no evidence of intent to deprive the plaintiff of the emails).

*Third,* Loyola claims that it preserved certain records after receiving John's litigation hold letter, and attempts to distinguish cases cited by John because, in those cases, the documents were destroyed after the receipt of a litigation hold letter. Resp. 9. Yet Loyola points to its efforts to preserve documents *two weeks after* it received the litigation hold letter and only reviewed documents from one specific computer storage location. *Id.* Loyola does not point to any other efforts to locate and preserve the recording immediately upon receiving the litigation hold letter. Moreover, Loyola's own policies called for the preservation of interview recordings from the moment they were made. Dkt. 161, Loyola Rsp. to PSMF 67. Even if Loyola retained the discretion to destroy such recordings later under a reasonable document retention protocol, Loyola's failure to preserve John's interview recording ***as his case was ongoing*** was untenable. Indeed, Loyola cannot even state when and how the recording was lost.[10]

---

[10]     The Court should deem John's SMF 67-75 as undisputed. Loyola's does not genuinely dispute the following: (1) investigators were required to preserve all audio recordings *after* the FIR was completed; (2) the former Deputy Title IX Coordinator testified that the recordings were to be preserved through the conclusion of an appeal; (3) both investigators testified that they preserved the recording and did not delete it; (4) a litigation hold letter was received by Loyola on January 17, 2017; (5) John's appeal was decided on January 20, 2017; and (6) Loyola does not know when or how the recording was discarded. Dkt. 128, PSMF 67-75. Loyola offers no record evidence to deny each of these facts, but instead attempts to obfuscate by claiming that Love claims to have discovered that the recordings were missing on February 2, 2017 — more than two weeks after he received the litigation hold letter. Resp. 9. Moreover, for all cases from 2016-2017 where Loyola preserved audio recordings,

## II.     CONCLUSION

Based on the foregoing, John's opening brief, and the parties' LR 56.1 submissions, the

Court should enter summary judgment in favor of John Doe on Count II.

Dated: April 7, 2021                                 Respectfully submitted,

                                                     JOHN DOE


                                          By:  _____/s/Jonathan M. Cyrluk_____
                                                     *One of John Doe's Attorneys*




Jonathan M. Cyrluk
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
Email: cyrluk@carpenterlipps.com

Patricia M. Hamill
Lorie K. Dakessian
CONRAD O'BRIEN PC
1500 Market Street, Suite 3900
Centre Square, West Tower
Philadelphia, Pennsylvania 19102-2100
Email: phamill@conradobrien.com
        ldakessian@conradobrien.com

---

John's case was the only case in which Loyola failed to preserve the recording of a respondent's interview. Rsp. to LSMF 120[B].

**CERTIFICATE OF SERVICE**

I, Jonathan M. Cyrluk, an attorney, hereby certify that, on April 7, 2021, I caused a copy of the foregoing to be served on all counsel of record via the Court's CM/ECF system.

_____/s/Jonathan M. Cyrluk_____
Jonathan M. Cyrluk
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
312-777-4820 (direct)
312-777-4839 (fax)
cyrluk@carpenterlipps.com