UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) Case No: 18-CV-7335 |
| | ) |
| v. | ) Hon. Steven C. Seeger |
| | ) Magistrate Judge Jeffrey T. Gilbert |
| LOYOLA UNIVERSITY OF CHICAGO, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Local Rule 56.1(b)(2), Plaintiff hereby responds to Defendant Loyola University of Chicago's Local Rule 56.1(b)(3) Statement of Additional Material Facts as follows:

1. During the hearing before the Hearing Board regarding Jane's allegations against John, the following exchange occurred:

MS. LANDIS: The second part of that statement, it says they mutually agreed that no one was coerced. How did coercion come up in that conversation?

JOHN: It didn't. I was stating that because of like the prompt that I received for this investigation says that I coerced her. One of the ... prompts – in one of them, it says coercion.
And so, that's why I brought that up during the interview is I said no one was coerced. It has nothing to do with that exact conversation.

\* \* \*

MS. LANDIS: Okay.

JOHN: It's just overall was a statement.

MR. HOUZE: Do you know what – sorry. I didn't mean to interrupt. Do you know what document that was in or can you be more specific in any way around

where you – I imagine the appendix, unless it was an email, the appendix should have most of the documents there.

JOHN: It was either one of those or it was my conversation with Tim Love, when I first met with him to discuss this.

MR. HOUZE: Okay.

JOHN: I wish that I could specifically pull it up right now.

MS. LANDIS: So I hear you saying that coercion was not a word that was used in your conversation with Jane –

JOHN: Yes.

MS. LANDIS: -- when you met to have a conversation.

JOHN: Yeah.

MS. LANDIS: Can you help me understand then why you told the investigators that they mutually agreed that they had moved physically fast and no one was coerced?

JOHN: That was a misinterpretation of what I had stated.

MS. LANDIS: Okay. So to the investigators, can you all speak to that line, if you can recall anything about the conversation in the interview with the Respondent?

MS. WATLAND: Yes. He did say that when they had had that conversation, that they were – he kept saying they had mutually agreed that they had moved too quickly and he had said that they mutually agreed that no one was coerced and that was intentionally put in quotations just because, to me, the phrasing – it seems more formal than I think I anticipate people usually talking to each other. So that was what was said.

MS. LANDIS: Okay.

MS. WATLAND: But he – I don't know if I followed up or I don't know if Ray followed up. I don't recall us asking, hey, did you say those exact words to her or did she say those exact words to you.
But when asking for what did you two talk about, what did you two agree upon, that was something that he had said multiple times was that language.

MS. LANDIS: Okay. So Leslie, I hear you saying in the interview, the Respondent did say that during the conversation, he and the Complainant mutually agreed that no one was coerced.

2

MS. WATLAND: Mm-hmm. (Affirmative).

[MS. LANDIS]: John, I hear you saying, thinking back to the conversation, you and Jane didn't specifically discuss coercion.

JOHN: Yeah, we – like yes, we did not say I was not coerced or something like that.

MS. LANDIS: Okay. Did you discuss – so if you didn't use the word coercion, did you talk about something similar to it?

JOHN: No. All we talked about was the fact that we felt like we rushed into things.

MS. LANDIS: Okay.

JOHN: And we wanted to pump the brakes and try to develop a normal - like a relationship out of this that isn't cemented in physical contact.

MS. LANDIS: Okay, and what did pump the brakes mean for you specifically?

JOHN: To – I know that we had stated trying to take things slow on our date. But that's – pump the brakes as in we're going to try to develop a relationship, but hold off on the physical contact, outside of anything other than like a kiss or a hug kind of thing, that we're not – we don't want physical, sexual contact to become something that is a cornerstone, I guess, of the relationship.

MS. LANDIS: Okay. So I hear you saying, for you, that meant taking things slow and holding off on any physical contact, outside of hugging or kissing.

JOHN: Yes.

MS. LANDIS: Is that correct?

JOHN: Yes.

MS. LANDIS: Okay. So Jane, from your perspective in that conversation, what was your understanding of pumping the brakes or taking things slow?

JANE: Exactly the same as his, as we don't want physical activity to be the cornerstone of this relationship. We want to build the relationship outside of this.

MS. LANDIS: Okay.

JANE: And that we moved too fast and that shouldn't have happened on that night.

