UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JOHN DOE,<br>                    Plaintiff,<br>vs.<br>LOYOLA UNIVERSITY CHICAGO,<br>                    Defendant. | No. 1:18-cv-7335<br>Hon. Steven Seeger<br>Magistrate Judge Jeffrey T. Gilbert |

**PLAINTIFF'S SUPPLEMENTAL SUMMARY JUDGMENT
SUBMISSION IN RESPONSE TO COURT'S QUESTIONS**

Pursuant to the Court's September 1, 2022 order [Dkt. 177], Plaintiff John Doe respectfully files this supplemental submission.

**Questions re: Loyola's failure to provide Jane's statement to Khan Harvey to the Board**

1. *Is it factually correct that the Board never knew about that statement by Jane Roe to Khan Harvey (or, at the very least, Khan Harvey's impressions about what Jane Roe had said)? Did the Board know anything about what Jane Roe had said to Khan Harvey? The parties appear to agree that the Hearing Board never knew about Khan Harvey's summary of her interview with Jane Roe.*

**RESPONSE:** Yes, it is factually correct that the Board never knew about Jane's statement or Khan Harvey's summary of Jane's statement that "she did not believe she was forced or coerced" into certain sexual activity. [Dkt. 128 at SOF ¶¶ 28-30; Dkt. 128-18, Watland Dep., at 131 & 157-60; Dkt. 128-20, Tennison Dep., at 218-25; Dkt. 128-25, Kelly Dep., at 106-09; Dkt. 128-26, Landis Dep., at 229; Dkt. 128-28, King-Taylor Dep., at 82-83; Dkt. 160, Def. Br., at 13.]

2. *If so, why is that? Why didn't the Board learn that information? Is there anything in the record about why the Board did not receive that information? Who decided not to share it, and why?*

**RESPONSE:** The investigators and the Board did not learn of Jane's statement because the Title IX coordinator, Tim Love, did not provide it to them. Love prepared the "History of the Case" for the FIR and, while he specifically referenced that Jane met with Khan Harvey on January 26, 2016, Love did not include Khan Harvey's statement that Jane did not believe she was forced

or coerced. [Dkt. 128 at SOF ¶¶ 28-29; Dkt. 158 at p. 81, at Resp. to Def. SOF ¶ 71; Dkt. 128-4, at LOYOLA 856-57, Lines 14-42; Dkt. 128-11, 11/20/19 Love Dep., at 246-49 & 251.] Love stated that he did "not intentionally" omit this information, adding that he omitted the statement because, "procedurally, [he] was just talking about the steps that were taken, not necessarily the substance." [Dkt. 128-11, 11/20/19 Love Dep., at 248-253.][1]

   3. *And is there any evidence in the record about whether it would have made a difference to the Board, or if they would have done anything differently?*

   **RESPONSE:** There is indirect evidence that Board may have found for John had it been provided with Jane's apparent inconsistent statement. In its decision letter, the Board stated it "did not have any other information to consider to evaluate the Complainant's credibility." [Dkt. 128-32, at LOYOLA 941-42.] The Board also noted that "[t]he presence or lack of coercion is a foundational component to determining whether consent was present for a sexual interaction." [*Id.* at LOYOLA 942.] The Board would have had to address Jane's statement to evaluate (a) Jane's credibility, and (b) "a foundational component" of consent. In addition, investigator Watland testified that had she known about Jane's statement she would have wanted to have asked Jane (and possibly Khan Harvey) about it. [Dkt. 128-18, Watland Dep., at 158-59.] Board member Landis would not speculate about what, if anything, she would have done differently had she been aware of the statement. Landis asserted that Jane's statement was not inconsistent with the Board's decision because the Board did not find that Jane was "forced or coerced." [Dkt. 136-49, Landis Dep. at 218-228.][2]

---

[1] Whether Love's testimony is credible is a fact issue that cannot be decided on summary judgment. *Garner by & through Humphreys v. United States*, No. 17-CV-07142, 2020 WL 8367417, at *5 (N.D. Ill. Mar. 27, 2020). Love's claim is belied by his inclusion in the FIR of Jane's statements to another Loyola employee. [Dkt. 128-4, at LOYOLA 865, lines 14-17; Dkt. 128-5, at LOYOLA 874-880; Dkt. 128-11, 11/20/19 Love Dep. at 247-49.]

[2] As set forth in John's summary judgment filings, however, Landis' *post hoc* testimony is not credible and is belied by the record. The Board could not have found John responsible for many of the acts at issue, including Jane performing oral sex on John, absent force or coercion. [Dkt. 128-32, at LOYOLA 942; Dkt. 157 at 32-34; Dkt. 158 at pp. 87-94; Dkt. 168 at 5-9.] Whether Landis' testimony is credible is also a fact issue for the jury. *See* fn. 1, *supra*.

**Questions re: Loyola's failure to interview male witnesses**

1. *Is there anything in the summary judgment record about John Doe asking the investigators to interview [the] two witnesses [John identified]? If so, where? Is there evidence that John Doe asked the investigators to interview them, as opposed to simply assuming that the investigators would interview them?*

**RESPONSE:** John testified "I provided the interviewers with names of witnesses. I do not recall if I definitively asked them to interview them." [Dkt. 136-43, John Dep. at 223-25.] In contrast, there is no evidence that *Jane* expressly asked the investigators to interview any witnesses, yet they interviewed Witness #1 after learning of her from Jane. [Dkt. 136-47, Watland Dep. at 171-73; Dkt. 136-40, Watland Decl. ¶ 8.])

