**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOHN DOE,                          )

                                 )

            Plaintiff,          )      Case No. 18-cv-7335

                                 )

         v.                    )      Hon. Steven C. Seeger

                                 )

LOYOLA UNIVERSITY CHICAGO,    )

                                 )

            Defendant.      )

_____)

## MEMORANDUM OPINION AND ORDER

This case is about sexual encounters that took place between two college students, and the university's response. Defendant Loyola University Chicago received a complaint from a student, Jane Roe. She alleged multiple instances of sexual misconduct by another student, Plaintiff John Doe.

Loyola investigated the claims. The university collected evidence from Doe and Roe, including interviews of each of them. It also interviewed a witness for Roe. The investigation culminated in a hearing before a disciplinary board. After reviewing the evidence, Loyola expelled John Doe. Doe appealed the decision, but Loyola affirmed.

Doe responded by filing suit, alleging that Loyola violated his statutory and contractual rights. He claims that the university discriminated against him because of his sex in violation of Title IX. He also claims that Loyola breached its contract by failing to comply with the university's procedures for disciplinary proceedings. In the alternative, Doe contends that he detrimentally relied on the university's non-contractual promises.

After discovery, the parties filed cross motions for summary judgment. John Doe moved for partial summary judgment on his breach of contract claim. Loyola moved for summary judgment on all three claims.

For the following reasons, the Court denies Doe's motion for partial summary judgment and grants Loyola's motion for summary judgment.

## Background

This case is about the expulsion of John Doe from Loyola University Chicago after it found that he had engaged in sexual misconduct. Before diving in, it is important to keep a few points in mind.

The issue before this Court is not whether Doe actually did what Roe accused him of doing. No one should read this opinion and draw any inferences about what happened during the encounters in question. And the issue is not whether Loyola has acceptable procedures, or handled things the right way, or presided over a fair disciplinary process writ large (at least, that's not *exactly* the issue).

The issue is whether Loyola violated John Doe's statutory and contractual rights during the process that culminated in his expulsion. More specifically, the issue is whether the record could support a finding that Loyola treated Doe adversely because he is a man. And the issue is whether Loyola broke its contract with Doe through the disciplinary process. Whether Loyola handled things appropriately is beside the point, unless any deficiencies could support a finding of discrimination or breach of contract.

Telling the story is a bit of challenge, given the bounty of material in the record. The submissions are quite voluminous, to put it mildly. For example, Doe's response to Loyola's

statement of facts (Dckt. No. 158) is 149 pages, and Loyola's response to Doe's statement of facts is (a more manageable) 43 pages. Suffice it to say that the Court went through it.

The backstory that led to the expulsion is rather long, and it includes a number of twists and turns. The key events include the underlying interaction between the students, the initial comments by Roe, the investigation, and the eventual hearing and decision. Each chapter is important to the overall story.

Before embarking, the Court offers one final disclaimer, and forewarning for the reader. The background section is quite long – roughly 30 pages. And the Opinion is lengthy, weighing in at over 70 pages. There is a lot of material, and then some. The length of the Opinion reflects the volume and the granularity of the arguments put forward by the parties, and the girth of their submissions. Standing on end, the Opinion is almost 70 feet tall, for a simple reason: there was a lot of ground to cover.

## I. John Doe and Jane Roe's Three Encounters

John Doe and Jane Roe were undergraduate students at Loyola during the 2015–2016 and 2016–2017 academic terms. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 2 (Dckt. No. 158).[1]

---

[1] When responding to an opposing party's statement of facts or statement of additional facts, the Local Rules require a party to "cite *specific evidentiary material* that controverts the fact and must *concisely explain* how the cited material controverts the asserted fact." *See* L.R. 56.1(e)(3) (emphasis added). Additionally, "a response may not set forth any new facts." *See* L.R. 56.1(e)(2). Nevertheless, Doe submitted responses that often spanned several pages, and introduced new facts as supposedly contradicting evidence. At times, Doe's response made things difficult to review. *See, e.g.*, Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 10 (Dckt. No. 158) (providing a seven-page response to a two-sentence fact); *id.* at ¶ 44 (providing a three-and-a-half-page response to a one-sentence fact); *id.* at ¶ 71 (providing a five-page response to a two-sentence fact). All told, Doe converted Loyola's 42-page statement of facts into a 149-page response. "A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity." *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004). Nevertheless, that is exactly what happened here. The Court carefully poured over the record.

They met on a shuttle bus in late 2015. *Id.* at ¶ 3. They had three encounters, and at least two of them involved sexual activity.

**The First Encounter.** On January 13, 2016, Doe and Roe went on a date. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 4 (Dckt. No. 161). That night, they had their first sexual encounter. It took place in Doe's apartment. *Id.* Doe and Roe describe the events differently, but not entirely. It is undisputed that the two students kissed, touched each other sexually, and engaged in oral sex. *Id.*

**The Second Encounter.** A few days later, Roe returned to Doe's apartment to talk about their first date. *Id.* at ¶ 5. The parties agree that Roe told Doe that she wanted to "take things slower" and "pump the brakes" on physical activity. *Id.* So, in their submissions, the parties agree on what Roe said about *prospective* sexual conduct, meaning future sexual activity.

But the parties disagree about what Doe said in response, and about what Roe said about *retrospective* sexual conduct, meaning past sexual activity.

According to John Doe, both of them "agreed they had rushed into things and 'regretted moving so fast.'" *Id.* So, Doe contends that they both expressed regret about their *retrospective* sexual conduct. That is, each of them expressed regret about what had happened already.

According to Loyola, the evidence does not support the notion that Roe told the investigators that she "regretted" anything. *Id.* In other words, as Loyola sees it, Doe is citing evidence about what he told investigators, not what both Doe and Roe told investigators. Loyola offers the following summary of the record: "It is undisputed that Jane went to John's apartment several days after January 13, 2016, that Jane told Loyola's investigators that she told John things were 'moving too fast' and that she wanted to 'take things slower' and 'pump the brakes'

4

on physical activity, and that John told Loyola's investigators that he and Jane agreed to various points." *Id.* (citing Final Investigation Report, at 6:187–96, 10:360–69 (Dckt. No. 128-4)).

The parties disagree about whether Doe and Roe engaged in sexual activity during that second encounter, meaning the follow-up get together when they talked about the first date. Loyola asserts that Doe initiated sexual contact with Roe during this second meeting. *See* Def.'s Statement of Facts, at ¶ 3 (Dckt. No. 132).

The university cites the Final Investigation Report, which adopted Roe's version of events. According to Roe, Doe "pushed her against the door, began kissing her, used his hand to" initiate sexual contact, "and stated, 'see what you do to me.'" *See* Final Investigation Report, at 6:202–03 (Dckt. No. 128-4).

Doe disputes that he did any such thing. Doe points out that the summary of his interview in the Final Investigation Report includes no mention of any sexual activity during that second meeting. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 3 (Dckt. No. 158) (citing Final Investigation Report, at 10:360–69). So Doe basically points to what he said before. And in that interview, he never said anything about any sexual contact during that second meeting.

***The Third Encounter.*** On January 17, 2016, Roe returned to Doe's apartment for a third time. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 161). She again performed oral sex on Doe. *Id.*

A few days later, Roe and Doe separately attended the same party, where they argued with each other. *Id.* at ¶ 7. The next day, they exchanged angry text messages. *Id.*; *see also* Final Investigation Report, at 16:641 – 17:648 (Dckt. No. 128-4, at 36–37 of 41).

5

## II.    Jane Roe's Informal Complaint

Roe felt uncomfortable with the series of events with Doe, so she told her athletic coach, Jackie Kropp.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 4 (Dckt. No. 158).  On January 21, 2016, Kropp used Loyola's Title IX reporting system (EthicsLine) to report "that [Roe] was encouraged to have physical contact with a male Loyola student past a point in which she was comfortable."  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 8 (Dckt. No. 161).[2]

At that point, Loyola's Deputy Title IX Coordinator was Rabia Khan Harvey.  *Id.* at ¶ 9. She was responsible for overseeing sexual misconduct cases involving students.  *Id.*  She also made sure that all employees were well trained, and she indirectly supervised Title IX investigators and hearing board officers.  *Id.*

Khan Harvey called Roe in for a meeting.  Khan Harvey wanted to discuss Roe's reporting options, describe the formal disciplinary process, offer supportive resources, and ask questions.  *Id.* at ¶ 10.

They met on January 26, 2016.  *Id.*  In her testimony, Khan Harvey described Roe as shy. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 6 (Dckt. No. 158).  She testified that Roe did not discuss in detail her encounters with Doe.  *Id.*  Roe shared very little about the encounters generally, and told Khan Harvey that she did not want to proceed with a formal investigation.  *Id.*

Khan Harvey asked about Roe's safety and whether she was feeling threatened.  *Id.* Khan Harvey also asked if Doe ever held her down or gave her orders.  *Id.*  And she asked whether Doe had ever pressured Roe or intimidated her.  *Id.*

---

[2]  Doe disputes that the report represents statements made by Roe herself.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 158).  But it does not dispute that Kropp entered this comment into EthicsLine.  *Id.*  All that matters is that Loyola's Title IX office saw this comment (and, more generally, the report).

6

Khan Harvey entered her notes from the meeting into EthicsLine.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 11 (Dckt. No. 161).  Khan Harvey wrote:  "[Roe] shared that on two separate occasions, [Doe] 'moved too quickly sexually' which made the student uncomfortable. While she doesn't believe she was forced or coerced, she performed oral sex on the accused student and now feels that he is trying to manipulate the situation by accusing her that she'll report that he raped her."  *Id.*; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 158).

The phrase in the middle of that passage – "she doesn't believe she was forced or coerced" – looms large in the case at hand.

In the end, Roe decided not to make a formal complaint at that time.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 12 (Dckt. No. 161).

Loyola took action, despite the lack of a formal complaint.  On February 2, 2016, Loyola's Title IX Coordinator for Athletics, Jay Malcolm, told Doe that Doe had to attend a training session because someone had filed a complaint.[3]  *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 4 (Dckt. No. 171).

In response, Doe emailed Khan Harvey on February 3.  *Id.* at ¶ 5.  Doe said that he was "blindsided, dumbfounded, and frankly sick to [his] stomach over all of this, so some help would be great."  *Id.*; *see* 2/3/16 Email (Dckt. No. 164-29, at 2–3 of 3).

---

[3]  Doe argues that Roe had asked the university to require Doe take the training, based on Khan Harvey's testimony that Roe "told [her] that she felt satisfied about the training, that in the immediate moment, she was okay with that outcome or that resolution, preventative measure, whatever you want to call it, as opposed to going forward with the formal process."  *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 171); Khan Harvey Dep., at 119:17-22 (Dckt. No. 164-1).  Loyola argues that this testimony does not prove that Roe personally requested the training.  *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 3.  But all that matters is that the Title IX office decided to ask Doe to go through training.

7

The next day, Khan Harvey responded that the university was "taking a pro-active response to report by mandating [Doe], and all student-athletes and staff, to participate in the two-hour training" in April. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 171); 2/4/16 Email (Dckt. No. 164-29, at 2 of 3). But the email also noted that Khan Harvey's "hunch [was] that they won't be filing a formal complaint because they are satisfied with alerting [her] office of this incident." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 5; 2/4/16 Email.

Doe attended the required training in April 2016. *Id.* at ¶ 6. Around the same time, he learned that his mother, who suffered from cancer, had about one week to live. *Id.*; BCT/CARE Internal Report (Dckt. No. 164-30). So, Doe emailed the Assistant Dean of Students, Kimberly Moore, asking for support and saying that "in [his] current state [he is] a bit of [a] disaster and attempting to focus on [his] studies has been extremely difficult." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 6 (Dckt. No. 171); BCT/CARE Internal Report.

Sometime in the spring of 2016, Roe met with Malcolm (again, the Title IX Coordinator for Athletics). *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 171). She told Malcolm that she had seen Doe in the varsity weight room, and that his presence made her upset. *Id.* Roe didn't say anything about having any communications with Doe. *See* Malcolm Dep., at 50:14-24 (Dckt. No. 164-28). And Roe did not reveal why it was so upsetting to see Doe in the weight room. *Id.*; *see also* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 7.

Malcolm was concerned, too, but for a different reason. "My concern was, we had [position] using our varsity weight room." *See* Malcolm Dep., at 51:2-11 (Dckt. No. 164-28).

In any event, Malcolm told Roe that the university couldn't take any further action unless Roe filed a formal complaint. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 171).

## III.  Jane Roe's Formal Complaint

Summer came and went, and old concerns resurfaced in the new school year.  In October 2016, Roe told Malcolm that she saw Doe on campus, and that she felt unsafe. *Id.* at ¶ 9.

That same month, Roe met with Loyola's Associate Dean of Students and Interim Deputy Title IX Coordinator, Tim Love.[4]  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 161).  Love's office handled the day-to-day operations of Title IX matters that involved students. *Id.*  Roe met with Love at least twice, and also met with the Assistant Dean of Students, Amber Miller.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 12 (Dckt. No. 171).

Malcolm also met with Love.  He could not remember exactly how many times they discussed Roe, but he agreed that it was somewhere between 2 and 50 times.  (That's quite a wide range.)  *Id.* at ¶ 10.

On November 1, 2016, Malcolm sent an email to Love and another official (Daniella Hanson) about Roe's case.  *Id.*; 11/1/16 Email (Dckt. No. 135-17, at 2–3 of 3).  The email summarized the backstory about what had happened up to that point.

Malcolm wrote that "Athletics has received limited information regarding an incident between these individuals."  *See* 11/1/16 Email (Dckt. No. 135-17, at 2 of 3).  The email shared that Roe originally "communicated that she did not want to make a formal complaint, but wanted the [position] to attend a Title IX training (which he did in Spring 2016)." *Id.*

---

[4]  The parties dispute the date of the meeting.  Love downloaded and reviewed Roe's EthicsLine file on October 13. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 161).  Neither party provided evidence of the date of Love's and Roe's meeting, but the exact date doesn't matter for the purposes of this decision.