<span style="color:red">MS. LANDIS: Got it. Okay, and was there anything else discussed that John hasn't referred to yet in that conversation, from your memory?</span>

<span style="color:red">JANE: I think this is when I told him that I was a virgin and when I – I expressed how I thought we were moving too fast and how I really knew him by saying like I don't even know your middle name and that was something that was just – I felt so uncomfortable with that, like this person – I had had a sexual encounter with this individual, but I didn't even know his middle name and I remember saying that to him and him telling me that it was [\*\*\*\*\*\*] and joking about how his initials are [\*\*\*], like [\*\*\* \*\*\*\*\* \*\*\*\*\*\*].[1]</span>

<span style="color:red">MS. LANDIS: Okay.</span>

<span style="color:red">JANE: And that happened.</span>

<span style="color:red">MS. LANDIS: Got it. So that's what you recall from the rest of the conversation.</span>

<span style="color:red">JANE: Mm-hmm (Affirmative).</span>

Ex. 4 (Doc. No. 136-3) at 93-97.[2]

**RESPONSE**: Admitted, with the clarification that the excerpt set forth by Loyola is a partial excerpt from the transcript of the referenced 2016 hearing, and the sections that Defendant omitted have been inserted above in red text, reflecting the exchange on pages 93-98 of Loyola Ex. 4.

2. When asked in her deposition, "did you use the word 'coerced'" when meeting with Jane on January 26, 2016, Rabia Khan Harvey testified: "I'm not sure if I used that exactly. ... So with coercion, I might have said things like: Were there repeated questions, or -- not questions – repeated orders that you heard or pressures or intimidation, such as, If you don't do it, I'll tell everyone you did it anyway." Ex. H, Khan Harvey Dep. (Doc. No. 136-44) at 99-100.

**RESPONSE**: Admitted, with the clarification that this sentence reflects a partial excerpt of Rabia Khan Harvey's deposition testimony.

---

[1] Information that reveals personally identifying information about John Doe are removed from the text excerpted here, but are available for review on page 98 of Loyola Ex. 4, filed under seal.

[2] [Text of Defendant's Footnote appears in Defendant's Statement]

4

3. Section 409.6.b of the 2016-2017 Community Standards states, in relevant part:

The University reserves the right to *audio record each individual interview* collected during meetings *for the sole purpose of preparing the Final Investigation Report. These audio recording will not be shared beyond the Investigators.* The recordings are not retained as part of an educational record. Audio recordings may be retained as needed at the discretion of the University.

Ex. 3 (Doc. No. 136-2) at 53, §409.6.b.

*RESPONSE*: Subject to an Objection to the characterization "in relevant part,"

Admitted that this sentence reflects a partial excerpt from the 2016-2017 Community Standards.

4. In April 2015, Jack McLean, Loyola's appellate officer, wrote a decision letter dated April 30, 2015 ("2015 Decision Letter") regarding the appeal of a gender-based misconduct case. McLean Decl., ¶3 (attached hereto as Exhibit 1).

*RESPONSE*: Admitted.

5. The case addressed in McLean's 2015 Decision Letter was governed by the procedural rules provided by the 2014-2015 Community Standards. *Id.* at ¶3, Ex. B.

*RESPONSE*: Admitted in part; Disputed in Part. Admitted that Jack McLean's

Declaration states this. Disputed insofar as Mr. McLean's 2015 Appeal Decision Letter does not

identify the year of the Community Standards that "governed" it.

6. The 2015 Decision Letter addressed issues relating to the fact that audio recordings of interviews were not shared with the parties, the hearing board, or with McLean as the appellate officer. *Id.* at ¶ 4.

*RESPONSE*: Admitted.

7. The 2015 Decision Letter included the following language:

The Respondent also alleges that his request for audio recordings of the interviews of the Complainant and witnesses were denied (see alleged Procedural Error # 5). The ordinary practice of the Office of Student Conduct and Conflict Resolution during proceedings such

5

> as this is not to release these audio recordings. The rationale is that those recordings should not be part of the official record because the Hearing Board did not have access to them during the hearing. Yet Section 405 (G) of the Community Standards provides "Respondent(s)...have the opportunity to inspect all documentation relevant to the case that will be used by the . . . board to make a decision."
>
> I am troubled with the above practice and interpretation of the Community Standards. Decisions such as these have immense implications for all parties. Yet, neither the Respondent nor the Complainant have the opportunity to review interview tapes, even if they specifically ask for such tapes. But, the Hearing Board, through the Investigators who are present, and consulted, at the hearing, is allowed to use selected parts of those interviews in reaching their decision. The Hearing Board does not hear the interviews, but they receive summary explanations of what those interviews contained. Given the implications of these decisions, this practice does not seem fair or just. The practice hobbles each party in preparing their case and could cloud the search for the facts.
>
>                      \* \* \*
>
> Relevant sections of the Community Standards are as follows:
> 401. Student Rights in the Conduct Process
>
> All students have the right to be treated with dignity and respect throughout any interaction with the conduct process. Students also have the following procedural rights in the conduct process:
> ...
> 4.     To review all documentation concerning the allegations during the hearing
> 5.     To refute information provided by witnesses
>
> 405. Hearings
>
> 3. Hearing Format
>
> Hearings generally proceed according to the following format:
> g. Respondent(s) ... have the opportunity to inspect all documentation relevant to the case that will be used by the conduct administrator or boards to make a decision
> h. Any applicable parties are questioned (including witnesses, if applicable)
>
> These provisions, in practice, can be contradictory. Although the parties have the right to refute information provided by witnesses, that right is hobbled by the inability to adequately prepare for the hearing. Again, given the enormous implications decisions such as this have, it does not seem appropriate to ban the parties from viewing the entire file before the hearing.