John told the investigators about his roommate, Witness A, because Witness A was "a significant witness from the beginning" and that Witness A's "name was provided as a crucial witness[.]" [Dkt. 136-43, Doe Dep., at 223-24.] Both John *and Jane* told investigators about their interaction with a mutual friend, Witness B. John considered Witness B an important witness. [*Id.* at 225.] During his interview, John told investigators that Jane obtained his phone number from Witness B, and that after the first encounter, he walked Jane back to her residence hall where he saw Witness B. [Dkt. 128-4 at LOYOLA0000863-64.] Likewise, Jane told investigators that Witness B facilitated John and Jane's first date and that right after their first sexual encounter they met Witness B in Witness B's room and John tried to get Jane to disclose their sexual encounter to Witness B. [*Id.* at LOYOLA 857-60; Dkt. 164-15 at LOYOLA 9-11.] The investigators removed the reference to Witness B's initials in Jane's interview summary and instead called him a "mutual friend" in the FIR. [*Compare* Dkt. 128-4 at LOYOLA 857 & 860 *with* Dkt. 164-15 at LOYOLA 9-14.]

John did not "simply assume" that the investigators would interview Witnesses A and B. *Loyola's policies required the investigators to identify witnesses based on the interviews of the*

3

*parties.* Loyola's 2016-2017 Community Standards states that investigators will "[c]oordinate the collection of all relevant information, which may include written statements by the complainant(s), respondent(s), and/or witnesses." [Dkt. 136-2 at 53, 56; *see also* Dkt. 136-46, 11/20/19 Love Dep., at 52.] Indeed, Love, on behalf of Loyola, told the Dep't of Ed. in 2019 that Loyola "must impartially collect, evaluate, and present evidence – *not the parties themselves*" and that student parties "will have done their part *if they simply cooperate with the reasonable requests of administrators and respond truthfully to the questions asked of them.*" [Dkt. 164-16 at p. 3 (emphasis added.)]

Loyola's witnesses confirmed that parties do not specifically have to name someone as a witness or ask that the person be interviewed. [Dkt. 136-46, 11/20/19 Love Dep., at 45-47, 215; Dkt. 136-48, Tennison Dep., at 78; Dkt. 136-44, Khan Harvey Dep., at 172, 176; Dkt. 136-51, McLean Dep., at 137-38.] Finally, when "[w]itnesses were not interviewed," investigators were required to "include [the] rationale [for not interviewing the witnesses] in the final investigation report." [Dkt. 128-47 at LOYOLA 3727.]

2. *If there is such evidence, is there anything in the record about why the investigators did not interview those two witnesses? Did they try?*

**RESPONSE:** Investigator Tennison did not consider interviewing Witnesses A and B and could not recall discussing doing so with Watland or Love. [Dkt. 136-48, Tennison Dep., at 176-78.] Watland could not recall if she asked Doe to identify any witnesses during his interview. [Dkt. 128-18, Watland Dep., at 150.]

The record shows that the investigators avoided interviewing these witnesses. On November 30, 2016, before interviewing the parties, the investigators wrote that their "working assumption is that we will not have to schedule additional interviews with witnesses, which would obviously delay our timeline and completion of the FIRs." [Dkt. 135-19 at LOYOLA 1236.] On December 2, 2016, Watland left Love a voice message concerning "whether or not [he] thought some

4

of the other students that were somewhat aware of some of the issues would be appropriate to contact as witnesses[.]" [Dkt. 164-91.] Watland did not have "a specific memory" of her conversation with Love, or a general memory of a discussion with Love about potential witness interviews, including Witness B. [Dkt. 136-47 at 82.] Watland could not recall a specific conversation with her co-investigator, Tennison, about which witnesses to interview, and could not remember "specifics around whether or not to interview" Witness B. [*Id.* at 80, 84, 108.]

3. And is there anything in the record about what those witnesses would have said, if given the chance?

**RESPONSE:** Yes. In his appeal, Doe submitted affidavits from both witnesses. [Dkt. 135-22 at LOYOLA 327-28.] Witness A would have stated that "[i]n January of 2016, [John] brought [Jane] back to our apartment" and they "all made small talk for about five minutes." [*Id.* at LOYOLA 327.] Witness A heard no noise or voices coming from John's bedroom for the next hour, and never heard "anything to suggest that [Jane] was in any way unhappy." [*Id.*] When Jane left, "[n]othing seemed out of the ordinary, and [Jane] did not say or do anything to indicate any kind of discomfort." [*Id.*] Witness B (John and Jane's mutual friend) would have told the investigators that on the night of John and Jane's first date (after John and Jane performed oral sex on each other), the three of them sat in Witness B's room and talked for about a half-hour, John and Jane seemed friendly with each other, and the next few times Witness B saw Jane "she had only positive and affectionate things to say about [John]." [*Id.* at LOYOLA 328.]

Dated: September 8, 2022          Respectfully submitted,

                                                      JOHN DOE

                                           By:      /s/Jonathan M. Cyrluk
                                                               *One of John Doe's Attorneys*

Jonathan M. Cyrluk
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
Email: cyrluk@carpenterlipps.com

Patricia M. Hamill
Lorie K. Dakessian
CONRAD O'BRIEN PC
1500 Market Street, Suite 3900
Centre Square, West Tower
Philadelphia, Pennsylvania 19102-2100
Email: phamill@conradobrien.com
          ldakessian@conradobrien.com

## **CERTIFICATE OF SERVICE**

  I, Jonathan M. Cyrluk, an attorney, hereby certify that, on September 8, 2022, I caused a copy of the foregoing to be served on all counsel of record via the Court's CM/ECF system.

        /s/Jonathan M. Cyrluk
        Jonathan M. Cyrluk
        CARPENTER LIPPS & LELAND LLP
        180 North LaSalle Street, Suite 2105
        Chicago, Illinois 60601
        312-777-4820 (direct)
        312-777-4839 (fax)
        cyrluk@carpenterlipps.com