Malcolm then went back to the point about who could use the weight room. He recalled that in the spring of 2016, Roe "communicated to Athletics that she felt uncomfortable seeing [Doe] in the weight-room," and that "Athletics made a policy that our [positions] were not to use the varsity weight room." *Id.*

Malcolm's email then continued to summarize the events that followed. Roe "communicated that she was still having issues knowing [that Doe] was in Norville and would 'be on the bench at the [sport] matches.'" *Id.* She "expressed an interest in transferring due to the anxiety she feels knowing she may run into" Doe. *Id.*

After that summary, Malcolm offered his two cents about the overall situation. Malcolm acknowledged that "this is a complicated scenario." *Id.* The university "want[s] to ensure our student-athletes are safe, feel safe and supported." *Id.* But at the same time, the university "understand[s] there hasn't been any decision against [Doe] (e.g., due process)." *Id.*

Love responded by email with an important update. Roe "has recently informed me that she wishes to proceed with the conduct process, so that will add another tool in our belt." *See* 11/1/16 Email (Dckt. No. 135-17, at 1 of 3). That update was accurate. Around that time, Roe did, in fact, make a formal complaint against Doe to Loyola's Title IX office. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 161).

Love suggested that the university "issue a temporary restriction on [Doe's] activities in [the athletics department] (i.e. temporarily suspend his role as a [position], pending the outcome of investigation/hearing)." *See* 11/1/16 Email (Dckt. No. 135-17, at 1 of 3).

Around the same time, another female student who had previously had sexual interactions with Doe also filed a formal complaint. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 161). That student, whose pseudonym is Elizabeth, dated Doe in early 2015.

*See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 15 (Dckt. No. 171).  She transferred

from Loyola in 2015, and had no intention of returning.  *Id.*  According to an email from Miller

to Love, Elizabeth was "willing to support [Roe] however [Roe] would like through the conduct

process," and had connected with her, too.  *Id.* at ¶ 14.

## IV.    The Community Standards

The two complaints against Doe triggered Loyola's formal "Gender-Based

Discrimination and Misconduct" process.  *See* Pl.'s Resp. to Def.'s Statement of Additional

Facts, at ¶ 16 (Dckt. No. 169).  The university published "Community Standards" to govern this

process.[5]  *Id.*

The Court takes a break from the timeline of events to summarize the requirements of

Loyola's Community Standards.  They form the basis for the contract that Loyola allegedly

breached.  The parties agree that these policies and procedures govern complaints about sexual

assault.  *Id.* at ¶ 9.  A key issue in the case is whether Loyola *followed* those standards.  *Id.*

The Community Standards create a procedure for how the university handles complaints

of misconduct.  The Community Standards call for an investigation, and then a hearing to

respond to the complaint.  *Id.*  The investigation includes interviewing parties and witnesses,

---

[5]  Loyola asserts that, because Roe's complaint stemmed from actions in January 2016, the university applied the policies from Community Standards in effect in January 2016 (meaning the 2015–2016 Community Standards), and the procedure from the Community Standards in effect at the start of the investigation (meaning the 2016–2017 Community Standards).  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 10 (Dckt. No. 158).  Loyola cited Love's declaration for support.  *Id.*  Doe disputes this claim, arguing that there are several reasons to not believe Love's declaration.  *Id.*  Doe kicks up a considerable amount of dust, but it doesn't really undermine Love's testimony.  Doe points out that Love didn't know *how* the university selected which Community Standards to use, and that the university did not notify Doe of the specific policy provisions that would apply, and so on.  Fair enough.  But that's beside the point.  None of his evidence *contradicts* Love, who unambiguously states that the university used 2015–2016 Community Standards for "the Policy definitions" and the 2016–2017 Community Standards for "the procedures."  *See* Love Dec., at ¶ 6 (Dckt. No. 135-24).  Instead, he asks the Court to question Love's credibility, which the Court cannot do at this stage.

creating audio recordings of interviews, and gathering evidence. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 11 (Dckt. No. 158).

The investigation usually "takes between two and four weeks." *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16, at 15 of 32). From beginning to end, the investigation, hearing, and decision should "take no longer than sixty (60) days unless extenuating circumstances cause unavoidable delay." *Id.* at § 409.6(a).

The investigation begins as soon as the "complainant notifies the Deputy Coordinator of their desire to pursue the formal conduct process." *Id.* at § 409.6(b). The Deputy Coordinator appoints two investigators, a Hearing Board chair, and two Hearing Board officers. *Id.* The investigators may request meetings to interview parties and witnesses and collect any relevant information. *Id.*

Both parties have procedural rights. The parties receive notice of (1) any required meetings, (2) the preliminary potential policy violations, and (3) the names of investigators. *Id.* The parties can present evidence, and they can select an advisor of their choice to accompany them. *Id.*

The parties themselves have some input over the evidence gathered during the investigation. They can present evidence, including proposing witnesses for the investigators to interview. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 158). The Community Standards expressly allow the parties to propose witnesses: "Both parties may present evidence throughout the investigation, including *proposing* witnesses to be considered for interviewing." *See* 2016–2017 Community Standards § 409.6(a)(vii) (Dckt. No. 128-16, at 14 of 32) (emphasis added).

12

The parties agree that "the interviewers will interview relevant witnesses."  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 158) (quoting the parties, not the Community Standards).  "The Title IX Investigators will . . . [r]equest meetings and separately interview . . . relevant witnesses that can provide a firsthand account of something seen, heard, or experienced relating to the alleged incident."  *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16, at 15 of 32).

The investigators create audio recordings of the interviews of the parties and the witnesses.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 10 (Dckt. No. 158).  What the investigators then *do* with those recordings is an important issue in this case.

For now, the key point is that the university can record each interview, and the recordings can't leave the possession of the investigators.  "The University reserves the right to audio record each individual interview collected during meetings for the sole purpose of preparing the Final Investigation Report.  These audio recordings will not be shared beyond the Investigators.  The recordings are not retained as part of an educational record.  Audio recordings may be retained as needed at the discretion of the University."  *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16).

Notice that the purpose of the recordings is to help the investigators prepare the Final Investigation Report.  The Community Standards do not suggest that the recording will be played as substantive evidence at the hearing.

Eventually, the investigators submit a Final Investigation Report to the Deputy Coordinator.  *Id.*  The parties and the Hearing Board each receive the Final Investigation Report and any other relevant information that will be considered by the Board, at least two days before the hearing.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 158).  The

investigators attend and participate in the hearing (but not the deliberation and decision). *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16); Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14. The Hearing Board has discretion to invite witnesses if need be. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14.

The Community Standards also provide guidance on when and how a party may appeal. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 158). They list three potential grounds for appeal. *Id.*

First, a student can appeal because of new substantive information that could not have been discovered at the time of the hearing and that would have likely changed the outcome. *Id.* Second, a student can appeal because of a "substantive procedural error," or because of an error in interpretation of the university policy that prevented a fair hearing and decision. *Id.* Third, a student can appeal any "finding (as to responsibility or sanctions or both) [that] was manifestly contrary to the information presented at the hearing or to the established Community Standards (i.e., the decision was clearly unreasonable and unsupported by the great weight of information)." *Id.* (quoting 2016–2017 Community Standards § 411.1 (Dckt. No. 128-16)).

The Dean of Students or a designee hears the appeals, unless the Dean of Students is the conduct administrator who made the original decision. *Id.* at ¶ 16. In that case, the Vice President for Student Development hears the case. *Id.* The decisionmaker ultimately issues a written decision and delivers it to each party. *Id.*

## V. The Investigation

The Community Standards provided the framework for what happened next.

On November 4, Love (again, the Associate Dean of Students and Interim Deputy Title IX Coordinator) assigned Ray Tennison and Leslie Watland to investigate the complaints of Roe

14

and Elizabeth. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 17 (Dckt. No. 161); Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 23, 30 (Dckt. No. 158).

The investigators worked together on the two complaints. But they prepared a separate Final Investigation Report for each woman's complaint. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 23. So there was a report about Roe's complaint, and a report about Elizabeth's complaint.

After the investigations were complete, two separate Hearing Boards heard the two women's complaints. *Id.* In other words, Tennison and Watland prepared a Final Investigation Report for Roe's allegations, and a Hearing Board considered Roe's complaint. Separately, Tennison and Watland prepared another Final Investigation Report for Elizabeth's allegations, and a different Hearing Board considered Elizabeth's complaint.

Also on November 4, Doe received two letters from Love. *Id.* at ¶¶ 24–25; First 11/4/16 Letter (Dckt. No. 135-4); Second 11/4/16 Letter (Dckt. No. 135-6, at 60–61 of 81). The first letter notified Doe that Roe had accused him of sexual misconduct. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 24 (Dckt. No. 158); First 11/4/16 Letter.

The letter did not offer many details. It simply stated: "The Office of Student Conduct and Conflict Resolution (OSCCR) has received information about your alleged conduct in January of 2016 at the following location: A private residence near the LSC. Specifically, it is alleged that you sexually assaulted fellow student [Jane Roe]." *See* First 11/4/16 Letter (Dckt. No. 135-4). The letter didn't contain any other details about the allegations, but it did inform Doe of his rights under the Community Standards, such as his right to an advisor in any meeting during the process. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 24 (Dckt. No. 158).

15

The second letter informed Doe of restrictions from accessing certain athletic buildings and his suspension from his role on a sports team. *Id.* at ¶ 25; Second 11/4/16 Letter.

On November 8, Love met with Doe. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 28 (Dckt. No. 158); Pl.'s Resp. to Def.'s Statement of Additional Facts, at ¶ 18 (Dckt. No. 169). At deposition, Doe testified that Love told him at that meeting that there were two complaints against him. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 28.

Doe also testified about what Love had told him about the process. Love told Doe that the same two investigators would look into both complaints, in keeping with the standard practice. Love also explained that there would be two separate Hearing Boards. *Id.* Each Hearing Board would know that there was a separate case against Doe, but would not know the details. *Id.*

Doe did not object to anything that Love told him about the procedure. *Id.* At deposition, Doe explained that he "trusted Tim Love, that that was standard practice." *Id.* (quoting Doe Dep., at 88:24 – 89:15 (Dckt. No. 136-42)).

Love also testified that he told Doe that "these cases to me tended to hinge on a question of whether there was pressure, unreasonable pressure, coercion, et cetera." *See* Pl.'s Resp. to Def.'s Statement of Additional Facts, at ¶ 18 (Dckt. No. 169) (quoting Love Dep., at 154:1-3 (Dckt. No. 136-46)). For a definition of coercion, Love referred Doe to the 2016–2017 Community Standards (rather than the 2015–2016 Community Standards, which provided the substantive standard of conduct governing the year of the conduct). *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 22 (Dckt. No. 171).

16

The 2016–2017 Community Standards defined "coercion" differently than the 2015–2016 Community Standards. Again, bear in mind that the conduct took place during the 2015–2016 school year, but the hearing took place during the 2016–2017 school year.[6]

The 2016–2017 Community Standards defined "coercion" as "the use of force, threats, or intimidation to elicit an action from another person." *Id.*; *see also* 2016–2017 Community Standards § 201(1)(f) (Dckt. No. 128-15). And they defined "consent" as "freely given, mutually understandable permission to engage in a specific activity," and referred readers to the sexual misconduct section for more details. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 22 (Dckt. No. 171); 2016–2017 Community Standards § 201(1)(i); *see also* 2016–2017 Community Standards § 202(21).

The 2015–2016 Community Standards had a different definition of "coercion." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 22 (Dckt. No. 171). They defined "coercion" as "unreasonable pressure for any activity." *Id.* They gave an example: "when an individual makes clear that the individual does not want sex, wants to stop, or does not want to go past a certain point of sexual interaction, continued pressure beyond that point can be coercion." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 18 (Dckt. No. 158).

The definition of "consent" in the 2015–2016 Community Standards was largely the same as the definition in the 2016–2017 Community Standards. But there were a few differences. The definition in the 2015–2016 Community Standards stated that submission to

---

[6] The parties consume space parsing the different definitions of "coercion" in the 2015–2016 Community Standards and the 2016–2017 Community Standards. At the end of the day, the difference does not appear material to this motion, but the Court surveys the field for the sake of completeness. As the Court understands it, the 2015–2016 Community Standards provided the *substantive* standard, and the 2016–2017 Community Standards provided the *procedure* for the hearing. That is, the 2015–2016 Community Standards provided the substantive rule for the standard of conduct, because those standards were in place at the time of the sexual conduct in early 2016. And the 2016–2017 governed the procedure for the hearing, because the hearing took place in late 2016.

sexual activity based on "the use of force or the threat of force is not consent." *Id.*; Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 22. The 2015–2016 Community Standards defined "force" to include "coercion." *Id.* "Coercion," in turn, meant "unreasonable pressure for any activity." *Id.*

On November 22, Watland (the investigator) emailed Doe to confirm that they would interview Doe on December 2 at 3:00 p.m. *Id.* at ¶ 24. He said that the interview would be about Roe's complaint, and there would be a separate meeting about Elizabeth. *Id.*

On November 29, Love emailed Watland and Tennison (the two investigators). *Id.* at ¶ 23; 11/29/16 Email (Dckt. No. 135-19, at 3–4 of 5). He gave some guidance on how to interview Doe about both complainants at one time. He ended by asking about the schedule: "do you think it might be possible to wrap up the investigation (with writing the FIRs) next week, such that we could have the hearing on the Finals Study Day, Wednesday December 14?" *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 22 (Dckt. No. 171); 11/29/16 Email. He then clarified that "if that seems unreasonable, please let [him] know – and be honest. I don't mean to rush/pressure anything, and I know this is a busy time for all." *See* 11/29/16 Email.

Watland and Tennison interviewed Roe first. The interview took place on December 1. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 21 (Dckt. No. 161). They audiotaped her interview. *Id.*

On December 2, the investigators emailed Doe to say that they would interview him about both Roe and Elizabeth later that day. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 24 (Dckt. No. 171). That decision contradicted the investigators' original email to Doe, which said that they would conduct separate interviews about Roe and Elizabeth. *Id.* Regardless, later that day, Watland and Tennison interviewed Doe. *Id.*

Right before the interview, Watland and Tennison informed Doe of his right to an advisor. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 32 (Dckt. No. 158). Doe testified that he chose to proceed without one, and signed a form acknowledging that they had informed him of his rights. *Id.*

During the interview, Doe had the opportunity to provide his account of what happened between him and Roe. *Id.* at ¶ 33. He told the investigators that Roe had initiated the sexual activity and that "[n]o one was coerced, no one was forced." *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 24 (Dckt. No. 161).