*Id.* at ¶4.

*RESPONSE*: Admitted that this is an excerpt from Loyola's 2015 Appeal Decision Letter.

8. The 2014-2015 Community Standards that McLean reviewed and applied in writing the 2015 Decision Letter contained different language on the issue of interview recordings than the 2016-2017 Community Standards that applied to John Doe's case. *Id.* at ¶5.

*RESPONSE*: Admitted in part and Disputed in part. Admitted that McLean makes this assertion in paragraph 5 of his Declaration. Disputed insofar as Loyola's 2015 Appeal Decision Letter does not contain a specific reference to the year of the Community Standards referenced. Further disputed because the 2014-2015 Community Standards had similar language as the 2016-2017 Community Standards. Loyola's 2015 Appeal decision references "Section 405 (G) of the Community Standards," as providing Respondents with "the opportunity to inspect all documentation relevant to the case that will be used by the … board to make a decision," Section 401.4 (students have the procedural rights in the conduct process to review all documentation concerning the allegations during the hearing), and Section 401.5 (students have the procedural rights to refute information provided by witnesses), Ex. A to McLean's Declaration. These same contractual provisions also are set forth in Loyola's 2016-2017 Community Standards. *See* Loyola Ex. 3, Section 405(3)(g) (respondents have the opportunity to review all documentation relevant to the case that will be used by the conduct administrator or boards to make a decision), Section 401.4 (students have the procedural right to review all documentation concerning the potential policy violations), and Section 401.5 (students have the procedural right to refute information provided by witnesses).

9. The 2014-2015 Community Standards did not have any provision akin to Section 409.6.b of the 2016-2017 version that expressly limits access to interview recordings beyond the investigators for the purpose of preparing the Final Investigative Report ("FIR"). *Id.* The 2014-

7

2015 version lacked any provision otherwise specifically addressing the use and retention of interview recordings. *Id*.

*RESPONSE:* Admitted that the 2014-2015 Community Standards does not contain the same language as is set forth in Section 409.6.b of the 2016-2017 Community Standards. Disputed regarding the Loyola's interpretation that Section 409.6.b limits the documents and information to be provided to the parties. *See* John Doe's Reply Br. 9-11. Further disputed insofar as the contractual provisions described by Loyola in LSOAF 8 were relevant to Loyola's determination in its 2015 Appeal Decision that it did "not seem fair or just" to deprive the parties and hearing board from having access to audio recordings of interviews, even though "the ordinary practice of the Office of Student Conduct and Conflict Resolution" was "not to release these audio recordings," and even though Loyola said that those provisions "in practice, can be contradictory."

10. [A] McLean's assessment of the question of the respondent's request to review interview recordings in the 2015 Decision Letter focused on Section 405.g of the 2014-2015 Community Standards, which required that a respondent have access to documents that the hearing board would use to render a decision. *Id.* at ¶6. [B] The hearing board did not have the interview recordings in that 2015 case, which meant the decision not to share interview recordings with the respondent did not violate any section of the 2014-2015 Community Standards. *Id.*

*RESPONSE:* [3]

[A] Objection to LSOAF 10[A] because it is legal argument concerning the interpretation of the 2015 Appeal Decision and to the characterization of what contractual provision the 2015 Decision Letter "focused on." To the extent a response is required: Admitted in part and Disputed in part. Admitted that McLean's Declaration makes this statement and that

---

[3] Due to the compound nature of Loyola's assertion in LSOAF 10, Plaintiff has inserted [A] and [B] in order to respond.

8

the Loyola's 2015 Appeal Decision references Section 405.g of the Community Standards.

Disputed insofar as the specific year of the Community Standards is not stated in that decision.