Watland summarized what he heard, writing: "In person, when [Doe] next saw [Roe], they shared that they had both rushed into things. They mutually agreed that they had moved fast physically and 'that no one was coerced.'" *Id.* at ¶ 25.

Watland took notes, and the investigators audiotaped the interview. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 158); Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 24 (Dckt. No. 171). They gave Doe a copy of a document titled "Title IX Interview: Overview and Expectations," which included a note about the recording of the interview: "Audio Recording. This interview WILL be recorded. The purpose of the audio recording is to assist the investigation team with capturing precise language that was shared during your interview for the purposes of the final investigation report." *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 22 (Dckt. No. 161). Doe and the investigators signed the document.[7] *Id.*

The Doe and Roe interviews were not the only evidence. The investigators also interviewed Roe's roommate, Witness #1. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 40 (Dckt. No. 158); Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 69 (Dckt. No. 171).

---

[7] Roe received and signed the same document during her interview, too. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 22 (Dckt. No. 161).

Witness #1 had a chance to review and make changes to her interview summary. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 40. The investigators included her summary as an appendix to the Final Investigation Report. *Id.* Additionally, the investigators received text messages as evidence from Doe and Roe. *Id.* at ¶ 41.

During his interview, Doe gave the investigators the names of two potential witnesses, C.R. and W.T. C.R. was Doe's roommate, and was in the apartment before and during the first encounter. W.T. was a friend, and Doe and Roe visited him in his dorm room after the first encounter. So, C.R. saw Doe and Roe before the first encounter, and W.T. saw them after the first encounter.

The investigators did not interview either of Doe's two witnesses.

## VI. The Final Investigation Report

After collecting the evidence, Love, Watland, and Tennison prepared the Final Investigation Report. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 27 (Dckt. No. 161). Watland drafted a three-page, 140-line summary of Doe's interview for inclusion in the Final Investigation Report. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 22 (Dckt. No. 161).

Recall that Love told Doe that these cases tended to hinge on coercion. To that end, the following passage appeared in the summary:

> In person, when Respondent next saw Complainant, they shared that they had both rushed into things. *They mutually agreed that they had moved fast physically and "that no one was coerced."* Both independently said they had regretted moving so fast. The Respondent shared that he believed that being physical so early in the relationship could jeopardize he and the Complainant not having a serious dating relationship. Respondent acknowledged it was Complainant's first time doing most of those things, and that he knew that they had moved quickly. She had described to him that it was her first time in many of those activities and that they should have taken their time with things. He wanted to have a relationship with her, and they agreed to "pump the brakes" on the

20

> physical activity so that they could develop a relationship outside of being
> physical.

*See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 158) (emphasis added); *see also*

Final Investigation Report, at 10 (Dckt. No. 128-4, at 30 of 41); Final Investigation Report, at 10

(Dckt. No. 135-6, at 30 of 81).

Love drafted the section of the Final Investigatory Report entitled "History of the Case."

*See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶¶ 27–28 (Dckt. No. 161). In that section, Love

included a reference to the January 2016 EthicsLine report by Roe's athletic coach (Krop). *Id.* at

¶ 27 (Dckt. No. 161).

For present purposes, the most important part of the "History of the Case" section

involved the description of Roe's meeting with Khan Harvey (again, the Deputy Title IX

Coordinator) on January 26, 2016. *Id.* at ¶ 28. Love mentioned that interview, but he failed to

mention anything about what happened at that interview.

Love did not give any description about the substance of the conversation between Roe

and Khan Harvey. *Id.* Recall, Khan Harvey's write-up included a statement about whether Roe

felt coerced. As a reminder, Khan Harvey wrote: "Student [Jane Roe] shared that on two

separate occasions, the Respondent [John Doe] 'moved too quickly sexually' which made the

student uncomfortable. *While she doesn't believe she was forced or coerced*, she performed oral

sex on the accused student and now feels that he is trying to manipulate the situation by accusing

her that she'll report that he raped her." *Id.* (emphasis added).

Love's write-up did not reveal the substance of that conversation at all. He merely shared

that the meeting took place, without covering what was said. Love did not attach a copy of Khan

Harvey's write-up, either. *Id.* at ¶ 29.

The punchline is that the investigators and the Board never knew about what Roe had said to Khan Harvey during the meeting on January 26, 2016. *Id.* at ¶ 30. They did not have access to the summary by Khan Harvey unless someone gave it to them. *Id.* But here, Love did not give the investigators and the Board a copy of the Khan Harvey report. *Id.* And Love did not write a description of what was said, either.

So, Khan Harvey wrote that Roe "doesn't believe she was forced or coerced," and did so less than two weeks after the first encounter. But the investigators and the Board heard nothing about it. The investigators and the Board explored the case without knowing anything about what Roe discussed with Khan Harvey. They did not know that, according to Khan Harvey, Roe "doesn't believe she was forced or coerced."

To doublecheck that point, this Court ordered supplemental submissions from the parties. *See* 9/1/22 Order (Dckt. No. 177). And sure enough, the parties agreed that the Board never heard anything about what Roe had said to Khan Harvey, and whether Roe felt coerced. *See* Def.'s Supplement Summary Judgment Submission, at 1 (Dckt. No. 178) ("It is factually correct that the Board never knew about Rabia Khan Harvey's ('Khan Harvey') impressions about what Jane Roe ('Jane') said to Khan Harvey and that the Board did not receive or review Khan Harvey's notes from the January 26, 2016 meeting with Jane."); Pl.'s Supplemental Summary Judgment Submission in Response to Court's Questions, at 1 (Dckt. No. 179) ("Yes, it is factually correct that the Board never knew about Jane's statement or Khan Harvey's summary of Jane's statement that 'she did not believe she was forced or coerced' into certain sexual activity.").

One of the hotly contested issues in the case is whether Roe *herself* ever said that she did not feel coerced. Doe points to the report prepared by Khan Harvey, and reads it to mean that Roe *personally* said that she did not feel coerced.

But at deposition, Khan Harvey offered a different take on what she had written. Khan Harvey could not recall the exact words that Roe used during her conversation. But Khan Harvey confirmed that the report accurately depicted her "impressions" of how Roe felt, based on Roe's answers to her questions. *See* Khan Harvey Dep., at 103:3 – 104:18, 242:20-24 (Dckt. No. 164-1); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 158).

Doe received a draft of the Final Investigation Report for the first time on December 8. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 158); *see also* 12/8/16 Email (Dckt. No. 135-6, at 69 of 81). He didn't receive the audio recording of his interview. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 23 (Dckt. No. 161). Watland asked Doe to review the report and confirm that it accurately portrayed his perspective. *See* 12/8/16 Email.

Doe responded the next day. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 158). He offered one correction but otherwise "confirm[ed] that these accurately represent my perspective from the interviews." *Id.*; *see also* 12/9/16 Email (Dckt. No. 135-6, at 69 of 81).

Specifically, Doe proposed the following change: "[L]ines 9-14, I want to clarify that she informed me that she was nervous because she was on a date with someone 'as attractive as you (me)' and then I proceeded to tell her that there is nothing to be nervous about, etc. That is the only change I would somehow incorporate. Thank you very much!" *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (quoting 12/9/16 Email).

Watland implemented that change, and then emailed an updated draft to Doe the same day. *Id.* at ¶ 37. He asked Doe to review the draft and return it that same day. *Id.*; *see also*

23

12/9/16 Emails (Dckt. No. 135-6, at 68 of 81).  Doe made a few other changes, but he did not

change the paragraph with his statement "that no one was coerced."  *See* Pl.'s Resp. to Def.'s

Statement of Facts, at ¶ 36 (Dckt. No. 158).

Doe received the Final Investigation Report on December 12 for his review.  *Id.* at ¶¶ 31,

48.  The university set his hearing for December 14, so he had two days to read and review the

report.  *Id.*

The Hearing Board consisted of Jessica Landis (Hearing Board Chair, Office of Student

Conduct and Conflict Resolution), Brian Houze (Hearing Board Officer, Office of Student

Activities & Greek Affairs), and Angela King Taylor (Hearing Board Officer Office of Student

Activities & Greek Affairs).  *Id.* at ¶ 33.  The Board received a copy of the report.  *Id.*

Doe noticed that the report did not mention two witnesses that he described in his

interview (called Witness A and Witness B).  *Id.* at ¶ 49.

Love emailed Doe an updated copy of the Final Investigation Report the same day,

noting that Roe had made a few minor adjustments.  *Id.* at ¶ 50.  Doe testified that he did not see

or read that email until late the next night, when Love mentioned it over the phone.  *Id.*  Doe

never reviewed the Final Investigation Report because his hearing was scheduled for the next

day at 9:00 a.m.  *Id.* at ¶ 51.

## VII.    The Hearing

The hearing on Roe's complaint took place on December 14.  *Id.* at ¶ 52; Def.'s Resp. to

Pl.'s Statement of Facts, at ¶ 34 (Dckt. No. 161).  The record includes a transcript of the hearing.

*See* Hearing Transcript (Dckt. No. 135-1).  Doe, Roe, and the investigators appeared in person

before the Hearing Board.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 34.

Doe and Roe each brought an advisor to the hearing. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 54 (Dckt. No. 158). So Doe did not have an advisor during his interview, but he did have advisor by the time that the hearing rolled around.

At the hearing, Doe had the chance to provide his own account of the "allegations against him," which the Court understands to mean his version of what had taken place. *Id.* at ¶ 55. At deposition, Doe did not recall if the investigators raised any alleged violations that he didn't have a chance to refute. *Id.*

In this suit, Doe takes issue with several aspects of the hearing. The hearing transcript spans 163 pages. The Court focuses on the highlights below. Doe's complaints fall into a few buckets. Doe believes that the Hearing Board gave too much credit to Roe's story, and too little credit to his story. He objects to how the Board treated his advisor. And he believes that the Board responded to his questions dismissively.

So, the Court reviews the facts of the hearing in that order.

A.      **The Exploration of What Transpired between Doe and Roe**

At the hearing, the Board asked a number of follow-up questions based on information in the Final Investigation Report. Some facts were undisputed, but many were hotly contested. *Id.* at ¶ 56.

For the first encounter, Doe and Roe both said that they went to dinner, returned to Doe's apartment, and engaged in sexual activity. *Id.* They agreed that Roe removed her sweater and bra, and Doe kissed Roe's bare chest. *Id.* And they agreed that Roe touched Doe's penis with her hand and performed oral sex on him, and that Doe performed oral sex on her. *Id.*

For the second encounter, Doe and Roe agreed that they met on January 15 or 16 in Doe's apartment. *Id.* at ¶ 59. They agreed that they talked about how things were "moving too fast" and agreed to slow down on sexual activity. *Id.*

For the third encounter, Doe and Roe agreed that they met on January 17 in Doe's apartment. *Id.* at ¶ 61. They also agreed that they kissed, and that Roe performed oral sex on Doe. *Id.*

But the parties disagreed on many facts, too. *Id.* at ¶¶ 57, 60, 62. In the end, these disagreements were key, because the Hearing Board ended up deciding that Roe's story was more reliable.

The parties described the details of their first encounter quite differently. *Id.* at ¶ 57. Roe recounted facts about her declining his request to see her breasts and to kiss her. *Id.* She also said that he took off his own pants, requested oral sex and simultaneous oral sex, digitally penetrated her, removed her pants, and rubbed his penis on her clitoris without penetrating. *Id.* And Roe said that she initially said "no" to engaging in simultaneous oral sex, taking off her pants, and having sex. *Id.* But she described the "no" to penetrative sex as "the only thing he ever listened to." *Id.*

Doe, in contrast, said that Roe helped him undo his pants, took off her own pants before she ever removed her shirt, touched his penis without his asking, requested oral sex from him, and took off her own shirt and bra. *Id.* at ¶ 58.

For the second encounter, Doe and Roe disagreed about how Doe left the apartment. *Id.* at ¶ 60. Roe said that Doe pushed her against the door, hugged and kissed her, and used his hand to place her hand on his penis, saying, "See what you do to me." *Id.* Doe, however, said that he simply walked to the door, gave her a hug and kiss, and left. *Id.*

26

For the third encounter, Doe said that the sexual activity occurred on the couch, but Roe said that it occurred in the bedroom. *Id.* at ¶¶ 62–63. Doe also said that they were kissing and then Roe touched his groin areas with her hand, and he asked, "Are you sure?" *Id.* at ¶ 62. According to Doe, Roe responded, "Yeah," and performed oral sex. *Id.* But according to Roe, Doe took off his own pants, and asked "Are you sure?" *Id.* at ¶ 63. Roe could not recall what she said, but also did not deny Doe's story that she said, "Yeah." *Id.*

The hearing eventually turned to Doe's interview summary. *Id.* at ¶ 64. The Hearing Board drew attention to the sentence about coercion, meaning the sentence stating that Doe had said that he agreed with Roe that "no one was coerced." *Id.*; *see also* Hearing Transcript, at 94:21-24 (Dckt. No. 135-1); Final Investigation Report, at 10 (Dckt. No. 128-4, at 30 of 41) ("They mutually agreed that they had moved fast physically and 'that no one was coerced.'") (summarizing Doe's statement to the investigators); Final Investigation Report, at 10 (Dckt. No. 135-6, at 30 of 81).

That statement caught the attention of the Hearing Board. The Board asked Doe how coercion came up in that conversation. *Id.* The Hearing Board seemed to think that a denial of coercion was *itself* evidence of coercion.