[B] Objection to LSOAF 10[B] because it is legal argument concerning the interpretation of the 2015 Appeal Decision and an incorrect interpretation of the Community Standards. To the extent a response is required: Admitted in part and Disputed in part. Admitted that McLean's Declaration makes this statement. Disputed insofar as Mr. McLean's 2015 Appeal Decision Letter does not identify the year of the Community Standards referenced.

11. [A] The 2015 Decision Letter did not find that the practice of not sharing interview recordings with respondents was a violation of a respondent's right to refute witnesses under Section 401 of the 2014-2015 Community Standards. *Id.* at ¶7. Instead, the 2015 Decision Letter expressed McLean's opinion that the practice of not allowing the respondent in that case access to interview recordings was not fair and McLean reversed the outcome of that case. *Id.* [B] Part of the reason for that opinion included other factual issues and evidentiary matters in play in that case, which addressed issues of incapacitation and involved video footage that would likely have revealed critical information on that issue but had been lost. *Id.*

*RESPONSE:* [4]

[A] Objection to LSOAF 11[A] because it is legal argument concerning the interpretation of the 2015 Appeal Decision and to Loyola's characterization of what the 2015 Appeal Decision purportedly "did not find." To the extent a response is required: Admitted in part, Disputed in part. Admitted that McLean's Declaration makes these statements. Disputed insofar as Mr. McLean's 2015 Appeal Decision Letter does not identify the year of the Community Standards referenced.

[B] Objection to LSOAF 11[B] because it is legal argument concerning the interpretation of the 2015 Appeal Decision. To the extent a response is required: Admitted that

---

[4] Due to the compound nature of Loyola's assertion in LSOAF 11, Plaintiff has inserted [A] and [B] in order to respond.

9

McLean's Declaration makes this assertion and that Loyola's 2015 Appeal Decision addressed issues in addition to Loyola's failure to share the audio recordings of the interviews with the parties and Hearing Board, such as Loyola's failure to document any attempt to contact witnesses who saw the parties immediately before and after the incident or to provide any explanation as to why these witnesses were not contacted. *See* Ex. A to McLean's Declaration.

12. Because John Doe's case in 2016 was adjudicated under the 2016-2017 Community Standards that included Section 409.6.b and language limiting the use of interview recordings and the personnel who could review such recordings, McLean found in the appeal of John Doe's case that the procedural rules applicable to his case did not allow anyone other than the investigators to review the audio recordings and they could only review them for the purpose of preparing the FIR. *Id.* at ¶8. As a result, the portion of John Doe's appeal that challenged the lack of any comparison of his interview recording to his testimony at the hearing in his case lacked merit and requested a step that would have violated Section 409.6.b of the 2016-2017 Community Standards. *Id*

*RESPONSE:* [5] Objection to LSOAF 12 because it is legal argument concerning the interpretation of the 2015 Appeal Decision. To the extent a response is required: Admitted that McLean's Declaration makes these statements, subject to an Objection to Defendant's characterization and interpretation of the "applicable" contractual provisions.

13. Section 401 of the 2016-2017 Community Standards is entitled "Student Rights in the Conduct Process," applies broadly to all student conduct matters, and includes these general statements: "Right to Review: To review all documentation concerning the potential policy violations during the hearing," and "Right to Refute: To refute information provided by witnesses." Ex. 3, (Doc. No. 136-2), at §401.4 & 5.

*RESPONSE:* Admitted with (i) an Objection to the characterization of the text as applying "broadly to all student conduct matters," and to "general" statements of rights, and (ii) a clarification that Section 401.6 also states that students have the "Right to Notice: To have notice

---

[5] Due to the compound nature of Loyola's assertion in LSOAF 12, Plaintiff has inserted [A] and [B] in order to respond.

10

of the potential violations before the hearing and have the relevant policies explained clearly and fully at every level of the conduct process."

14. Section 409.6.c of the 2016-2017 Community Standards applies only to hearings for gender-based discrimination and misconduct matters and states, in relevant part that: "The complainant(s) and respondent(s) will have at least two (2) days to review the Final Investigation Report and any other relevant information that will be considered by the board." *Id.* at §409.6.c.

*RESPONSE*: Admitted that this is an excerpt from Section 406.C of the 2016-2017 Community Standards, subject to an Objection to the terms "only" and "relevant" as characterizing the text.

15. Sections 401.4, 401.5, and 409.6.c of the 2016-2017 Community Standards do not contain any reference to audio recordings of interviews. *Id.* at §401.4 & 5, §409.6.c.