Doe told the Hearing Board that the summary "was a misrepresentation of what I said," and that coercion never came up. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 65 (Dckt. No. 158) (quoting Hearing Transcript, at 94:25 – 95:1 (Dckt. No. 135-1)). So, the Hearing Board turned to the investigators to ask how that line made it into the summary. *Id.*

Watland stated that Doe "kept saying they had mutually agreed that they had moved too quickly and he had said that they mutually agreed that no one was coerced and that was intentionally put in quotations just because, to me, the phrasing – it seems more formal than I

27

think I anticipate people usually talking to each other.  So that was what was said." *Id.* (quoting Hearing Transcript, at 95:7-14 (Dckt. No. 135-1)).  But Watland didn't recall following up with Doe to ask whether he used those exact words (meaning "no one was coerced").  *Id.*

The Board also asked Doe about some of his texts.  *Id.* at ¶ 66.  Roe had texted Doe: "I'm not stupid [Doe] I'm not falling for this anymore, I can only hope that the next girl you decide to use is smarter than me and doesn't fall for your shit."  *Id.*  Doe responded in a series of texts, with the final one saying, "I feel like you want me to be the guy who takes your virginity . . . and then you will proceed to claim I raped you."  *Id.*

Doe said that he sent that text because "everything seemed perfectly fine and then she leaves and just changes like that freak[ed] [him] out."  *Id.* at ¶ 67.  He "decided to say that . . . because it seems like [Roe] just want[ed] attention."  *Id.*  He went on to state his story that Roe initiated the sexual conduct:  "I'm now sitting in front of a board of people try to judge my character on something that someone clearly regrets doing and pushing the blame on me."  *Id.*

## B.  The Treatment of the Advisors

Doe also takes issue with how the Board dealt with the advisors at the hearing.

According to Doe, Houze (again, a Hearing Board officer) threatened to remove Doe's advisor at some point during the hearing.  *Id.* at ¶ 68.  Meanwhile, he allowed Roe to talk to her advisor repeatedly without consequence.  *Id.*

The parties disagree on what, exactly, happened.  Loyola claims that Houze made one brief comment to the advisors:  "I want to take a minute and just remind both advisors of their role and remind that there should not be any coaching going on.  So just a stern reminder.  Thank you."  *See* Def.'s Statement of Facts, at ¶ 68 (Dckt. No. 136) (quoting Hearing Transcript, at 78:17-20 (Dckt. No. 136-1)).

28

Doe, however, argues that the Hearing Board addressed the advisors more often than that. He provided evidence that Landis (again, the Hearing Board Chair) addressed the advisors at the beginning of the hearing, to say that they are to "serve[] as a silent support person" and are not "really to speak at all" during the hearing. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 67 (Dckt. No. 158) (quoting Hearing Transcript, at 12:3-8 (Dckt. No. 135-1)).

Doe testified that the Board didn't enforce that rule when it came to Roe. Doe testified that the Board allowed Roe to speak with her advisor four or five times. *Id.* (citing Doe Dep., at 80:17 – 81:3 (Dckt. No. 135-42)). Doe also said that, when Houze issued the "stern reminder" to the advisors, "he was staring directly at [Doe] and [his] advisor." *Id.* (quoting Doe Dep., at 84:11-12). According to Doe, that stare suggested the warning was only directed at him and his advisor. *Id.*

### C.    The Response to Doe's Questions

At deposition, Doe testified that the Hearing Board belittled him when he raised questions. *Id.* at ¶ 69. Specifically, he posed a few questions for the Board to ask Roe, and he thinks that the Board mocked him. *Id.*

For example, Roe apparently said that she could not picture them having simultaneous oral sex, but knew that it happened. *Id.* That statement befuddled Doe, and he wanted the Board to drill down and get clarification.

Doe asked the Board to ask follow-up questions. He responded: "Can we get clarification on what, I can't picture it, but I know it happened, means? Because if you can't picture an act that you're claiming happened, how do you – like how do you know that that's what happened? Like do you understand what I'm trying to say?" *Id.* (quoting Hearing Transcript, at 77:10-16 (Dckt. No. 135-1)).

29

Houze did not ask Roe those follow-up questions. Instead, Houze responded: "I can think of a number of instances where I'm sure that something happened, but I can't picture it, to be straightforward with you." *Id.* (quoting Hearing Transcript, at 77:17-19).

Doe testified that "the manner in which he looked at me and my advisor, but more specifically me, it came across in an extremely hostile manner." *See* Doe Dep., at 122:17-19 (Dckt. No. 135-42).

*     *     *

In total, the hearing lasted about three hours. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 54 (Dckt. No. 158). The next day (December 15), Doe requested to meet with Love, and he told him that the meeting was unfair and that the Board refused to ask his questions. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 67 (Dckt. No. 171). Love told Doe to trust the process, and that he could raise any concerns in an appeal. *Id.*

## VIII. The Decision

After the hearing, the Hearing Board deliberated. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 71 (Dckt. No. 158). Landis (the Chair) testified that she recalled that the Board had two sessions. *Id.* The Hearing Board had to weigh the evidence and reached a decision based on the preponderance of the evidence. *Id.*

After deliberation, the Hearing Board determined that Roe's account was more credible than Doe's account. *Id.* at ¶ 72. The Board decided that Doe was responsible for "non-consensual sexual penetration" and "non-consensual sexual contact" based on his first and second encounters with Roe. *Id.*

On December 20, the Hearing Board issued a decision letter.  *Id.* at ¶ 73; *see also* 12/20/16 Decision Letter (Dckt. No. 135-11).  It purported to "summarize the outcome" of Doe's hearing.  In bold letters, right at the beginning, the letter announced the decision:

> **After reviewing all available information related to this incident and discussing it with you, I have found that you are <u>RESPONSIBLE</u> for engaging in non-consensual sexual contact and non-consensual sexual penetration.**

*See* 12/20/16 Decision Letter (bold and underline in original).

The Decision Letter addressed the credibility of Doe and Roe.  The Board stated that Roe had offered a consistent version of the events in the 11 months since the first encounter:

> The Board noted that Complainant has consistently shared her account of the alleged events over the course of the last 11 months:  she reported a consistent account to Witness 1 the night of the incident, to her Coach a few days after the incident, to the Investigators months later, and to the Board during the hearing.

*See* 12/20/16 Decision Letter, at 2 (Dckt. No. 135-11, at 3 of 10).

The Board declared that Roe was consistent all long.  But the Board never heard anything about Khan Harvey's write-up from January 26, 2016, stating that Roe "doesn't believe she was forced or coerced."  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 30 (Dckt. No. 161).  The Board declared that Roe was consistent, without hearing about a potential inconsistency.

On the other hand, the Board concluded that Doe was inconsistent, albeit only once.  *See* 12/20/16 Decision Letter, at 3 (Dckt. No. 135-11, at 4 of 10).  The Decision Letter pointed to the statement in the Final Investigation Report that Doe and Roe "mutually agreed that they had moved fast physically and 'that no one was coerced.'"

The Letter recounted how Doe had taken issue with that phraseology at the hearing, and how the Board had asked for clarification from the investigators.  The investigators confirmed that the report accurately captured what Doe had said.  *See* 12/20/16 Decision Letter, at 2–3

(Dckt. No. 135-11, at 3–4 of 10) ("The Investigators stated that during the interview Respondent stated that the topics of conversation between himself and Complainant included both the agreement that they had moved too fast physically and that no one was coerced. They also shared that the Respondent repeated the phrase 'mutually agreed that no one was coerced' multiple times during his interview which is why they included the phrase in quotation marks in the FIR.").

In the end, the Board gave weight to the fact that Doe was trying to walk-back a statement in the Final Investigation Report, especially after having opportunities to review and change the summary before the hearing. *Id.* The Board wrote:

> All things considered, Respondent's inconsistency regarding the discussion of coercion, while a singular instance, is noteworthy to the Board. The presence or lack of coercion is a foundational component to determining whether consent was present for a sexual interaction. As such, Respondent's inconsistency around this topic in particular holds significant weight.

*See* 12/20/16 Decision Letter, at 3 (Dckt. No. 135-11, at 4 of 10).

The letter listed six discrete acts of sexual misconduct. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 74 (Dckt. No. 158); 12/20/16 Decision Letter (Dckt. No. 135-11). The first five acts took place during the first encounter on January 13. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 74; 12/20/16 Decision Letter. The last instance took place during the second encounter. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 74; 12/20/16 Decision Letter.

As a result of these findings, Loyola expelled Doe. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 74 (Dckt. No. 158); 12/20/16 Decision Letter (Dckt. No. 134-11).

## IX.     The Second Hearing

Doe's hearing on Elizabeth's complaint took place in front of a different hearing board on December 14, 2016.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 52 (Dckt. No. 158).  That hearing board issued a decision six days later, finding Doe not responsible for any policy violation.  *Id.* at ¶ 53.

## X.     The Appeal

The decision letter ended by noting that Doe had 120 hours to appeal the decision, and giving him a link.  *See* 12/20/16 Decision Letter (Dckt. No. 134-11).  He needed to appeal before Christmas.

On December 24, Doe filed an appeal.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 99 (Dckt. No. 158); Appeal (Dckt. No. 135-13).  Loyola stayed his expulsion pending the result.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 110.  An Assistant Vice President, Jack McLean, received the appeal as the Dean's designee.  *Id.* at ¶ 100.

Doe raised three grounds for appeal:  (1) new substantive information, (2) substantive procedural error, and (3) a finding manifestly contrary to the evidence.  *Id.* at ¶ 99.

First, Doe appealed based on new substantive information from two witnesses.  Doe sought the admission of two witness statements, from individuals known as "C.R." and "W.T." *Id.* at ¶ 101.

C.R. was Doe's roommate, and was in the next room on the first night in question.  *Id.* Doe says that he would have "refuted the Complainant's testimony regarding her demeanor due to him seeing her after the sexual encounters occurred."  *Id.* (quoting Appeal (Dckt. No. 135-13)).

33

The other potential witness was W.T. The parties don't reveal the nature of their relationship with that person. But Doe argued that W.T. "could have refuted the [Roe's] claims of lack of consent and the testimony with the witness based on conversations with the Complainant during the relationship." *Id.* (quoting Appeal).

Before the hearing, Doe gave the names of C.R. and W.T. to the investigators. *Id.* at ¶ 102. He assumed that the investigators would interview them, but there's no record that they did so. *Id.*

Second, Doe appealed based on substantive procedural errors. That argument included three subparts. Again, Doe thought that the investigators should have interviewed C.R. and W.T. *See* Appeal (Dckt. No. 135-13). He thought the Hearing Board lacked impartiality because the Board knew that Doe was subject to a second hearing. *Id.* And he thought that the Board received materially false information from the investigators about whether Doe ever used the word "coerced" when talking with Roe. *Id.*

Third, Doe appealed based on the notion that the Board's finding was manifestly contrary to the record. He argued that the Hearing Board's credibility determination (*i.e.*, its decision to believe Roe's story over his story) was without merit. *Id.* And he argued that there was nothing in the record suggesting that Roe did not give consent. *Id.*

After Doe submitted his appeal, McLean received a letter from Doe's attorney and declarations by W.T. and C.R. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 105 (Dckt. No. 158). McLean testified that he skimmed these documents, but did not consider them for the appeal, because Doe submitted them after the 120-hour appeal window. *Id.*

On January 20, 2017, McLean issued his decision denying Doe's appeal. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 60 (Dckt. No. 171); *see also* Appeal Decision Letter (Dckt.

34

No. 135-14) ("**I have decided to uphold the original decision of responsibility as well as any/all sanction(s)**.") (bold in original). The Appeal Decision responded to each of Doe's claims, dismissing them all. *See* Appeal Decision Letter.

For the failure to interview C.R. and W.T., McLean observed that any claim based on new substantive information must show that the new information was not available or discoverable "at the time of the hearing and that it would have likely changed the outcome of the case." *Id.* He then explained that Doe "fail[ed] to address why this information was not discoverable at the time of the hearing, or how it would have likely changed the outcome of the case." *Id.*

McLean also found no merit in Doe's three substantive procedural error claims. He noted that Doe offered "other additional evidence the night before the hearing, [but] did not ask to have [C.R.] and [W.T.] testify at the hearing." *Id.* at 3 (Dckt. No. 135-14, at 4 of 7). McLean noted that Doe did not provide any explanation about "how a Hearing Board member(s) seeing the Respondent/Appellant, with or without his attorney, in the OSCCR offices would lead the hearing board members to conclude a second complaint had been filed against" him. *Id.*

For the third substantive procedural error claim, McLean found no reason to believe the investigators gave materially false information to the Hearing Board about Doe's use of the word "coerced." *Id.* McLean observed that investigators do not pass along their reports until after final verification by the interviewees, and Doe "ultimately certified that the written statement as drafted by the investigators was accurate, never taking issue with the language about 'no one was coerced.'" *Id.* McLean also reviewed the audio tapes and determined it was "clear" that the "the Investigators were in consensus about what they heard." *Id.* So, he deferred to the findings of the Hearing Board on the credibility issue. *Id.*

35

Finally, for the manifestly contrary to evidence claims, McLean deferred to the Hearing

Board.  *Id.*  For the issue about credibility, McLean wrote:  "The Appeals Officer cannot reverse

a finding a credibility if there is any supporting evidence for the Hearing Board's finding in the

record and audio recording of the hearing.  There is supporting evidence in both the Final

Investigation Report and audio tape, so the Respondent/Appellant's argument regarding

credibility must fail."  *Id.*  For the consent claim, McLean reviewed Doe's instances that he

alleged were evidence of consent, and concluded that "[e]ach of these examples fails to

appreciate what 'consent' is, as defined by the Community Standards."  *Id.*

The Decision Letter ended as it began, affirming the Hearing Board's finding:  "**For the

reasons cited above, the Hearing Board decision is affirmed and upheld in full.**"  *Id.* (bold in

original).  It then restated the charges, the finding of the Hearing Board, and the sanction of

expulsion.  *Id.*

## XI.    The Lawsuit

After Loyola denied Doe's appeal, Doe filed a complaint against Loyola.  *See* Cplt.

(Dckt. No. 1).  He soon amended the complaint.  *See* Am. Cplt. (Dckt. No. 19).