*RESPONSE*: Admitted in part and Disputed in part. Admitted that the three referenced contractual provisions do not contain the words "audio recordings of interviews." Disputed insofar as Section 401.4 "Right to Review" states that a student has the procedural right "[t]o review all documentation concerning the potential policy violations during the hearing," and the term "documentation" encompasses the audio recording, which is documentation of a person's interview, and that Section 401.5 "Right to Refute" states that a student has a procedural right "[t]o refute information provided by witnesses," which logically means that information by a witness/investigator about the content of the interview can be refuted through reference and access to the audio recording of the interview.

16. Section 409 of the 2016-2017 Community Standards contains the following provisions regarding information parties must receive during a gender-based misconduct proceeding:

> "Both parties ... will have the opportunity to review any investigative report after the investigation has concluded but before a formal hearing."

11

> "The Title IX Investigators will: ... Coordinate the collection of all relevant information, which may include written statements by the complainant(s), respondent(s), and/or witnesses."
>
> "The complainant(s) and respondent(s) will have at least two (2) days to review the Final Investigative Report and any other relevant information that will be considered by the board."

*Id.* at §§ 409.6.a.iii, b, & c.

*RESPONSE*: Admitted with the clarification that the three excerpted provisions are not the only information that the 2016-2017 Community Standards states that parties must receive during a gender-based misconduct proceeding. Section 409 contains other provisions regarding information that parties must receive during a gender-based misconduct proceeding, including but not limited to the following: Section 409.1(a)-(f) lists the "Rights of Survivors at Loyola University Chicago" which includes "the right to be informed in writing" of, *inter alia*, available counseling services, medical services, legal assistance, and other available supports within the institution, etc.; Section 409.6(a)(iv) states that "Both parties will be notified in writing of the preliminary potential policy violations assigned at the beginning of the investigation process;" and Section 409.6(d) (Decisions and Notice of Outcome) states that "Parties will be informed simultaneously and in writing by the Board Chair as to the outcome of the hearing, including any sanctions imposed, and the rationale for the decision and sanctions."

17. Section 409.6.c of the 2016-2017 Community Standards provides, in part, that "Hearings are typically audio recorded. The board's private deliberations are not recorded. All audio records are the property of Loyola University Chicago and are retained as part of the educational record. *Id.* at §§ 409.6.c.

*RESPONSE:* Admitted.

18. Love testified in his deposition that when he met with John on November 8, 2016, he told John that "these cases to me tended to hinge on a question of whether there was pressure, unreasonable pressure, coercion, et cetera." Ex. J, Love Dep. (Doc. No. 136-46) at 154.

*RESPONSE*: Admitted.

19. McLean wrote a decision letter dated January 20, 2017 regarding John's appeal of the finding that he was responsible for gender-based misconduct that recounted that McLean had reviewed the audio tape from John's hearing, noted that John had certified the accuracy of the written summary of his interview without taking issue with the language about "no one was coerced," that the investigators testified at the hearing about what they heard John say about "no one was coerced" in his interview, and that the Hearing Board members found the investigators' account more credible than John on the issue of what he said during his interview. Dep. Ex. 18 at LOYOLA0000936. That decision letter also reported that supporting evidence in both the FIR and the audio tape of John's hearing existed to refute John's appeal argument regarding credibility. Dep. Ex. 18 at LOYOLA0000937.

*RESPONSE*: Admitted only that McLean wrote a decision letter dated January 20, 2017 and these are topics discussed in the decision letter.


Dated: April 7, 2021                                   Respectfully submitted,

                                                       JOHN DOE


                                                       By:    /s/Jonathan M. Cyrluk
                                                           *One of John Doe's Attorneys*


Jonathan M. Cyrluk
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
Email: cyrluk@carpenterlipps.com

Patricia M. Hamill
Lorie K. Dakessian
CONRAD O'BRIEN PC
1500 Market Street, Suite 3900
Centre Square, West Tower
Philadelphia, Pennsylvania 19102-2100
Email: phamill@conradobrien.com
       ldakessian@conradobrien.com

13

## CERTIFICATE OF SERVICE

  I, Jonathan M. Cyrluk, an attorney, hereby certify that, on April 7, 2021, I caused a copy of the foregoing to be served on all counsel of record via the Court's CM/ECF system.

               /s/Jonathan M. Cyrluk
            Jonathan M. Cyrluk
            CARPENTER LIPPS & LELAND LLP
            180 North LaSalle Street, Suite 2105
            Chicago, Illinois 60601
            312-777-4820 (direct)
            312-777-4839 (fax)
            cyrluk@carpenterlipps.com