Doe's amended complaint included four counts:  (1) Title IX, (2) breach of contract,

(3) estoppel and reliance, and (4) negligent infliction of emotional distress.  *Id.*  In August 2019,

Judge Feinerman (this Court's predecessor before reassignment) dismissed the claim of negligent

infliction of emotional distress.  *See* 8/13/19 Order (Dckt. No. 47); Mem. Opin. & Order (Dckt.

No. 48).  The other three counts remain.

After discovery, the parties each moved for summary judgment.  Doe moved for partial

summary judgment on the breach of contract claim.  *See* Pl.'s Mtn. for Partial Summ. J. (Dckt.

No. 126); Pl.'s Mem. in Support of Mtn. for Partial Summ. J. (Dckt. No. 127).  Loyola moved

for summary judgment on all three remaining claims.  *See* Def.'s Mtn. for Summ. J. (Dckt.

No. 130); Def.'s Mem. in Support of Mtn. for Summ. J. (Dckt. No. 131).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  *See* Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no

genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive summary judgment, the opposing party must go beyond the pleadings and identify

specific facts showing the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving

him the benefit of all reasonable inferences.  *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th

Cir. 2016).  The Court does not weigh the evidence, judge credibility, or determine the truth of

the matter, but rather determines only whether a genuine issue of triable fact exists.  *See Nat'l*

*Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).  Summary

judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in

favor of the non-movant.  *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*,

674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

The parties filed cross motions for summary judgment.  Doe moved for summary

judgment on the breach of contract claim (Count II).  Loyola moved for summary judgment on

all three counts:  sex discrimination under Title IX (Count I), breach of contract (Count II), and estoppel and reliance (Count III).

During the briefing, the promissory estoppel claim (Count III) fell by the wayside. Promissory estoppel is a cause of action in "the absence of any mutual agreement by the parties on all the essential terms of a contract."  *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 329 Ill. Dec. 322, 906 N.E.2d 520, 526 (2009) (cleaned up).  That is, it applies when the parties don't have a contract.

In its summary judgment brief, Loyola conceded that "the Community Standards created a contract between the parties."  *See* Def.'s Mem. in Support of Summ. J., at 29 (Dckt. No. 131). In response, Doe agreed to drop the promissory estoppel claim "[b]ecause Loyola does not contest that the parties have a binding contract."  *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 36 n.21 (Dckt. No. 157).  Loyola's motion for summary judgment on Count III is granted.

Only two counts remain:  the Title IX claim, and the breach of contract claim.  The Court will analyze each claim in turn.

## I. Title IX

Doe argues that Loyola violated Title IX because it expelled him through a process that intentionally favored women over men (and specifically favored his female accuser over him). *See* Am. Cplt., at ¶ 173 (Dckt. No. 19); Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 23–36 (Dckt. No. 157).

Before diving into the argument, one salient point stands out.  Doe faced two disciplinary proceedings, based on accusations by two women:  Roe and Elizabeth.  Doe won one, and lost one.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 53 (Dckt. No. 158).  Doe has a hard time arguing that the deck is stacked against him, because he won one of the two hands.

And even then, the Board did not side with Roe on everything. Roe's complaint involved three encounters. The Board sided with Roe on two of them, and sided with Doe on one of them. *Id.* at ¶ 95. He won some, he lost some.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *See* 20 U.S.C. § 1681(a). "The Supreme Court has interpreted Title IX to provide individual plaintiffs with an implied private right of action to pursue claims of gender discrimination in federal court and has recognized a number of claims that constitute discrimination." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019).

To prove a Title IX violation, a plaintiff must show that "(1) the educational institution received federal funding, (2) the plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against the plaintiff based on gender." *Johnson v. Marian Univ.*, 829 F. App'x 731, 732 (7th Cir. 2020) (citing *Columbia Coll. Chicago*, 933 F.3d at 854).

Only the third element is at issue here. When it comes to evidence of discrimination in this area, the Seventh Circuit has steered clear of overly complicated formulas for getting to the bottom line. The question is simple. The "test" is simply "whether [the university] discriminated against [the student] 'on the basis of his sex.'" *Id.* (citation omitted).

Doe offered a few different types of evidence that Loyola discriminated against him. Some of the evidence is about Loyola's handling of sexual assault cases in general. And some of the evidence is about how Loyola handled his particular case.

39

Doe's evidence about sexual assault cases in general comes in two varieties. Doe provided evidence of outside pressure on Loyola to discriminate against men in sexual assault cases. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 23–25 (Dckt. No. 157). He also presented data from Loyola's other sexual misconduct cases, arguing that Loyola's handling of other cases supports an inference of gender bias in this case. *Id.* at 35–36.

Evidence about the handling of sexual misconduct cases in general "can be relevant" when deciding whether a university mistreated someone on the basis of sex. *See Johnson*, 829 F. App'x at 732. A track record of mistreating a group can inform whether a university mistreated a member of the group.

Relevancy is one thing; sufficiency is another. To prove a claim, a plaintiff needs to offer something more than evidence about the handling of sexual misconduct cases generally. That is, "a plaintiff cannot rely on such generalized information alone; he must combine it with facts creating an inference that, in *his specific case*, the institution treated him differently because of his sex." *Id.* (emphasis in original).

Evidence about Loyola's handling of Doe's specific case matters most. *Id.* He needs evidence of mistreatment in his particular case to get over the summary judgment hump and land at trial.

To that end, Doe offered evidence about how Loyola treated him in this particular case. He makes quite a few arguments about his investigation, hearing, and appeal. *Id.* at 25–35.

Doe focuses on four categories of evidence. First, he argues that the Hearing Board made an inexplicable and unsupportable credibility determination. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 25–30 (Dckt. No. 157). Second, he argues that Loyola discriminated against him by interviewing Roe's female witness, but failing to interview his male witnesses. *Id.* at 30–31.

40

Third, he contends that the Board displayed hostility toward him at the hearing, which suggests bias. *Id.* at 31–32. Fourth, he argues that Loyola ignored substantive procedural errors that skewed the process against him. *Id.* at 32–35.

There's a lot there. But at the end of the day, there isn't much there.

## A.      The Credibility Determination

Doe devotes most of his argument to challenging the Board's credibility determination. *Id.* at 25–30. He tries to fit this case within *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019), which involved a disciplinary proceeding where the university accepted the accuser's story without even talking with her. *See Purdue*, 928 F.3d at 669.

That's a difficult starting point for Doe, to put it mildly. Loyola talked with both Doe and Roe, repeatedly. The university gave each of them an opportunity to be heard, and then heard again. Each of them talked with the investigators. Each of them attended the hearing. Each of them got to speak their piece, and had a chance to hear what the other person had to say.

Even so, Doe tries to shoehorn this case into that framework, arguing that the Hearing Board's decision was "just as perplexing." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 25 (Dckt. No. 157).

At bottom, Doe takes issue with the Board's conclusion that Roe was more believable. He runs through six reasons why Loyola's determination made no sense. In his view, the decision was so nonsensical that it must be a sign of sex discrimination. *Id.* at 26–30.

### 1.      The Interview Summary

Doe opens with a weak argument. Doe takes issue with the suggestion in Loyola's summary judgment brief that he "certified" the interview summary prepared by the investigator. *Id.* at 26.

41

The argument is flavored with semantics, quibbling about what "certified" means. According to Doe, the investigator asked him to review and comment on the interview summary, but Doe never "certified" it. *Id.* ("John was not asked to and did not 'certify' Watland's interview summary; Watland only asked him to confirm that it 'accurately reflects your perspective from the interview.'").

Fair enough. Nothing rests on whether the interview summary was certified, as opposed to "confirm[ed]." Nothing rides on the difference between certifying something and confirming something.

Putting semantics aside, the record cannot support a finding of discrimination when it came to the interview summaries. The investigators talked with both Doe and Roe, and gave each of them an opportunity to review and comment on the summaries before sending the final report to the Hearing Board.

If anything, the treatment of Doe and Roe was remarkably similar. The investigators asked nearly identical questions to each of them.

In his email to Doe about the summary, Watland asked Doe to "[p]lease review the attached summaries and confirm with us by 1:00pm on Friday, December 9, 2016, that this accurately represents your perspective from the interview." *See* 12/8/16 Email (Dckt. No. 135-6, at 69 of 81). After Doe responded with one edit, Watland responded that he made the change and asked Doe to "review and return to [him] today." *See* 12/9/16 Email (Dckt. No. 135-6, at 68 of 81).

The exchange with Roe was almost a carbon copy. In her email to Roe about her summary, Tennison asked Roe to "[p]lease review the attached summary and confirm with us by 9:00am on Friday, December 9, 2016, that this accurately represents your perspective from the

interview." *See* 12/7/16 Email (Dckt. No. 135-6, at 65 of 81).  After Roe responded with a list of corrections, Tennison emailed that she had made the changes and asked her to "[p]lease review again and provide your feedback or certify that the summary is accurate as written."  *See* 12/8/16 Email (Dckt. No. 135-6, at 63 of 81).

The Court fails to see any material difference in how the investigators treated Doe and Roe on this point.  The investigators provided a copy of the summaries to Doe and Roe, respectively, and asked each of them to "review" and "confirm" the contents.  Then, after each provided feedback, Doe and Roe were offered a second review.  The words weren't identical (*i.e.*, "review and return" versus "review again and provide your feedback or certify"), but they didn't need to be.  And in any event, they were pretty close.

The simple reality is that the investigators afforded both Doe and Roe a chance to review and comment on the summaries.  And then they gave both Doe and Roe a chance to view it again, one last time.

There is no discernible material difference, in style or substance, between the two emails.  And even if there was, the record includes no reason to think that the difference had anything to do with the sex of the two participants.  If anything, it looks even handed.

### 2.      The Destruction of the Recordings

Doe next argues that Loyola failed to preserve the audio recording of his interview.  *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 26 (Dckt. No. 157).  He views the lack of preservation as a sign of discrimination.

The Community Standards offer some guidance on how to deal with the interview recordings.  Basically, the recordings did not *need* to be retained, but the university *could* retain them.  "The University reserves the right to audio record each individual interview collected

43

during meetings for the sole purpose of preparing the Final Investigation Report. These audio recordings will not be shared beyond the Investigators. The recordings are not retained as part of an educational record. Audio recordings may be retained as needed at the discretion of the University." *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16).

Doe's theory of discrimination does not get very far before he hits a roadblock. Loyola did not keep *any* of the recordings at issue. That is, Loyola didn't preserve the recordings for Doe, Roe, or Witness #1. *See* Audio Recordings Table (Dckt. No. 135-24, at 13 of 30) (listing "None" under "Recordings Preserved" for case no. 1162-2016). It is not as if Loyola destroyed Doe's recording but kept Roe's recording. Loyola got rid of them all.

By all appearances, Loyola took an even-handed approach, and treated both Doe and Roe the same. It is hard to see how Loyola could have treated Doe differently on the basis of sex if it treated Doe and Roe the same.

In theory, it is possible that the university could have destroyed all of the recordings in an effort to help Roe. Imagine, for the sake of argument, a world in which Doe was the world's best witness, and Roe was the world's worst witness. Imagine if Roe had said a bunch of incriminating statements that undermined her story. And imagine if the university wanted to sweep it all under the rug to help Roe and hurt Doe. In that scenario, destroying all of the recordings could help Roe, and hurt Doe, because the recordings could have shed light on who was telling the truth.

But here, there is no such evidence. Nothing in the record supports the notion that the destruction of the recordings was anything other than a neutral, even-handed practice. One can imagine a different scenario, but on this record, it is only a creature of one's imagination. There is no evidence of any shenanigans when it comes to the recordings.

Doe contends that Loyola's destruction of the recordings was out of the ordinary. Doe writes that "of the eight cases (including John's cases) in 2016 and 2017 where Loyola preserved audio recordings of interviews, *Loyola preserved the respondent's interview audio recording in every case except one: John's interview*." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 26–27 (Dckt. No. 157) (emphasis in original).

The record does not support those numbers. Based on the record, Loyola did not preserve interviews in 11 of 19 cases between 2016–2017. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 120 (Dckt. No. 158). So, Doe's case was well within the mainstream. And even if this case departed from the fold, there is no reason to think that any departure had anything to do with discrimination.

Even if Loyola should have saved Doe's recording, there is no evidence to suggest that Loyola deleted it because of his sex. There is no evidence that Doe's sex had anything to do with the destruction of the recordings.

Doe argues that the recording "would have confirmed [Doe's] account." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 27 (Dckt. No. 157). Maybe so. Maybe the recording would have supported Doe's position. But the loss of potentially helpful evidence is not evidence of discrimination unless there is some reason to think that the loss was motivated by the sex of Doe and Roe. And here, there is no such evidence.

One other point deserves mention. At the hearing, the Board gave both Doe and Roe "uninterrupted time for anything you'd like to say." *See* Hearing Transcript, at 7:16-17 (Dckt. No. 135-1); *see also id.* at 9:25 – 10:3 ("[T]oday is a chance for you to share your perspective, to respond to questions and give us any other additional information you would like the Board to consider.").

45

And in fact, at the hearing, Doe addressed the most hotly contested part of the Final Investigation Report – the statement that Doe and Roe agreed that no one was coerced. *Id.* at 93:12 – 95:1. He told the Board that the investigators misunderstood him, and the Board then asked the investigators for clarification. *Id.* at 95:2-5. Doe received another chance to explain himself. *Id.* at 96:6-16.

In sum, maybe the recording no longer existed. But Doe could, and did, speak for himself. It is hard to see how Doe was railroaded when he had the opportunity to speak and be heard.

True, it is possible that the recordings may have helped Doe's cause. The Board made a credibility determination against Doe, based on an inconsistency between what Doe had told the investigators and what Doe was saying at the hearing. Basically, according to the investigators, Doe said that he and Roe "mutually agreed that no one was coerced." But Doe denied saying any such thing. And the Board held that inconsistency against him. *See* 12/20/16 Decision Letter, at 3 (Dckt. No. 135-11, at 4 of 10) ("As such, Respondent's inconsistency around this topic in particular holds significant weight.").

If the recordings still existed, maybe the Board could have listened to them to determine whether Doe was, in fact, consistent. *But see* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16) (stating that the purpose of the recordings is to help the investigators prepare the Final Investigation Report, without suggesting that the Board can or will hear them). It is possible that the recordings could have helped Doe. But again, the question is not whether the recordings might have helped Doe. The question is whether there is evidence that Loyola failed to preserve them for discriminatory reasons. And here, there isn't.

### 3.    Investigator's Summary

Doe argues that Loyola expelled him "based solely on a rushed and inexperienced investigator's erroneous summary."  *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 26 (Dckt. No. 157).  Specifically, Doe faults Loyola for his failure to notice a supposed error in the Final Investigation Report.

The alleged error involves the following statement in the Final Investigation Report: "They mutually agreed that they had moved fast physically and 'that no one was coerced.'" *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 158) (emphasis added); *see also* Final Investigation Report, at 10 (Dckt. No. 128-4, at 30 of 41); Final Investigation Report, at 10 (Dckt. No. 135-6, at 30 of 81).

That statement has some ambiguity.  The question is whether the agreement applies to both parts, or only the first one.  According to Doe, it reads like Doe and Roe (1) *agreed* that they went too fast; *and* (2) *agreed* that no one was coerced.  In reality, according to Doe, the agreement covered only the first part.  Doe claims that he said that (1) Doe and Roe agreed that they went too fast, and (2) no one was coerced.

According to Doe, he told the investigators that no one was coerced, and that both Doe and Roe had expressed regret about going so fast.  But Doe says that he never told the investigators that Doe and Roe discussed coercion.  According to him, coercion wasn't a topic of conversation with Roe at all.  Doe simply told the investigators that no one was coerced, *not* that Doe and Roe *talked* about coercion and agreed that there was none.

Doe doesn't have much of a leg to stand on when it comes to any error in the investigator's summary.  Doe had not one, not two, but three chances to review the summary of his interview in the Final Investigation Report before the hearing.

47

An investigator emailed Doe on December 2. *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 24 (Dckt. No. 171). The investigator sent Doe a draft of the Final Investigation Report on December 8, and invited any comments or corrections. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 158); *see also* 12/8/16 Email (Dckt. No. 135-6, at 69 of 81).

Doe responded on December 9 and made one correction. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 158); *see also* 12/9/16 Email (Dckt. No. 135-6, at 69 of 81). He otherwise "confirm[ed] that these accurately represent my perspective from the interviews." *Id.*

The investigator changed the draft and sent the updated version to Doe later that day. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 37 (quoting 12/9/16 Email). He invited any additional changes or corrections. *Id.*; *see also* 12/9/16 Emails (Dckt. No. 135-6, at 68 of 81). Doe made a few other changes, but he did not change the paragraph with his statement "that no one was coerced." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 158). Doe received the Final Investigation Report on December 12 for his review. *Id.* at ¶¶ 31, 48. The hearing took place on December 14, two days later. *Id.*

Doe did not correct that sentence, despite repeated opportunities. Doe now explains that the "investigator's error was not obvious to John on his initial review." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 27 (Dckt. No. 157). Fair enough. If there was a mistake, Doe didn't catch it either.

The phraseology in the summary cannot give rise to an inference of discrimination. The record shows that the investigator reached out to Doe repeatedly, and gave him every

48

opportunity to get things right. Maybe the language was not perfect, but it wasn't discriminatory, either.

More generally, the pace of the investigation cannot support a finding of discrimination. The investigators gave Doe and Roe the same amount of time to respond. There is no evidence that Doe received less of an opportunity to review the summary than Roe. Once again, things look even handed.

### 4.    More Lenient Standards for Roe

Doe argues that "Loyola did not hold [Roe] to the same exacting standards as" him. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 27 (Dckt. No. 157). That is, he contends that the Hearing Board ignored inconsistencies in Roe's story, but zeroed in on one supposed inconsistency in his story.

Doe offers a few examples. First, he notes that Roe changed a detail in Witness #1's statement, and the Hearing Board assumed that the witness, not Roe, was mistaken. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 71 (Dckt. No. 158); 12/16/20 Decision Letter (Dckt. No. 135-11). But when the Board perceived an inconsistency in Doe's story, the Board assumed that he was wrong. *See* 12/16/20 Decision Letter, at 2–3 (Dckt. No. 135-11, at 3–4). So, Doe basically thinks that the Board was predisposed to believe Roe and disbelieve Doe.

Those examples aren't exactly the same. The Hearing Board discredited Doe because (in their view) he contradicted himself, but, in this instance, Roe contradicted a witness. One is a self-contradiction, and the other is an inconsistency between two witnesses. A factfinder could conclude that a witness who does not contradict herself is more credible than a witness who does contradict himself.

49

More generally, the Board was not compelled to find Doe more believable than Roe, even if she had contradicted herself. *Cf. McFlower v. Jaimet*, 349 F.3d 436, 454 (7th Cir. 2003) ("Inconsistencies in a witness's testimony are not unusual either, and normally these are left for the factfinder to assess."). The Board could have found Roe more credible that Doe, even if Roe hypothetically was not perfectly consistent.

Maybe, for the sake of argument, the Hearing Board botched the credibility determination. Maybe, just maybe, Doe was more credible than Roe, but the Hearing Board reached the opposite conclusion. Fact finders sometimes do that – it comes with the territory. The record does not support the conclusion that there was anything nefarious about the Board's credibility determination. A mistaken credibility determination, without more, is not evidence of discrimination.

Needless to say, this Court does not sit in judgment over the Board when it comes to credibility determinations. *See Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 99 (D. Mass. 2021) ("[W]hether a different factfinder would assess [Roe's] credibility differently is not a relevant line of inquiry."). The Board had a front row seat at that hearing, and this Court didn't even have a seat at the table. This Court's role is simply to survey the record and decide whether there is any evidence of discrimination. And when it comes to the credibility determinations, there isn't. On this record, the credibility determinations were within the field of play.

Second, Doe points out that Roe consistently called the first and third encounters with Doe "the same," but the Board determined the first encounter was nonconsensual and the third was consensual. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 10, 95 (Dckt. No. 158).

It is true that Roe called the first and third encounters with Doe "the same," but the Board only decided that only the first one was nonconsensual. *Id.* That reality does not get Doe very far when it comes to discrimination.

Again, this Court's job is not to second guess the findings of the Hearing Board. The fact that the Board disagreed with Roe in one part of her story is not evidence of discrimination against Doe.

If anything, it cuts the other way. The Board was listening, thinking critically, and weighing the evidence. Sometimes the scales tilted in Roe's direction, but not always.

### 5. New Justifications

Doe argues that Loyola is now trying to "bolster the Board's credibility determination with new justifications, arguing that the Board's 'rationale' did not need to include all of the Board's grounds, or even all the significant ones." *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 29 (Dckt. No. 157). The argument seems to be that Loyola is coming up with after-the-fact justifications for the Board's decision. Doe then offers a long paragraph and turns on a firehose of reasons.

Doe calls into question a statement by Landis (the Chair), and a statement by Houze (another Board member). Suffice it to say that neither statement is evidence of general bias.

Imagine if Doe is right, and Loyola is now trying to bolster the Board's decision with new justifications. That's not a reason to conclude that the Board's decision was discriminatory. To get to a jury, Doe needs to come forward with evidence that the Board discriminated against him. Taking aim at new arguments by Loyola is taking one's eye off the ball.

### 6. Not Weighing the Evidence

Finally, Doe argues that Loyola did not actually weigh the evidence. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 29 (Dckt. No. 157). The argument is conclusory. In the end, the argument is little more than an expression of disagreement with the Board's decision.

### B. The Failure to Interview Doe's Witnesses

The next category is about the witnesses. Doe argues that Loyola failed to interview his two witnesses, even though he disclosed them to the investigators. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 30–31 (Dckt. No. 157). He views the failure to interview those witnesses as evidence of discrimination. *Id.* at 31.

A refusal to hear evidence from one side can support an inference of discrimination. *See Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) ("[Purdue] refused to hear from John's witnesses, including his male roommate who maintained that he was in the room at the time of the alleged assault and that Jane's rendition of events was false."); *see also Doe v. Columbia Univ.*, 831 F.3d 46, 56 n.10 (2d Cir. 2016) ("[W]hile a factfinder might ultimately determine that [an alternate explanation] was the true reason for not seeking out and interviewing these witnesses, it is also plausible that the failure to seek them out was attributable to discrimination . . . ."). An even-handed approach requires listening to both sides.

But a failure to talk to particular witnesses is not necessarily discriminatory. It depends on the facts. And here, this Court directed supplemental submissions from the parties to tighten the record about why the investigators talked to some witnesses but not others. *See* 9/1/22 Order (Dckt. No. 177). The parties submitted additional briefs, and gave helpful answers. *See* Def.'s Supplement Summary Judgment Submission, at 3 (Dckt. No. 178); Pl.'s Supplemental Summary Judgment Submission in Response to Court's Questions, at 3 (Dckt. No. 179).

The starting point is Loyola's Community Standards, which require interviews with relevant witnesses. "Investigators will . . . interview complainant(s), respondent(s), and relevant witnesses that can provide a firsthand account of something seen, heard, or experienced relating to the alleged incident." *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 44 (Dckt. No. 158).

The investigators did interview Roe's roommate and best friend, Witness #1, who is a woman. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 40. The interview took place on December 7, 2016, a few days after the interviews of Roe and Doe. *See* Final Investigation Report, at 3 (Dckt. No. 135-6).

The Final Investigation Report includes a detailed summary of statements by Witness #1. On the night of the first sexual encounter, Roe told Witness #1 what had happened. *See* Final Investigation Report, at 13–14 (Dckt. No. 135-6). The summary was granular and graphic, including details about the removal of clothing and the acts that followed. *Id.* She had detailed knowledge about later interactions, too, including Roe crying after the third encounter. *Id.* at 7.

Doe offered the names of two potential male witnesses, his roommate (C.R.) and a friend (W.T.). *Id.* at ¶ 42. But the investigators never interviewed them. *Id.* at ¶ 43. According to Doe, Loyola's decision to interview Roe's female witness but not his two male witnesses is proof of sex discrimination.

The record confirms that Doe gave the investigators the names of the two witnesses. But as it turns out, there is no evidence that he asked the investigators to interview them. Doe testified: "I provided the interviewers with names of witnesses. I do not recall if I definitively asked them to interview them." *See* Doe Dep., at 224:22-24 (Dckt. No. 136-43); *see also id.* at 224:3-4 ("I didn't know I would have to ask them if I presented them with witnesses."). He did

not submit written statements from them at the hearing because he assumed that the investigators would talk with his witnesses. *Id.* at 225:6 – 226:4; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 102 (Dckt. No. 158).

At deposition, Doe initially testified that he gave the investigators the names of "crucial" witnesses. *See* Doe Dep., at 224:7-10 (Dckt. No. 136-43). But he soon walked it back, explaining that he isn't sure that he ever characterized the witnesses as crucial when talking with the investigators. *Id.* at 224:14-15.

The record includes testimony from the investigators about why they did not interview Doe's two witnesses. Watland could not recall why they did not interview W.T. "I don't recall a specific thought process around that. I mean, I know we didn't interview W.T., but I don't remember the thought process behind that." *See* Watland Dep., at 108:6-8 (Dckt. No. 136-47); *see also id.* at 109:3-5 ("I don't recall any requests for him to be a witness. And I don't – I don't recall believing that he had any direct information about what had occurred.").

Watland offered more details in a declaration. "John mentioned two roommates during his interview but did not state during his interview that either of the roommates observed his sexual encounters with Jane. Instead, he reported that Jane met both of his roommates in John's room *before* Jane and John went into John's bedroom on January 13, 2016. John told us that W.T. observed John and Jane in Jane's residence hall the night after the January 13, 2016 sexual encounter. John did not report that he told his roommates or W.T. about what happened during John's sexual encounter with Jane on January 13, 2016 or any other day." *See* Watland Dec., at ¶ 4 (Dckt. No. 136-40) (emphasis added).

Tennison also testified about the decision not to interview W.T. Apparently, Doe and Roe walked to campus after their first sexual encounter and went to W.T.'s dorm room. *See*

54

Tennison Dep., at 163:15 – 164:10 (Dckt. No. 136-46).  Before long, Roe said that she was tired and wanted to go back to her room.  (And Doe kept asking her – in front of W.T. – *why* she was tired.)

When asked why he didn't interview W.T., Tennison testified:  "I don't think – as I described witnesses earlier, I don't think there is discrepancy here that WT would help animate." *Id.* at 165:15-17; *see also id.* at 166:12-14 ("[I]t did not appear that WT would have anything to add to the story that we didn't already know.  There was no point in discrepancy here.").

Tennison testified that they "interviewed everybody that we deemed necessary to produce the report." *Id.* at 176:13-14.  But he could not recall any conversations about the possibility of interviewing W.T. *Id.* at 177:5-7.

The record sheds a little bit more light about why they did not do any more interviews. On November 30, 2016, before interviewing Doe and Roe, Tennison sent an email to Love about their time pressures, including possible delays if they had to schedule witness interviews.  "I should also mention that our working assumption is that we will not have to schedule additional interviews with witnesses, which would obviously delay our timeline and completion of the FIRs [Final Investigation Reports]." *See* 11/30/16 Email (Dckt. No. 135-19).

On December 2, 2016, Watland left a voicemail for Love, asking for his two cents about whether it made sense to interview anyone else.  "[W]e had met with our on-campus complainant yesterday.  And I wanted to talk through whether or not you thought some of the other students that were somewhat aware of some of the issues would be appropriate to contact as witnesses, to get some insight from you." *See* Voicemail (Dckt. No. 164-91, at 3 of 5).

In his appeal, Doe submitted declarations from C.R. and W.T. *See* C.R. Dec. (Dckt. No. 135-22, at 5 of 9); W.T. Dec. (Dckt. No. 135-22, at 6 of 9).  C.R. shared an apartment with Doe,

and he was there when Doe brought Roe to the apartment on the night of the first sexual encounter. *See* C.R. Dec., at ¶ 4. He stated that Doe and Roe went into a bedroom, and stayed there for about an hour. *Id.* at ¶¶ 5–6. He never heard anything like "no," "stop," or anything along those lines. *Id.* at ¶ 7.

W.T. saw Doe and Roe after their first sexual encounter, when Doe brought Roe to W.T.'s dorm room. *See* W.T. Dec. (Dckt. No. 135-22, at 6 of 9). Both Doe and Roe "seemed happy, were friendly with each other and talkative." *Id.* at ¶ 6. The next few times he saw Roe, she "had only positive and affectionate things to say" about Doe. *Id.* at ¶ 7. But she was angry with Doe a few weeks later. *Id.* at ¶ 8.

Overall, W.T. and C.R. seem like "relevant witnesses" as defined by Loyola's Community Standards. Relevant witnesses are people who "can provide a firsthand account of something seen, heard, or experienced relating to the alleged incident." *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16). C.R. saw Doe and Roe before the first encounter, and was in the next room during that encounter. W.T. saw Doe and Roe after the first encounter, when they came to his dorm room.

The demeanor of a person after a critical event can shed light on what happened. In fact, Witness #1 gave a statement that Roe was crying after the third encounter. If the demeanor of Roe after the third encounter is relevant, then the demeanor of Roe after the first encounter seems relevant, too.

Doe also is right that, under the Community Standards, he didn't have to *ask* the investigators to interview witnesses. That was their job. The parties agree that, according to Loyola's procedures, "the interviewers will interview relevant witnesses." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 158).

56

Even so, the question is not whether the investigators should have interviewed the witnesses. The question is whether the failure to do so could give rise to an inference that the university discriminated against Doe.

On this record, the Court holds that no reasonable jury could conclude that the failure to interview the witnesses had anything to do with the fact that Doe was a man. The record shows that the investigators were under time pressure, and they reached out to Love about whether it would make sense to interview any other witnesses. That's not consistent with a discriminatory intent.

Watland and Tennison did not give the world's most illuminating explanation of why they decided not to interview W.T. and C.R. The investigators seemingly believed that those two witnesses would not shed any light. But it is hard to know whether witnesses are important without talking to the witnesses.

Maybe the investigators concluded that the witnesses were unimportant, even without talking to them, because Doe did not give them the sense that they were important. Again, Doe could not remember ever telling the investigators that the witnesses were crucial.

The question is not whether their explanation was fully satisfying. It wasn't. The question is not whether the investigators should have interviewed those witnesses. Or, at the very least, the question is not *simply* that. The question is whether a reasonable jury could find that the investigators decided not to interview Doe's witnesses for discriminatory reasons. And here, the Court concludes that that bridge is a bridge too far.

### C.    Hostility by the Board

Doe's third category is about the tone of the hearing.  Doe argues that the Board displayed hostility toward him, and he views the hostility as evidence of bias.  *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 31–32 (Dckt. No. 157).

Doe offers two examples of hostility.  First, Doe points out that the Board failed to ask some of his questions.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 69–70 (Dckt. No. 158).  At the hearing, Doe spoke up and asked to clarify the record.  He asked:  "Can we get clarification on what, I can't picture it, but I know it happened, means?  Because if you can't picture an act that you're claiming happened, how do you – like how do you know that that's what happened?  Like do you understand what I'm trying to say?"  *Id.* (quoting Hearing Transcript, at 77:10-16 (Dckt. No. 135-1)).

Houze responded:  "I can think of a number of instances where I'm sure that something happened, but I can't picture it, to be straightforward with you."  *Id.* (quoting Hearing Transcript, at 77:17-19).

Doe takes umbrage at that response.  At deposition, Doe testified that he felt that Houze was scowling at him, and chastising him.  *See* Doe Dep., at 122:1 – 123:17 (Dckt. No. 136-42).  Houze had a "furrowed brow, a very I guess cocky attitude."  *Id.* at 123:7-8.  Houze looked at Doe, and at Doe's advisor, "in an extremely hostile manner."  *Id.* at 122:17-19.

Second, Doe offered evidence about the handling of advisors at the hearing.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 67 (Dckt. No. 158).  The Board allowed Roe to speak with her advisor four or five times.  *Id.* (citing Doe Dep., at 80:17 – 81:3 (Dckt. No. 135-42)).  But Doe testified that, when Houze issued a "stern reminder" that advisors should not help the parties, "he was staring directly at [Doe] and [his] advisor."  *Id.* (quoting Doe Dep., at 84:11-12).

According to Doe, that stare suggested that the warning was only directed at him and his advisor. *Id.*

It was important for the Board to handle the hearing in an even-handed way, with fair and respectful treatment of each side. Everyone wants to be treated that way. The Board could not have its thumb on the scale for either side before the process got underway.

Still, even when viewed in a light favorable to Doe, the evidence cannot support the inference that the Board displayed hostility to Doe at the hearing. On this record, a failure to ask Doe's questions cannot support an inference of sex discrimination. Doe points to only one example, and the Board member responded that clarification wasn't necessary.

To be frank, it wasn't the greatest of questions. (In that setting, this Court wouldn't have asked those follow-up questions, either.) Even when viewing the evidence in favor of Doe, there isn't much there.

The atmospherics and tone of the hearing are more difficult to evaluate. A cold written record never conveys the human dynamics of a hearing. People communicate in all sorts of ways that a transcript cannot capture. Anyone who has ever appeared in court, or attended a deposition, knows the limits of a transcript. Written words imperfectly capture humanity.

A speaker's volume, speed, and tone of voice send signals, not to mention the speaker's facial expressions and body language. People say a lot when they are speaking, above and beyond the words that they use. So much happens, and so much is felt, that isn't written down.

Still, the transcript is all there is. After reviewing the transcript, the Court concludes that the Hearing Board conducted the hearing in a professional manner. And more importantly for present purposes, the content of the hearing simply cannot support a finding of hostility toward Doe because of his sex.

### D.    Substantive Procedural Errors

Doe's final category is about substantive procedural errors.  Once again, Doe unleashes an avalanche of arguments, which carries the risk of burying good ones.

One argument deserves special mention.  Khan Harvey met with Roe on January 26, 2016, less than two weeks after the first sexual encounter on January 13.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 11 (Dckt. No. 161).  Khan Harvey wrote a summary of what she heard:  "[Roe] shared that on two separate occasions, [Doe] 'moved too quickly sexually' which made the student uncomfortable.  While *she doesn't believe she was forced or coerced*, she performed oral sex on the accused student and now feels that he is trying to manipulate the situation by accusing her that she'll report that he raped her."  *Id.* (emphasis added).

The parties agree that the investigators and the Hearing Board never heard anything about that statement.  *See* Def.'s Supplement Summary Judgment Submission, at 1 (Dckt. No. 178) ("It is factually correct that the Board never knew about Rabia Khan Harvey's ('Khan Harvey') impressions about what Jane Roe ('Jane') said to Khan Harvey and that the Board did not receive or review Khan Harvey's notes from the January 26, 2016 meeting with Jane."); Pl.'s Supplemental Summary Judgment Submission in Response to Court's Questions, at 1 (Dckt. No. 179); *see also* Love Dep., at 255:14-20 (Dckt. No. 136-46).

It is difficult to understand why the university did not give the investigators and the Board that witness summary.  True, maybe Khan Harvey was simply capturing her impressions of what Roe said, not memorializing her exact words.  For the sake of argument, take that assumption as a given.  Even so, it is hard to understand why Loyola neglected to tell the investigators and the Board about what Khan Harvey had written down about Roe.

After all, Khan Harvey spoke with Roe less than two weeks after the incident. So it was relatively fresh in Roe's memory. And Khan Harvey was one of the first people at the university to talk with Roe about what happened. (Roe talked with her athletic coach first.)

Khan Harvey was not your Average Joe when it came to misconduct of this nature. She was the Deputy Title IX Coordinator, and was responsible for overseeing sexual misconduct cases involving students. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 161). She indirectly supervised Title IX investigators and hearing board officers. *Id.* She was an important person in Loyola's Title IX ecosystem.

So, even if Khan Harvey merely gave her impressions, those impressions had value. That's why she had the job. It was within her wheelhouse, to put it mildly. If her impressions weren't important, one wonders why Loyola put her there.

Still, Loyola's Community Standards didn't entitle Doe to discovery. The standards only required Doe to receive evidence that the Hearing Board considered. *See* 2016–2017 Community Standards § 409.6(c) (Dckt. No. 128-16) ("The complainant(s) and respondent(s) will have at least two (2) days to review the Final Investigation Report and any other relevant information *that will be considered by the board*.") (emphasis added). So, the fact that Doe didn't see the summary did not violate Doe's rights under those standards, because the Board didn't see it either.

Again, when it comes to the Title IX claim, the question is not whether Loyola violated its standards. The question is not whether Loyola should have given the Board more information. And the question is not whether Loyola treated Doe fairly overall. The question is whether sex discrimination was the driving force behind Loyola's failure to share this witness summary with the Board.

Here, there is no such evidence. Maybe, for a witness statement like this, it wouldn't take much. But there needs to be something more than a failure to provide evidence – even if the underlying evidence is as powerful as the witness statement here.

Tim Love, Loyola's Associate Dean of Students and Interim Deputy Title IX Coordinator, prepared this section of the Final Investigation Report. He made the decision to mention Roe's meeting with Khan Harvey, and the decision not to include the substance of that conversation. *See* Def.'s Supplement Summary Judgment Submission, at 1–2 (Dckt. No. 178); Pl.'s Supplemental Summary Judgment Submission in Response to Court's Questions, at 1–2 (Dckt. No. 179).

When asked why he didn't tell the investigators or the Board about the summary, Love testified: "So procedurally, I was just talking about the steps that were taken, not necessarily the substance." *See* Love Dep., at 251:9-10 (Dckt. No. 136-46). He couldn't offer any explanation:

> Q:   Why didn't you put in the final investigation report that Jane had previously said that she didn't believe that she was forced or coerced?
>
> A:   I don't recall.
>
> Q:   Is that a mistake?
>
> A:   I don't – I don't recall.
>
> Q:   Do you agree with me that it would be relevant for the hearing officers to hear that Jane, on a previous occasion, said that she didn't believe she was forced and coerced in connection with the same encounters that are at issue in Jane's claim in this case?
>
> A:   Again, it really depends on the details of the case. The investigation did explore her feelings of being uncertain on how – what to make – how to make sense of the incident that she experienced that was I believe referenced in other materials.

*Id.* at 254:6-22. Importantly, Love testified that he did not make a conscious decision to withhold that information from the investigators and the Board:

> Q:     Sir, did you make a conscious choice not to include the statement that Jane made to Rabia Kahn Harvey, as Rabia Khan Harvey reports, that: Jane doesn't believe she was forced or coerced? Did you make a conscious choice not to put that in the FIR?
>
> A:     No.

*Id.* at 254:24 – 255:6.

Love couldn't give much of an explanation for his failure to share potentially explosive evidence about a statement from the accuser. The question, then, is what to do about the lack of an explanation. There is something to be said for the argument that this evidence is so powerful that withholding it seems difficult to explain in a good way.

But at the end of the day, the burden rests on Doe. It isn't enough for him to show that the investigators and the Board lacked evidence that they should have received. He needed to come forward with evidence that they did not have Khan Harvey's write-up because of a discriminatory animus.

That inferential leap isn't far away. But here, it is beyond the reach of the evidence. Doe needed more to bridge the gap, and he didn't quite get there.

Love's failure to share Doe's statement with the investigators, the Board, and Doe seems, well, lousy. If accused of something, any of us would want to know what the accuser had said early on, especially if it seemed inconsistent with what he or she said when it counted at a later hearing. Everyone recognizes the value of a prior inconsistent statement. Withholding that information seems unfair.

But fairness, writ large, is not the yardstick. The question is not whether the university followed fair procedures, or gave Doe a fair chance to challenge the veracity of Roe's account. The standard is whether the failure to share that information was intentionally discriminatory, not whether it was unfair. *See Hayden ex rel. A.H. v. Greensburg Comm. Sch. Corp.*, 743 F.3d 569,

583 (7th Cir. 2014) ("The discrimination must also be intentional in order to support a claim for damages under Title IX."); *Doe v. Marian Univ.*, 2019 WL 7370404, at *9 (E.D. Wis. 2019) ("Merely demonstrating a discriminating outcome falls short of demonstrating a discriminatory intent."). Something can be unfair, but not discriminatory. Doe needed to come forward with evidence of discrimination, and he didn't quite get there.

True, at some point, the unfairness of a hearing could become so great that it gives rise to an inference of discrimination. At some point, if an accused is getting railroaded, it could support an inference that an illicit purpose drove the unfairness. Repeatedly getting the short end of the stick can give rise to an inference of discrimination. A jury could connect the dots if there are enough dots to form a picture of discrimination. But that's not this case.

Doe piles on with a few more arguments, suggesting that Loyola provided him with deficient and misleading information about the charges and his rights, and gave him an incorrect version of the Final Investigation Report for him to review two days before the hearing. *See* Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 33–34 (Dckt. No. 157). After surveying the record, the Court sees no support for a potential finding of discriminatory animus.

\* \* \*

Doe provided the Court pages and pages of arguments and documents. But he failed to come forward with enough evidence to support a finding of sex discrimination by a reasonable jury. His evidence might show mistakes by Loyola, or misjudgment by the Board. But it did not paint a picture of discrimination on the basis of sex.

Accordingly, the Court doesn't need to consider the more general evidence Doe provides (meaning, the evidence about outside influences and Loyola's sexual assault case statistics). Those buckets only become relevant when he has "combine[d] [them] with facts creating an

64

inference that, in *his specific case*, the institution treated him differently because of his sex." *See Johnson*, 829 F. App'x at 732.

In the end, Doe failed to provide evidence that Loyola treated him differently because of his sex. Loyola's motion for summary judgment on the Title IX claim (Count I) is granted.

## II.    Breach of Contract

The second claim is breach of contract. The parties agreed that "the Community Standards created a contract between the parties." *See* Def.'s Mem. in Support of Summ. J., at 29 (Dckt. No. 131). Doe argues that Loyola breached the contract by failing to comply with its policies about disciplinary proceedings. *See* Am. Cplt., at ¶¶ 215–18 (Dckt. No. 19); Def.'s Mem. in Support of Partial Summ. J., at 9–15 (Dckt. No. 160); Pl.'s Resp. to Def.'s Mtn. for Summ. J., at 36 (Dckt. No. 157).

Both parties moved for summary judgment on this claim. The parties devote a significant portion of the real estate in their briefs to the standard for a breach of contract claim in the context of a student disciplinary proceeding. The Court will pin down the applicable standard, and then will apply it to the facts. In the end, there is no evidence of a breach.

### A.    The Standard

The parties agree that Loyola can expel students for violating the Community Standards. But they disagree about the amount of deference that Loyola should receive when it expels a student.

Loyola argues that it deserves deference when it makes decisions about student discipline. *See* Def.'s Resp. to Pl.'s Mtn. for Partial Summ. J., at 2 (Dckt. No. 160). And because of that deference, Doe should face a heightened burden to prove a breach of contract. That is, according to Loyola, Doe must "show that Loyola's dismissal decision was 'without any

65

discernable rational basis.'" *Id.* (quoting *DiPerna v. Chicago Sch. of Prof. Psych.*, 893 F.3d 1001, 1007 (7th Cir. 2018)).

In contrast, Doe argues that a heightened burden does not apply. *See* Pl.'s Mem. in Support of Partial Summ. J., at 14 (Dckt. No. 127); Pl.'s Reply in Support of Mtn. for Partial Summ. J., at 3 (Dckt. No. 168). According to Doe, "courts typically defer to a university's academic judgments, but that deference does not apply when 'academic judgment had nothing to do with [plaintiff's] dismissal.'" *See* Pl.'s Mem. in Support of Partial Summ. J., at 14 n.11 (quoting *Bosch v. NorthShore Univ. Health Sys.*, 2019 IL App (1st) 190070, 440 Ill. Dec. 486, 155 N.E.3d 486, 499 (2019)).

Ordinarily, in a breach of contract case, one side does not receive deference (unless the contract says it does) when it comes to a breach. If parties make a deal, and one side allegedly breaks it, a court usually does not put a thumb on the scale in favor of either side.

But when it comes to disciplinary decisions, a deferential standard of review makes sense because the underlying decision is a judgment call. If discretion is baked into the decision, it is hard not to apply a deferential standard, because discretion is an inherent part of the deal. That is, the parties know, going into the contract, that the school would have some discretionary powers.

That rationale might break down when it comes to express procedural rights – say, the right to know the charges, or the right to appear at a hearing and present evidence, and so on. The parties wouldn't expect the university to have discretion to take away procedural protections (unless the school's policy says so).

In the disciplinary setting, universities have to make judgment calls about what to do with particular students. The exercise of judgment in academic affairs comes with a measure of

deference. "Illinois courts have expressed a reluctance to interfere with academic affairs and have held that a student's breach of contract claim must involve decisions that were arbitrary, capricious, or made in bad faith." *Columbia Coll. Chicago*, 933 F.3d at 858.

In *Columbia College*, the Seventh Circuit addressed a Title IX claim brought by a male student. There, as here, the student received disciplinary action from the school based on a finding of sexual misconduct. *Id.* at 854. And there, as here, the student claimed that the university "violated its own policies and procedures by failing to provide him with an impartial investigation and adjudication." *Id.* at 858. He argued that he "was not provided with access to the documents related to his hearing," and that the decision was against the weight of the evidence. *Id.*

The Seventh Circuit applied a deferential standard to the school's disciplinary decision. "Columbia would not be liable even if we find it exercised its academic judgment unwisely; rather it must have disciplined a student without any rational basis." *Id.* In other words, "[t]he burden on Doe is high. To find in his favor we must find that Columbia 'did not exercise its academic judgment at all, instead acting arbitrarily or in bad faith in its treatment of plaintiff.'" *Id.*

The Seventh Circuit followed the same thread in *DiPerna v. Chicago School of Professional Psychology*, 893 F.3d 1001 (7th Cir. 2018). There, the Seventh Circuit reviewed the expulsion of a student accused of plagiarism. *Id.* at 1003. The Court of Appeals reiterated that Illinois "'courts are reluctant to interfere with the academic affairs *and regulation of student conduct* in a private university setting,'" so "breach of contract claims brought by a student against a private college or university are subject to a distinct standard." *Id.* at 1007 (emphasis

added) (quoting *Raethz*, 805 N.E.2d at 699). Notice that the discretion extends beyond academic decisions – it covers the "regulation of student conduct," too. *Id.*

Other courts have applied the same approach, affording deference to schools in the disciplinary setting when the claim involves breach of contract. *See Liu v. Nw. Univ.*, 78 F. Supp. 3d 839, 848 (N.D. Ill. 2015) ("[A] student's breach of contract claim against a private university is treated somewhat differently from a typical breach of contract claim, with Liu required to allege not only a breach but also that Northwestern's conduct was arbitrary, capricious, or in bad faith."); *Raethz v. Aurora Univ.*, 346 Ill. App. 3d 728, 282 Ill. Dec. 77, 805 N.E.2d 696, 700 ("[I]n the student-university context, a student may have a remedy for breach of contract when it is alleged that an adverse academic decision has been made concerning the student but *only* if that decision was made *arbitrarily, capriciously, or in bad faith*.") (emphasis in original).

Doe leans on an Illinois Appellate Court decision, but it offers no support. *See Bosch v. NorthShore University Health System*, 2019 IL App (1st) 190070, 440 Ill. Dec. 486, 155 N.E.3d 486, 499 (2019). The court in *Bosch* evaluated a breach of contract claim involving the expulsion of a student. *Id.* at 491. The plaintiff said that the university fabricated reasons to expel him because they didn't like him. *Id.*

The Illinois court acknowledged the heightened standard for school-expulsion cases: "[S]chool-expulsion cases involving academic decisions stand on a very different footing than garden-variety breach-of-contract actions. That's because courts have long expressed their reluctance to second-guess the decisions of educators on questions of academic performance." *Id.* at 496; *see also id.* ("[W]e will only reverse an educational institution's academic decision if we find it to be arbitrary and capricious or the product of bad faith or malice.").

The court then clarified that "'wholly invented' criticisms" are precisely the sort of evidence that satisfies the heightened standard. *Id.* at 499. "If those claims are not allegations of bad faith, malice, and the absence of any valid professional judgment, it's hard to imagine what allegations *would* suffice." *Id.* (emphasis in original).

*Bosch* doesn't help Doe's cause. If anything, *Bosch* recognized that universities receive deference, and that a higher standard applies when bringing a breach of contract claim about disciplinary proceedings. The language about fabricated evidence did not change the standard. Instead, it applied the standard.

Doe then points to the Seventh Circuit's decision in *Purdue*. But that case involved due process, not breach of contract. *See Purdue Univ.*, 928 F.3d at 663 ("When a right is protected by the Due Process Clause, a state 'may not withdraw [it] on grounds of misconduct absent[] fundamentally fair procedures to determine whether the misconduct has occurred.' Determining what is fundamentally fair is always a context-specific inquiry. Thus, for example, a university has much more flexibility in administering academic standards than its code of conduct.") (citations omitted).

This Court holds that Loyola is entitled to deference on its decision to expel Doe. The question is whether Loyola made the decision to expel Doe "without any discernable rational basis." *DiPerna*, 893 F.3d at 1007. "Or, put another way, the student must show the decision was 'such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" *Id.* (citation omitted). In sum, to bring a breach of contract claim under Illinois law, Doe must show that Loyola acted arbitrarily, capriciously, or in bad faith.

**B.     The Facts**

Doe has a heavy burden, and on this record, he can't carry it.  He makes three arguments, but cannot show a breach.  *See* Pl.'s Mem. in Support of Mtn. for Partial Summ. J., at 9–15 (Dckt. No. 127).

### 1.     Roe's Statement to Khan Harvey

First, Doe argues that Loyola violated the Community Standards by failing to obtain Khan Harvey's write-up saying that Roe "didn't believe she was forced or coerced." *Id.* at 11. As Doe sees it, the investigators had a duty to get their hands on all relevant evidence.  And by failing to obtain that write-up and share it with him, they dropped the ball.

Doe relies on a few procedural rights that students have in disciplinary proceedings.  *See* 2016–2017 Community Standards § 401.4 (Dckt. No. 128-16).  Students have the right to "review all documentation concerning the potential policy violations," and to "refute information provided by witnesses." *Id.*  The investigators also must "[c]oordinate the collection of all relevant information, which may include written statements by the complainant(s), respondent(s), and/or witnesses." *Id.* at § 409.6(b).

Doe argues that Khan Harvey's report contained "relevant information" because it reflected information from Roe about the incidents.  Again (as any reader who has made it this far undoubtedly remembers), Khan Harvey met with Roe in January 2016, and later wrote: "[Roe] shared that on two separate occasions, the [Doe] 'moved too quickly sexually' which made the student uncomfortable.  While *she doesn't believe she was forced or coerced*, she performed oral sex on the accused student and now feels that he is trying to manipulate the situation by accusing her that she'll report that he raped her." *See* Def.'s Resp. to Pl.'s Statement

of Facts, at ¶ 11 (Dckt. No. 161) (emphasis added); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 158).

Love knew about that summary when he wrote the "History of the Case" section of the Final Investigation Report. He wrote that Roe had met with Khan Harvey on January 26, 2016. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 28 (Dckt. No. 161). But he didn't write anything about the substance of their conversation, including whether Roe felt forced or coerced. *Id.* He didn't attach Khan Harvey's summary, either. *Id.* at ¶ 28.

As a result, the investigators and the Board never saw the summary. They never knew what Roe had said to Khan Harvey, and they never heard anything about Khan Harvey's impressions of Roe's statements.[8] *Id.* at ¶ 30.

That omission is not enough to prove a claim. At best, Doe has pointed to important evidence that the investigators and the Board should have received. Doe basically argues that the record was incomplete, and failed to include key information from the accuser.

Fair enough. Even so, that omission is not enough to show that the university's decision was "arbitrary, capricious, or made in bad faith." *Columbia Coll. Chicago*, 933 F.3d at 858. It is a far cry from the situation in *Bosch*, where the university fabricated evidence. *See Bosch*, 2019 155 N.E.3d at 499. The record here cannot support a finding by a reasonable jury that Loyola failed to investigate in good faith.

---

[8] The parties view the write-up differently. Doe believes that Khan Harvey wrote down what Roe said. Loyola believes that Khan Harvey merely wrote down her impressions of what Roe had said. The parties filed cross motions for summary judgment, and for each motion, the Court has to view the evidence in a light favorable to the non-movant. So, for purposes of Doe's motion, the Court has to view the record in a light favorable to Loyola, and vice versa. In the end, whether Khan Harvey captured what Roe had said, or merely wrote down her impressions form the interview, is not material.

### 2. The Recordings

Next, Doe makes an argument about the recordings. As before, part of the argument involves the failure to preserve the recordings. (The university apparently destroyed them at some point after the hearing, but the parties don't say exactly when that happened.)

Doe also argues that the Board should have listened to the recordings before making its decision. And the Board should have given Doe that opportunity, too. *See* Pl.'s Mem. in Support of Mtn. for Partial Summ. J., at 10 (Dckt. No. 127) (arguing that Loyola breached the contract "by (a) failing [to] give John [Doe] access to the audio recording of his interview, and (b) relying on the written summary of John's interview without reviewing the best evidence (*i.e.,* the audio recording) of what John actually said during the interview before concluding that John's statement at the hearing contradicted an 'implied' statement in the FIR"). According to Doe, the recording would have confirmed his side of the story.

But again, there is no evidence that the university destroyed the recordings in bad faith. And at the hearing, the Board did look into whether Doe was inconsistent. The Board requested clarification from the investigators about what Doe had said, and the investigators confirmed the accuracy of their summary.

The Community Standards did not require the Board to go back to the recordings and figure out what, exactly, Doe said. The Community Standards did not impose a "best evidence" rule. In effect, the Board decided that it could rely on the statements from the investigators, without relying on the recordings.

There is no evidence that the Board made that decision in bad faith. In sum, it was not arbitrary and capricious for the Board to rely on the statements of the investigators.

72

If anything, the Community Standards undercut Doe's clam. The standards do not suggest that the Board can hear the recordings if it wants to. Instead, they do the opposite. The standards say that the record recordings are "collected . . . for the sole purpose of *preparing* the Final Investigation Report." *See* 2016–2017 Community Standards § 409.6(b) (Dckt. No. 128-16). And only the investigators will hear the recordings: "The University reserves the right to audio record each individual interview collected during meetings for the sole purpose of preparing the Final Investigation Report. These audio recordings will not be shared beyond the Investigators." *Id.*

Doe relies on a general provision about access to evidence. But there is a more specific provision that addresses the handling of the recordings. The specific wins over the general. "The more specific provision of a contract governs where it arguably conflicts with a more general provision." *See Aeroground, Inc. v. CenterPoint Props. Tr.*, 738 F.3d 810, 813 (7th Cir. 2013); *Grevas v. U.S. Fidelity & Guar. Co.*, 152 Ill. 2d 407, 178 Ill. Dec. 419, 604 N.E.2d 942, 944 (1992) ("Courts and legal scholars have long recognized that, where both a general and a specific provision in a contract address the same subject, the more specific clause controls.").

In sum, Doe lacks evidence that the university breached the contract when it came to the recordings.

### 3. The Appeal

Doe ends with a bootstrap argument. He argues that Loyola breached the Community Standards during the investigation and the hearing (as explained above), and therefore should have granted his appeal. The bootstrap works when the shoe is on the other foot, too. No underlying breach, no wrongful denial of his appeal.

### 4.    Implied Contractual Obligations

Finally, Doe makes a few arguments about implied contractual obligations.  But they cover the same ground – the recordings, the write-up by Khan Harvey, and so on.  There is nothing new, so the Court will not replow old ground.

### Conclusion

For the reasons stated, the Court denies Doe's motion for partial summary judgment and grants Loyola's motion for summary judgment.

Date:  September 28, 2022

Steven C. Seeger
United States District Judge